

MARC P. COOK, ESQ.
Nevada Bar No. 004574
GEORGE P. KELESIS, ESQ.
Nevada Bar No. 00069
JULIE L. SANPEI, ESQ.
Nevada Bar No. 0005479
COOK & KELESIS, LTD.
517 South Ninth Street
Las Vegas, Nevada 89101
Phone:        (702) 737-7702
Fax:           (702) 737-7712
E-mail:       law@bckltd.com
*Attorneys for Plaintiff, LATESHA WATSON*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

LATESHA WATSON,

               Plaintiff,

v.

CITY OF HENDERSON; BRISTOL ELLINGTON; KEVIN ABERNATHY; KENNETH KERBY; DEBRA MARCH; RICHARD DERRICK; RICHARD MCCANN; NICK VASKOV; KRISTINA GILMORE; DOES I through X, inclusive,

               Defendants.

Case No.: 20CV 1761

**COMPLAINT AND JURY DEMAND**

COMES NOW, Plaintiff, LATESHA WATSON (hereinafter "Plaintiff" or "Dr. Watson") by and through counsel, the law firm of COOK & KELESIS, LTD., brings this action pursuant to 42 U.S.C. §1981, §1983, §1985, Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. §2000e, *et seq.* ("Title VII") and related claims for damages permitted by Nevada law.

### Preliminary Statement

1.     This is a civil action for monetary relief arising from injuries Plaintiff sustained as a result of Defendants' systematic discrimination based upon race and gender. During Plaintiff's employment with the City of Henderson, she was subjected to systemic discrimination, undermined, conspired against, harassed, dehumanized, exposed to centuries old bigotry, and experienced back-room retaliation from a city government and its cronies.

2.      Dr. Watson was immensely qualified for her job, with over 19 years experience as a police officer in Texas and a career trajectory and work history demonstrated her ability to be a successful chief of police.

3.      Upon taking her position as Chief of Police, Dr. Watson was quickly the subject of retaliation and discrimination from a "good old boy" network that seemed surprised that she was a black woman – notwithstanding her interviews, photos, and memberships in  the National Organization of Black Law Enforcement Executives (NOBLE) and International Association of Woman Police (IAWP) – and which was unwilling to allow her to perform her duties. Ironically, however, following Dr. Watson's  termination, Defendants continue to follow the policy changes implemented during her tenure.

4.      The City of Henderson, including, but not limited to the City of Henderson Police Department has a long history of unethical, illegal, and civilly culpable conduct and actions as well as hostile conditions.  The Defendants, and each of them, represented to Dr. Watson that she was being hired to help facilitate a cultural change in the police department but instead, sought a figurehead for the perception of change, while undermining any effort to diffuse the culture.

5.      While the City of Henderson and the Defendants gave Dr. Watson a seat at the table, they did not want her to have a voice.  Dr. Watsons's race and gender were the underlying basis for Defendants' discriminatory actions.  However, race is a construct.  As such, statutes, including, but not limited to 42 U.S.C. 1981, 42 U.S.C.1983 and Title VII hold such reprehensible conduct to be violations of federal law.

**Jurisdiction and Venue**

6.      This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1367.  Plaintiff has plead one or more federal questions.  See e.g. 42 U.S.C. §1981, §1983 and §1985, Title VII of the 1964 Civil Rights Act, *amended*, 42 U.S.C. §2000 et. seq.

7.      The acts set forth herein occurred in Henderson, Nevada.

8.      Plaintiff's causes of action arose in Henderson, Nevada.

9.      Venue is appropriate pursuant to 28 U.S.C. §1391(b)(2) because the events, acts and/or omissions giving rise to Plaintiff's claims occurred in the State of Nevada, County of Clark.

10.     Prior to filing this action, Plaintiff timely exhausted her administrative remedies by filing a charge of discrimination with the Nevada Equal Rights Commission (NERC) and the Equal Employment Opportunity Commission (EEOC).  Plaintiff received a right to sue letter dated July 16, 2020.

**Parties**

11.     Plaintiff, Dr. Watson, was the Chief of Police for the Henderson Police Department as defined by NRS 266.530 and was designated an executive officer for the City of Henderson pursuant to 1.090 of the Henderson City Charter.

12.     Defendant, City of Henderson ("City"), is a governmental entity organized and existing under the laws of the State of Nevada, is a political subdivision as defined by NRS Chapter 41 and was the local government employer of members of the Henderson Police Department ("HPD"), a law enforcement department/agency for the City.

13.     Defendant, Bristol Ellington ("Ellington"), is and was the Deputy City Manager for the City of Henderson appointed pursuant to Sec. 3.020 of the Henderson City Charter and is a public officer as defined by NRS 281A.160.

14.     Defendant, Kevin Abernathy ("Abernathy") is and was at all times relevant hereto, a peace officer as defined by NRS 289.010(4) and the President of the Henderson Police Supervisors Association ("HPSA"), an employee organization as defined by NRS 288.040, which acts as the collective bargaining unit for supervisory law enforcement officers of HPD.

15.     Defendant, Kenneth Kerby ("Kerby") is and was at all times relevant hereto, a peace officer as defined by NRS 289.010(4) and the President of the  Henderson Police Officers Association ("HPOA"), an employee organization as defined by NRS §288.040 which acts as the collective bargaining unit for rank and file police officers of HPD.

16.     Defendant Debra March ("March") is and was the Mayor for the City of Henderson as defined by Sec. 3.010 of the Henderson City Charter and is a public officer as defined by NRS 281A.160.

17.     Defendant Richard Derrick ("Derrick") is and was the City Manager for the City of Henderson as defined by Sec. 3.020 of the Henderson City Charter and is a public officer as defined

1  by NRS 281A.160.

2       18.    Defendant Richard McCann ("McCann") is and was at all times relevant hereto, the

3  Nevada Association of Public Safety Officers Executive Director & Chief Labor Representative.

4       19.    Defendant, Nick Vaskov, ("Vaskov") is and was at all times relevant hereto, the City

5  Attorney for the City of Henderson as defined by NRS 266.465 to 266.470 tasked with acting as the

6  legal advisor of the city council and all officers of the city.

7       20.    Defendant, Kristina Gilmore ("Gilmore") is and was at all times relevant hereto, an

8  Assistant City Attorney for the City of Henderson as defined by NRS 266.465 to 266.470 tasked with

9  acting as the legal advisor of the city council and all officers of the city.

10       21.    Each individual Defendant identified herein is included in both their individual and

11  official capacities.

12       22.    The true names or capacities whether individual, corporate, associate or otherwise,

13  of Defendants, DOES I through X are unknown to Plaintiff who, therefore, sue said Defendants by

14  such fictitious names; Plaintiff is informed and believes and thereon allege that each of the

15  Defendants designated herein as DOE are responsible in some manner for the events and happenings

16  referred to and caused damages proximately to Plaintiff as herein alleged and that Plaintiff will ask

17  leave of this Court to amend this Complaint to insert the true names and capacities of DOES I

18  through X when the same have been ascertained and to join such Defendants in this action.  Further,

19  Plaintiff designates all persons unknown claiming any interest in the property as Defendants, DOES

20  I through X, inclusive.

21       23.    The acts performed by agents or employees of Defendant City of Henderson, whether

22  such representatives have been individually named herein as a defendant, or are yet to be identified,

23  were ones which those representatives had the actual and/or apparent authority to perform, may have

24  been within the scope of their employment, were of the kind they were authorized to perform, may

25  have been within the scope of their employment, were of the kind they were authorized to perform,

26  and were actuated at least in part by a desire to serve their employer, and therefore the City is liable

27  for their acts pursuant to the doctrine of respondeat superior.

28

**Common Allegations**

24.     Dr. Watson began her law enforcement career in 1994 in Hutchins, Texas. By 2002, she was a police officer in the Arlington, Texas and as of 2014, she had risen through the ranks to become the department's youngest Deputy Chief.

25.     Dr. Watson holds a B.S. in Criminal Justice, a M.S. in Criminology and a Ph.D. in Management and Organizational Leadership. She is currently pursuing a Ph.D in International Psychology concentrating on Organizations and Systems.

26.     Dr. Watson has worked to advance women in policing and is in demand as a speaker at symposiums and conferences, and facilitates law enforcement courses regarding the value of diversity in the recruitment, retention, selection, and promotion of women in law enforcement.

27.     Additionally, Dr. Watson has conducted extensive research and published on the topics of women in policing, women as law enforcement executives, organizational leadership, gender disparities in law enforcement, police management, immigration enforcement, organizational performance and effectiveness, management and leadership.

28.     In approximately 2017, Plaintiff was recruited during a nationwide search soliciting candidates to apply to the City of Henderson, Nevada for the position of Chief of Police.

29.     Written search materials indicated, "[t]he ideal candidate will be a reform-minded leader who conveys a strong and effective command presence, combined with having outstanding people and management skills."

30.     Key responsibilities identified for the position were to establish departmental policies, review and interpret laws and regulations affecting the City, direct and perform complex management work in the enforcement of laws and the preservation of peace within the community; provide law enforcement advice, opinions and services to the City Council, City Manager, Assistant City Manager and various department heads.

31.     Dr. Watson applied for the position and following a selection process during which 90 candidates were vetted, was hired by City Manager, Robert Murnane ("Murnane") on September 15, 2017.

32.   At time of Dr. Watson's hiring in 2017, the City had experienced a turnover of four (4) Police Chiefs since 2005.

33.   Plaintiff's tenure was intended to reform the HPD. Specifically, Murnane told Dr. Watson she was hired to facilitate a cultural change in the department.

34.   Murnane also told Plaintiff the police department operated as a "good ol' boy" system where nepotism and favoritism were rampant. A select subculture enjoyed preferential treatment over many rank and file members, where promotions were based on friendships and connections, not necessarily merit, and where inappropriate personal conduct was overlooked if a police officer had the right associates.

35.   However, it soon became apparent Dr. Watson was being installed merely as a figurehead and given a place at the executive table with no voice.

36.   Although her job duties and responsibilities had been predetermined prior to her hiring, Dr. Watson had to fight to perform the essential functions she had been hired to complete.

37.   She was eventually subjected to constant efforts to undermine her authority and prevent her from adequately performing her job duties through a series of lies, rumors, false allegations, deliberate interference and direct attempts to have her terminated.

38.   Dr. Watson's first day of work was November 20, 2017. At that time, Plaintiff was the sole Black female sworn peace officer in the HPD and the only Black department head.

39.   As of November 2017, because Murnane was on leave, Plaintiff reported directly to Assistant City Manager Gregory Blackburn ("Blackburn") and Assistant City Manager Derrick.

40.   In February 2018, Murnane retired. Plaintiff continued to report to Derrick as acting City Manager until he was officially appointed City Manger in July, 2018.

41.   After Derrick was sworn in, Plaintiff asked him if he wanted to hire a new Chief of Police since Murnane, not Derrick had selected her. Specifically, Plaintiff wanted to know if Derrick wished to select someone to carry out his own goals and objectives for the City. Derrick told her his goals for the City remained the same, that he understood organizational reform meant changes, and that changes would be met with resistance and complaints. Derrick told Dr. Watson to move forward with the planned cultural changes.

42.     From the start of her employment, Plaintiff began enforcing existing Code of Conduct policies which had previously been applied inconsistently pertaining to discipline of police officers for improper personal conduct: activity resulting in arrests, domestic abuse, DUI, or even use of prohibited holds.  Initially, her decisions to discipline officers were approved by the City.

43.     On or about July 26, 2018, Plaintiff's job was restructured to have her report directly to Deputy City Manager, Bristol Ellington.

44.     Ellington was Plaintiff's third supervisor within eight (8) months of her hiring.

45.     Ellington consistently waivered between appearing to support Plaintiff by providing her with information about inappropriate comments and actions taken behind her back and alternately, harming her by facilitating the City's attempts to interfere with HPD business to undermine Plaintiff's decisions and policies.

46.     Ellington was agreeable with Plaintiff's decisions to discipline certain members of HPB. For others, Ellington told Dr. Watson discipline was unnecessary; that they were "good people" who "sometimes make mistakes," and she could not be "punitive" with her decisions. Irrespective of the fact that discipline was already predetermined based on existing policy in specific situations, Ellington balked at its application in occasional cases for reasons which were not apparent to Plaintiff other than her belief that they were probably associates of the "right" people in the department.

47.     Even before she arrived in Henderson, Dr. Watson was made aware of a culture in the HPD designed to derail any efforts she undertook to effectuate reform:

  a. On October 20, 2017 Plaintiff received an email from a former HPD employee who attended an annual training conference for law enforcement executives in Nevada and warned her that administrative members of the HPD were already discussing her inability to make changes to the agency, looking for her to fail and openly discussing their disgust with her hiring.

  b. The email laid out a pattern utilized by prior administrative staff to undermine a prior Chief of Police who had been hired from outside the HPD organization. That Chief was crippled by the use of tactics such as the filing of a multitude of complaints

about his leadership style in an plan to bully him out of office.

c.     Additionally, during a series of receptions held for her when she arrived in Henderson, Dr. Watson was pulled aside by well-wishers who made comments to her about the challenges she would be facing: "you are going to have a hard time, they don't want you," "they don't accept outsiders and they're definitely not going to accept a woman," and "they don't think women belong in policing, especially command over White males."

48.     The City, including, but not limited to HPD, has a long history of unethical, illegal and civilly culpable conduct, actions and hostile conditions. Dr. Watson began her employment with the City believing the police department was the sole agency that required vast changes, she gradually came to realize the problems were systemic and extended beyond HPD.

49.     As she worked to dismantle the existing "good ol' boy" culture, Dr. Watson became a target of systematic discrimination based upon her race and gender.

50.     Policy changes implemented by Dr. Watson received push-back, insubordination or other inappropriate negative reactions.  It appeared that any attempts Dr. Watson made to ensure transparency in the department caused problems.

51.     On May 15, 2018, the City's Human Resources Department and Assistant City Attorney Gilmore attempted to interfere with Dr. Watson's decision to keep a police officer who, while unconscious lost her loaded gun, on administrative leave. While the cause of the officer's blackout was being investigated, Plaintiff did not want the officer working for the department fearing she was unfit for any position until her medical condition could be identified.

52.     Gilmore informed Plaintiff that HPD needed to accommodate the officer and suggested placing the officer in corrections. Plaintiff voiced strong objections believing a compromised officer should be dealing with persons in-custody. Plaintiff pointed out that there was insufficient information available regarding the officer's condition, and that memory issues severe enough to lead to blackouts meant the officer was not fit for duty. Ultimately, the officer was placed on family medical leave but was never formally disciplined for losing the loaded gun.

53.     In October 2018, Gilmore also disagreed when Plaintiff sought to enforce termination against an officer arrested for domestic battery with strangulation. The disagreement existed even though counsel for the officer had not prepared for the disciplinary meeting, had not thoroughly reviewed the file, and could give no specific justification for opposing the officer's termination. To the contrary, it appeared Gilmore had been given instructions to object to the discipline and prevent it from being carried out.

54.     Later, Dr. Watson became aware of dash-cam video of an officer clearly utilizing unnecessary force and then failing to follow appropriate procedures in reporting the force used. When Plaintiff moved to discipline the officer, Ellington stated Plaintiff's administration was too punitive to officers under "the circumstances."

55.     Although she was criticized and many of her attempts to implement and enforce policies were undermined, the following changes Plaintiff introduced have continued to be utilized by the current HPD administration:

    a.     Use-of-Force Policy: a standard where only the amount of force necessary to bring an incident under control, make an arrest, or protect police or others is used and establishes that use-of-force is a last resort.

    b.     De-escalation Policy: tactics and techniques to be used in order to minimize the likelihood of use of force while increasing the chance of voluntary compliance.

    c.     Concurrent Administrative Investigation and Criminal Investigation for Officer Involved Shootings: in addition to the criminal investigation, the administrative investigation was a transparent determination of whether the officer's actions or inactions were justified in accordance with the organization's policies, procedures, rules, and training; an administrative investigation may lead to disciplinary action based on violations of organizational policies and/or procedures.

    d.     Geographic-Based Policing: patrol officers and supervisors were assigned to defined geographic areas (beats) within the City in order to become subject matter experts (SME) within the area. Delivers a coordinated approach to solving crime concerns since personnel gain in-depth insight into recurring problems and trends. Establishes

direct communication between community and HPD;

    e.    Community-Oriented Policing: Used in conjunction with Geographic-Based Policing to create opportunities to strengthen the community/police relationship through continuous engagement and professional interaction. This resulted in historic reduction of response times, month-to-month reductions in crime categories (violent crimes and property crimes), and increases in prospective police work such as officer self-initiated activity.

    f.    ComStat Process: In depth analysis of crime problems occurring throughout the City and the development and implementation of sustainable initiatives to address them.

    g.    Restructuring of the Traffic Section: Plaintiff assigned new supervision and introduced intelligence-led policing which produced more than 1.1 million in increased revenue from enforcement actions.

56.    While Dr. Watson was subjected to harassment behind the scenes and her push for transparency within the department caused a faction within HPD/the Unions to conjure reasons to file complaints, City officials outwardly praised and commend her job performance:

    a.    In July, 2018, City Manager Derrick approved Plaintiff for the highest percentage raise available for her position. The raise caused her to exceed the highest salary classification for the Chief of Police position and necessitated that she receive the difference as a bonus for the year;

    b.    The following January, during an operations meeting with City department heads, City Manager Derrick informed the group that successes in the police department were a direct result of the change implemented by Plaintiff to policing efforts. Ellington also addressed the group to commend Plaintiff for outstanding job performance.

57.    Throughout Plaintiff's employment with the City, Ellington conveyed to her that he had her best interests in mind while simultaneously limiting his involvement in matters where he had the authority to intervene to stop the harassment and backstabbing.

58.     During a meeting with Plaintiff on September 19, 2018, Ellington, in an off-topic comment, conveyed that his relationships with police department employees were professional except for a close friendship with HPD Captain Dave Mattoon ("Mattoon"). Ellington wanted Plaintiff to know that they never discussed Plaintiff and specifically pointed out that Mattoon "never said anything negative about [Plaintiff]."

59.     Notwithstanding that unsolicited representation, during meetings with Ellington it was apparent Ellington was being provided information from current HPD captains who were present during command team meetings because Ellington would repeat discussions that occurred there which he should not have otherwise been privy.

60.     On September 26, 2018, during a meeting with HPOA President Kerby and HPSA President Abernathy to address  false information they provided to Derrick and Ellington regarding communications they had with Plaintiff, they denied what Ellington reported they had said. Additionally, they complained  that Dr. Watson sometimes wore business attire and wore her hair down and curled.

61.     Derrick and Ellington failed to rebuke those obviously sexist comments.

62.     Instead of recognizing the complaint as harassment and initiating an investigation or reprimand, Ellington advised Plaintiff that it was her responsibility to deal with it and handle it on her own.

63.     Ellington also directed Dr. Watson to handle the reprimand of Kerby and Abernathy for providing untruthful information and to let them know that false reporting would not be tolerated.

64.     On September 28, 2018, Ellington reported to Dr. Watson that a member of the Henderson Police Officer's Union told him, "Since we can't get anything on the Chief, we are going to target her daughter and her husband now."

65.     Shockingly, Ellington did not discipline or investigate the individuals who made the comment and further refused to disclose their identity ensuring no investigation could or would be conducted.

66.     Although Plaintiff implored Ellington to proceed with discipline or an investigation and take action to address the brazen threat against Plaintiff's family, he refused to do so thereby

impliedly sanctioning the conduct and sending a message to the offenders that Plaintiff would not be protected.

67.     The following week, a series of events unfolded making it clear the threats to go after Plaintiff's family had been set in motion.

68.     Union representative Richard "Rick" McCann – who served as the representative for the officer union, HPOA, and the supervisor union, HPSA, for more than 11 years – filed an open records request for body worn camera footage of a minor accident call which the Office of Public Information determined pertained to a traffic accident involving Plaintiff's 16-year-old daughter.

69.     Based on information and belief, the footage request was the first time McCann had ever sought information related to an officer, supervisor, or the Chief of Police. Although other Henderson police officers have had family members involved in criminal activity, based on information and belief, McCann had never before sought to review video footage related to those incidents.

70.     Further, McCann held no supervisory position over Plaintiff or over the officers who were at the scene.

71.     McCann requested two copies of the footage, even though after viewing it in the presence of HPD staff he verified no wrongdoing by the Plaintiff's daughter.

72.     Thereafter, word of the accident was reported to the media. A request for the footage was received from the LVRJ after a "source" informed it the video involved wrongdoing and a reporter indicated it would be used in a story about the Plaintiff violating ethics.

73.     A third request for the video was made by retired Police Chief Pat Moers.

74.     Finally, in April 2019, an investigative reporter for Channel 13 requested the video stating she had been "tipped off" about the incident and asked why Plaintiff's daughter had not been charged with a hit-and-run. The reporter was informed that there could be no enforcement activity in a parking lot and furthermore, no crime had been committed, all policies were followed and no one left the scene so it was not a hit-and-run.

75.     At this point, Plaintiff questioned Derrick and asked if Ellington had even notified Derrick of the threat made against Plaintiff's family. Derrick replied he had not and that since the

1   behavior was unacceptable and children were considered "off limits." Derrick represented that he

2   would connect with the City Attorney's Office to put a stop to the harassment.

3       76.   As had been the case previously, Derrick's concern was feigned and nothing was ever

4   done to protect Dr. Watson from further harassment.

5       77.   Derrick took no action, even though on more than one occasion the Plaintiff's

6   daughter was followed home from school by officers in marked police vehicles. Plaintiff's daughter

7   was unable to determine who the officers were.

8       78.   HPD officers posted disparaging comments about Plaintiff on a racist website titled

9   N*#@**mania.com.

10      79.   Neither the posts nor the website was ever investigated by the City.

11      80.   Thereafter, Plaintiff personally reported the threat to Mayor March. Again, rather than

12   open an investigation, the Mayor instead advised Plaintiff to "stay strong" and everything would be

13   okay.

14      81.   Union President, Sgt. Kevin Abernathy stated to officers, "I want this black bitch out

15   of here and we need to find complaints against her."

16      82.   No investigation was initiated as a result of Abernathy's statement.

17      83.   Despite knowing that statement had been made, the City failed to investigate the

18   Plaintiff's concerns but *would* investigate complaints lodged against Plaintiff.

19      84.   Beginning in the summer of 2018, Abernathy encouraged union members to lodge

20   numerous false complaints about Plaintiff, to wit, that she:

21          a.   created an environment of fear within the command team;

22          b.   violated ethics laws and policies by accepting NHL tickets;

23          c.   cheated on a certification exam;

24          d.   hired a friend to evaluate HPD policies; and,

25          e.    was discriminatory.

26      85.   On September 28, 2018, Plaintiff was informed a complaint had been made after HPD

27   participated in a lip-sync challenge. A second complaint was filed because an officer was not

28   promoted to detective and made a discrimination allegation. A third complaint was asserted claiming

1  the Plaintiff made religious references in a meeting.

2       86.    All complaints were investigated and ultimately no violations were found.

3       87.    On October 4, 2018, in response to a request from Dr. Watson, a meeting was held

4  with Plaintiff, Derrick, Ellington, Vaskov, and Deputy Chief Thedrick Andres ("Andres") to discuss

5  the attacks against Plaintiff and their investigation by an outside law firm even though the attacks

6  all lacked merit or validity.

7       88.    Unbeknownst to Plaintiff, the law firm had been a contributor to five (5) separate City

8  council members.

9       89.    Vaskov told Plaintiff that regardless of whether or not the complaints were meritless,

10  every single one of them needed to be investigated, irrespective of whether the same individuals

11  were responsible for the complaints. Unfairly, the meritless complaints were eventually used against

12  Plaintiff as if they were valid.

13       90.    Vaskov further explained that the outside law firm was used to ensure that the

14  investigatory process was "fair and impartial" necessitating the use of a third party, not interested

15  entities or individuals.

16       91.    Vaskov stated that the same investigation procedure was followed for all City

17  executives and the same outside law firm would conduct the investigations.

18       92.    Vaskov did not explain why none of the complaints Plaintiff made regarding the

19  harassment she received had been subject to the same process.

20       93.    Vaskov's comment justifying the use of the outside firm to ensure fairness and

21  impartiality was false and misleading. Plaintiff later learned that Gilmore was present during the

22  certain confidential investigatory interviews.

23       94.    For example, Gilmore was present for an investigation initiated by Lt. Mattingly and

24  was identified as being Mattingly's representative although the City Attorney's Office purportedly

25  represents department heads - i.e., the Chief of Police. Nevertheless, although Andres also received

26  a formal notice, Gilmore did not attend his interview.

27       95.    When Plaintiff questioned why a City Attorney was present during investigatory

28  interviews, especially when they were supposed to be conducted by a neutral third-party law firm,

she was informed Gilmore was there to "take notes," which is inconsistent with the City Attorney being identified as Mattingly's representative, and the fact that the City Attorney was only present at certain interviews. Moreover, it is clear the City's presence was a clear conflict and undermined the stated purpose of having a fair and impartial third-party investigate the complaints.

96.     The outside legal firm was used to investigate Plaintiff while a White female employee of the HPD had similar complaints filed against her which were not similarly investigated.

97.     Defendants, and each of them, were also advised by sources that the Plaintiff was being discriminated against by other anonymous source(s) alleging false complaints and discrimination.

a.     An anonymous December 22, 2018 letter detailed knowledge of prior events inside the Henderson Police Department and indicated Plaintiff's race was "a problem for some people in the department."

b.     A letter from "Employees of Henderson Police Department" addressed to March and "City of Henderson Leaders" notified them of a "witch hunt" and "smear campaign" against Plaintiff through "fake allegations and meritless complaints." The letter also complained of "political shenanigans" that are hurting officers and that "no one seems to care." The letter suggested possible motives: "Is it because she's an 'outsider'? Is it because she's African-American? Or is it because they are cronies of Pat Moers and continuing to do his dirty work?"

c.     A third letter, addressed to March, Ward III member John Marz, Derrick, and Vaskov, referred to "poisoning" directed at Plaintiff, and implored the city to intervene advising that "[i]t is a shame the City of Henderson in not SUPPORTING and BACKING Chief Watson" with regard to the false complaints by the same few individuals. This author also views the "constant undermining" as disheartening and embarrassing. Particularly as this author thanks "Chief Watson for this noticeable change" in the department under her leadership.

98.     On November 1, 2018, Dr. Watson was informed in a meeting with Vaskov and Ellington that a 191A "Coaching & Counseling" notice she had written to Abernathy relating to a disrespectful email he sent needed to be removed from his file.  Plaintiff was informed Abernathy and McCann were threatening to file a lawsuit claiming Abernathy was being prevented from performing his union duties. Plaintiff pointed out that Abernathy was not reported for or being prevented from performing union duties; the report was for being disrespectful. Vaskov advised the 191A needed to be removed because he did not believe the City would win an arbitration.  Plaintiff voiced her concern that the city management should not be involved with police disciplinary matters and questioned why it was even concerned with low level discipline.  In response, Vaskov handed Plaintiff a letter that was already drafted with Plaintiff's name printed at the bottom and asked her to sign it. Plaintiff reviewed the letter and indicated she could not sign it because it was not accurate.

99.     Ellington became noticeably upset and told Plaintiff to revise the letter but that it had to be done quickly so Abernathy could be told the 191A had been destroyed.

100.    Plaintiff was forced to write a letter to Abernathy stating the 191A would not be in his personnel file but that he was expected to remain respectful and professional in all forms of communication. She also relayed her concern that if the City Manager's office and the City Attorney's Office got involved in non-disciplinary issues it would open the door to larger issues because it would undermine her authority.

101.    On November 16, 2018, a complaint was initiated before the Local Government Employee Management Relations Board by the HPSA and HPOA against Plaintiff alleging she was attempting to diminish the role of the labor associations with the City by discriminating against labor association members, interfering with the association's representation of members, and implementing excessive discipline in "contravention of long established policies and practices."

102.    This complaint contained false and fabricated allegations that Plaintiff attempted to run HPD independently from the rest of the City, and was mistreating and disrespecting captains on the command team.

103.    In reality, it was the City who failed to collaborate with Dr. Watson and allowed fabricated false reports in order to create complaints to be used against her.

a.   Although prior Chiefs of Police had the final word on whether or not to promote officers to the positions of Deputy Chiefs and Captains, Plaintiff's decisions were second-guessed and undermined.

b.   For example, on January 14, 2019, Ellington emailed Plaintiff advising he was meeting with the unions the following morning and would be notifying the HPD that a scheduled police department promotion ceremony was being canceled. The promotion ceremony was for the rank of sergeants, lieutenants, and captains. Ellington did not want the newly selected captains to be promoted and sought to have the selection process redone because HPSA filed a complaint with Human Resources. Of note, beginning in December 2018, Ellington was involved with frequent communications and discussions with Plaintiff about the entire process and had approved the selections. However, pressure from HPSA caused Ellington to backtrack and act as if every decision made by Plaintiff was done without his knowledge. Although prior Chiefs of Police had been permitted to set criteria for promotion, Dr. Watson was not permitted to do so. Ellington wanted Plaintiff to clear the selections with the Union. When she refused, the ceremony was stopped from proceeding without notice to Plaintiff or her department.

c.   City Human Resources made numerous complaints about Plaintiff alleging she was failing to cooperate because Plaintiff disagreed with Human Resources' decisions and could not be convinced to "go along." When meetings were called to address the non-cooperation complaints, Plaintiff was able to provide documentary proof of her multiple attempts to accommodate discussions and schedule meetings about the disputes.

104.   On January 24, 2019 Plaintiff received another notice of a formal investigation to be conducted by the same "independent" law firm. The allegations as they pertained to Dr. Watson were again contrived and false.

105.   Eventually, in March 2019, after Plaintiff had been placed on leave, Ellington recognized that the frivolous complaints filed against the police department executive team,

1  specifically the Plaintiff, were a problem and indicated the city management & City Attorney's Office

2  were working to establish a vetting process to eliminate future unnecessary investigations.

3      106.    There were never any findings of wrongdoing by Dr. Watson in all the complaints

4  lodged against her.

5      107.    For a approximately a year, beginning in 2018, the city department heads participated

6  in professional coaching since they were all new to their positions and had been hired by Derrick

7  from outside the Henderson establishment.

8      108.    The coaching was intended to assist them with leadership skills, help then coordinate

9  and collaborate regarding the operation of the City, successfully work together, and develop a better

10  understanding of each other's departments' perspectives.

11      109.    The coach assigned to Plaintiff had a history of providing coaching for the City.

12      110.    On January 28, 2019, during the last one-on-one coaching session, the coach warned

13  Dr. Watson, not to trust anyone and to be very careful not to let Ellington or the City ruin her

14  reputation or career.

15      111.    The coach informed Plaintiff that she was terminating her relationship with the City

16  because city management wanted her to disclose the details of coaching sessions notwithstanding

17  ethical confidentiality considerations.

18      112.    This coach advised that she had already provided a written summary regarding

19  Plaintiff to Ellington, that the report had been favorable to Plaintiff and that Ellington did not like

20  the summary. Plaintiff asked Ellington for a copy of the written summary but he refused to provide

21  it.

22      113.    In February of 2019, Ellington's assistant sent an email to Dr. Watson which

23  scheduled Plaintiff's quarterly review February 12th. Plaintiff was asked to respond to questions

24  posed by Ellington prior to the meeting, Notably, the questions did not pertain to the Plaintiff's job

25  duties but rumors circulating within HPD.

26      114.    On March 5, 2019 Plaintiff was notified that a complaint had been made to the City

27  Attorney's Office by an unknown party reporting discriminatory treatment of the Plaintiff by the City

28  Attorney's Office.  A new independent law firm was hired to investigate the complaint. However,

1    before this law firm even held an initial interview which was scheduled for March 28, 2019, Dr.

2    Watson was placed on administrative leave.

3         115.    The reason for the administrative leave was represented as being done to give the

4    Plaintiff twenty-one (21) days to consider a Separation Agreement and Release of All Claims

5    ("Agreement"). Plaintiff was notified that if she accepted the Agreement and resigned her position

6    she could collect paid leave until May 9, 2019, while she found other employment. If she did not

7    accept, she would be terminated as of April 4, 2019.

8         116.    When the administrative leave was imposed, Ellington told Plaintiff, "I respect you

9    but you are not a good fit for me and [Derrick]."

10        117.    The administrative leave halted the independent investigation. Plaintiff was not even

11   allowed information about the substance of the complaint or identity of the complainant.

12        118.    After Plaintiff was placed on administrative leave, Ellington met with the HPD

13   executive team, Deputy Chief Thedrick Andres; Deputy Chief Michael Denning and Chief of Staff

14   David Burns, and informed them that Plaintiff had done a "great job" with HPD. He stated that the

15   programs Dr. Watson had implemented would be continued moving forward.

16        119.    On April 8, 2019, Plaintiff, through her counsel, filed a discrimination complaint with

17   Vaskov. She expressed her desire for "continued employment with the opportunity to serve the

18   Henderson community" and that she be allowed to continue the job that she was hired to perform

19   without being harassed, conspired against, restricted based on backroom retaliatory deals, and with

20   no further discrimination. Further, she demanded that the false and defamatory comments and hostile

21   work environment that impeded her ability to perform her job, immediately cease. She further sought

22   to eliminate the petty manner in which contrived allegations have been brought against her.

23        120.    Dr. Watson further advised that the "improper conduct and corruption [violated her]

24   rights, impeded her ability to perform her job for the community, and could no longer be tolerated

25   with impunity. She requested that steps be taken immediately to address the deprivation of rights,

26   privileges and immunities. Plaintiff specifically requested the implementation of a strict protocol to

27   prevent continued illegalities so she could perform her duties as originally intended at the time of

28   her hiring.

121.    In response to the complaint, on April 11, 2019, with no investigation of any nature, Dr. Watson was disparately and unfairly terminated. She was reportedly discharged for creating divisions between management and unions, undertaking policy changes without the consent of the City Attorney's Office or the City's Human Resources Department, failing to show respect town union members and not cooperating with an independent investigator.

122.    Post termination, Plaintiff was subjected to continued improper behavior.

123.    On April 16, 2019, Dr. Watson by and through her counsel forwarded a letter to Defendants Vaskov, March, Derrick, Ellington and City Ward representatives requesting the preservation of evidence, including but not limited to electronically stored information.

124.    The City Attorney's office responded on behalf of the Defendants on May 2, 2019. Therein, it feigned ignorance and alleged it did not have sufficient information as to "the nature of any claims" that would be made against the City. This statement implied the City Attorney's office was ignorant of Plaintiff's multiple complaints, was unaware of the substance of meeting attended by its own employees, and had forgotten that a detailed discrimination complaint naming Plaintiff as a victim had just weeks before been assigned to a third party law firm for investigation. It was confirmation Plaintiff's situation had been of no consequence to the City, as such behavior and a hostile environment had always been tolerated and would continue to be tolerated with impunity.

125.    Further, Dr. Watson's letters of April 8, 2019 and April 16, 2019, which had only been provided to the identified individuals somehow made it into the possession of the media.

126.    In ongoing efforts to harm Dr. Watson, the City also provided the media with its response to Plaintiff's NERC/EEOC charges but refused to disclose them to Plaintiff or her representatives notwithstanding the confidential nature of this process set forth in NRS §233.190.

127.    Subsequent to her termination from HPD, Plaintiff had great difficulty finding subsequent employment related to Defendants' smear campaign against her which consisted of leaking half-truths and outright falsehoods to the media and using a writer for a local paper as a puppet to publish disparaging lies about her which continued even after her termination.

128.    Although she submitted multiple applications for available Chief of Police positions and was the most qualified applicant in many instances, she was not hired. Dr. Watson was

1   informed in Columbus, Ohio that her application could not advance past an initial screening level

2   and was told by her recruiter that several other jurisdictions had reviewed the publicly available

3   information about her from Henderson and it factored in the decision not to hire her.

4       129.   Ultimately, Dr. Watson was considered, but not hired, in: Columbus, Ohio (Chief of

5   Police); Frisco, Texas (Chief of Police); Keller, Texas (Chief of Police); Dallas Independent School

6   District (Chief of Police); Federal Reserve Bank of Dallas (Las Enforcement Chief of Police); City

7   of Dallas, Texas (Assistant Director, Strategic Implementation Projects); Boulder, Colorado (Chief

8   of Police); Aurora, Colorado (Chief of Police); Vallejo, California (Chief of Police); Hayward

9   California (Chief of Police); Fresno, California (Chief of Police); San Mateo, California (Chief of

10  Police); Riverside, California (Chief of Police); Elk Grove, California (Chief of Police); Bay Area

11  Rapid Transit, California (Chief of Police); Los Angeles World Airports, Los Angeles, California

12  (Assistant Chief of Police); Dekalb County, Georgia (Chief of Police); University of Nevada Reno,

13  Nevada (Assistant Vice President/Chief of Police); Greensboro, North Carolina (Chief of Police);

14  North Carolina State University (Chief of Police); Charlotte-Mecklanberg, North Carolina (Chief

15  of Police); Richmond, Virginia (Deputy Chief of Police); Oro Valley, Arizona (Chief of Police); FBI

16  - LEEDA (FBI Law Enforcement Executive Development Association (Executive Director);

17  Indianapolis International Airport, Indianapolis, Indiana (Assistant Chief of Police); Marysville,

18  Washington (Chief of Police); and Smarthmore College, Pennsylvania (Assistant Public Safety

19  Director).

20      130.   Acts undertaken to smear Plaintiff included leaking correspondence between

21  Plaintiff's counsel's office and the City of Henderson's City Attorney's office which continued

22  beyond her employment and included confidential human resource meeting discussions.

23      131.   Disputes with HPD were reported in the press and resulted in extensive damage to

24  Plaintiff's reputation and employment potential.

25      132.   Moreover, based on information and belief, McCann called Plaintiff's current

26  employer to dissuade it from hiring her as the Director of Sacramento's Office of Public Safety

27  Accountability.  The caller told the Sacramento it shouldn't want Plaintiff there.

28      133.   Plaintiff has undergone medical treatment as a result of the Defendants' conduct and

suffered the loss of wages, seniority, health care benefits, retirement benefits as well as past and future income as a direct and proximate cause of the conduct of Defendants, and each of them.

## FIRST CAUSE OF ACTION

(Racial Discrimination and Hostile Work Environment in Violation of 42 USC §1981 against City of Henderson, Ellington, Derrick, March, Vaskov, Gilmore, Abernathy and Kerby)

134.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs, and incorporates the same herein by reference.

135.    Plaintiff is a person within the jurisdiction of the United States and has the right to make and enforce contracts.

136.    The United States Code, Title 42, Section 1981, 42 USC §1981, prohibits an employer from discriminating on the basis of race in the making, performance, modification and termination of contracts and the enjoyment of all benefits of the contractual relationship. A racially hostile work environment is a form of race discrimination.

137.    Plaintiff is a racial minority, African American. Defendants discriminated against Plaintiff on the basis of race in the performance of and enjoyment of all the benefits of her employment relationship with HPD.

138.    Plaintiff was qualified to hold the position of Chief of Police.

139.    The conduct to which Plaintiff was subjected was unwelcome.

140.    Defendants also discriminated against Plaintiff based on race by subjecting her to a racially hostile work environment. The conduct of Defendants was both severe and pervasive, objectively and subjectively offensive, and negatively affected the terms and conditions of Plaintiff's employment.

141.    But for Plaintiff's race, she would not have suffered the loss of her legally protected right.

142.    Defendants also discriminated against Plaintiff by subjecting her to disparate treatment on the basis of race. HPD treated Plaintiff less favorably than similarly-situated non-black employees.

143.    A policy making individual was involved in the discrimination, ratified the

discrimination and allowed subordinates to continue the discriminatory conduct.

144.    Defendants' actions, as described above, directly and proximately have caused and continue to cause Plaintiff to suffer loss of income and other financial benefits, pain and suffering, humiliation, indignity, loss of professional reputation, and personal embarrassment.

.145.    Defendants engaged in the discriminatory actions described above with malice or with reckless indifference to Plaintiff's legal rights.

146.    Plaintiff has been required to retain the services of an attorney to pursue this action and is entitled to recover attorney's fees and costs incurred.

### SECOND CAUSE OF ACTION

(Deprivation of Constitutional Rights in Violation of 42 USC 1983 against
City of Henderson, Ellington, Derrick, March, Vaskov, Gilmore, Abernathy and Kerby)

147.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs, and incorporates the same herein by reference.

148.    The United States Code, Title 42, Section 1983, 42 USC §1983 states that every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ...

149.    Defendants acting under color of state law deprived Plaintiff of rights secured by the Constitution.

150.    Each government official defendant, through the official's own actions, has violated the Constitution.

151.    The Fourteenth Amendment of the U.S. Constitution secures certain rights, such as the right to due process, for U.S. citizens.

152.    42 USC 1983 provides a mechanism for the private enforcement of substantive rights conferred by the U.S. Constitution.

153.    Plaintiff had a property interest in future employment and was rejected for

1  employment after her termination from HPD as a result of the damage to her reputation caused by

2  Defendants as set forth herein.

3      154.  Plaintiff's property interest was a protected interest cannot be revoked without

4  constitutionally sufficient procedures.

5      155.  The reputational damage caused the loss of Plaintiff's property interest without due

6  process of law.

7      156.  The Defendants made allegations against Plaintiff calculated to damage her standing

8  and associations, the accuracy of those allegations is contested, the allegations were publicly

9  disseminated and were made in connection with Plaintiff's termination.

10      157.  Actions undertaken in the course and scope of Defendants' employment are clothed

11  with the authority of state law and are subject to liability for direct and personal participation in the

12  acts set forth herein.

13      158.  Plaintiff has been required to retain the services of an attorney to pursue this action

14  and is entitled to recover attorney's fees and costs incurred.

15                **THIRD CAUSE OF ACTION**

16      (Conspiracy in Violation of 42 USC 1985 against all Defendants)

17      159.  Plaintiff repeats and realleges each and every allegation contained in the foregoing

18  paragraphs, and incorporates the same herein by reference.

19      160.  Section 1985(3) of the Civil Rights Act of 1964 provides a civil remedy for

20  conspiracies that interfere with constitutionally or federally protected rights when motivated by

21  invidiously discriminatory animus.

22      161.  Defendants' conspired to engage in conduct motivated by a racial or perhaps

23  otherwise class-based, invidiously discriminatory animus.

24      162.  Defendants engaged in a conspiracy.

25      163.  Defendants committed overt acts in furtherance of the object of the conspiracy.

26      164.  Defendants intended to deprive Plaintiff of the equal protection of, or equal privileges

27  and immunities under the law.

28      165.  The actions of Defendants resulted in an injury or deprivation of federally protected

rights to Plaintiff.

166.   It would have been clear to a reasonable person that the Defendants' conduct was unlawful.

167.   The actions of the Defendants were outside the scope of their employment with the City of Henderson and the HPD.

168.   Plaintiff has been required to retain the services of an attorney to pursue this action and is entitled to recover attorney's fees and costs incurred.

## FOURTH CAUSE OF ACTION

(Race and Gender Discrimination in Violation of 42 USC 2000e-29(a)/Title VII against City of Henderson)

169.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs, and incorporates the same herein by reference.

170.   Title VII of the Civil Rights Act of 1964 forbids employment discrimination based on "race, color and sex."

171.   Plaintiff suffered disparate treatment in her employment when she was singled out and treated less favorably than others similarly situated.

172.   Plaintiff has been required to retain the services of an attorney to pursue this action and is entitled to recover attorney's fees and costs incurred.

## FIFTH CAUSE OF ACTION

(Discrimination in Violation of NRS 613.330 against City of Henderson)

173.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs, and incorporates the same herein by reference.

174.   Pursuant to NRS 613.330, it is unlawful for an employer discriminate against an employee on the basis of race, color, or sex.

175.   As an employee of the HPD, Plaintiff is a person entitled to protection under Nevada's anti-discrimination statute.

176.   Defendant, City of Henderson, had a legal obligation, pursuant to the aforementioned statute and its own internal policies, to maintain a workplace free of unlawful discrimination.

177.   Despite explicit provisions in Nevada discrimination law, the City subjected Plaintiff to different terms and conditions of employment because of her race, color and/or sex, all of which are violations of NRS 613.330.

178.   Plaintiff performed her job satisfactorily but nonetheless suffered illegal discrimination and harm and was treated differently as than a similarly situated employee who did not belong to the same protected class.

179.   As the proximate cause of the City of Henderson's discriminatory and illegal conduct, Plaintiff has been harmed.  Her damages include, but are not limited to, mental anguish, emotional harm and humiliation and economic losses due to loss of advance placement or promotional opportunities.

180.   Plaintiff has been required to retain the services of an attorney to pursue this action and is entitled to recover attorney's fees and costs incurred.

### SIXTH CAUSE OF ACTION

(Intentional Interference with Contractual Relation against all Defendants)

181.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs, and incorporates the same herein by reference.

182.   Plaintiff had a valid contractual relationship with the City of Henderson to serve as its Chief of Police.

183.   The Defendants were aware of the contractual employment relationship.

184.   Defendants have engaged in intentional conduce intended or designed to disrupt Plaintiff's contractual relationship.

185.   Defendants further know, or were substantially certain, that their actions would interfere with Plaintiff's contractual relationship.

186.   Defendants have no privilege or justification for their actions.

187.   As a result of Defendants' actions, Plaintiff's contractual employment relationship with the City of Henderson was disrupted.

188.   Plaintiff suffered resulting damage as a result of the disruption of her contractual employment relationship.

189. Plaintiff has been required to retain the services of an attorney to pursue this action and is entitled to recover attorney's fees and costs incurred.

## SEVENTH CAUSE OF ACTION

(Intentional Infliction of Emotional Distress against all Defendants)

190. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs, and incorporates the same herein by reference.

191. The acts of all Defendants, and each of them, as described herein, were extreme and outrageous.

192. The acts of the Defendants, and each of them, either intentionally or recklessly caused Plaintiff emotional distress.

193. The Plaintiff suffered severe trauma and emotional distress.

194. The Defendants' conduct actually and proximately caused Plaintiff's suffering

195. As a result of the acts of intentional emotional distress identified hereinabove, Defendants, and each of them, breached their duty to Plaintiff and Plaintiff is entitled, directly and proximately, to damages in an amount to be more specifically determined at the time of trial.

196. Plaintiff has been required to retain the services of an attorney to pursue this action and is entitled to recover attorney's fees and costs incurred.

## EIGHTH CAUSE OF ACTION

(Negligent Infliction of Emotional Distress against all Defendants)

197. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs, and incorporates the same herein by reference.

198. As set forth herein, Defendants engaged in negligent conduct.

199. The Defendants' negligent conduct caused Plaintiff to suffer severe trauma and emotional distress.

200. The Defendants' conduct was the proximate cause of Plaintiff's severe trauma and emotional distress.

201. As a result of the negligent infliction of emotional distress identified hereinabove, Plaintiff has been directly and proximately damaged in an amount to be more specifically determined

1    at the time of trial.

2          202.    Plaintiff has been required to retain the services of an attorney to pursue this action

3    and is entitled to recover attorney's fees and costs incurred.

4                        **NINTH CAUSE OF ACTION**

5         (Defamation against City of Henderson, Ellington, Abernathy, Kerby and McCann)

6          203.    Plaintiff repeats and realleges each and every allegation contained in the foregoing

7    paragraphs, and incorporates the same herein by reference.

8          204.    Defendants made false and defamatory statements about Plaintiff.

9          205.    The statements were unprivileged publications made to third persons.

10          206.    Defendant published the remarks to third parties with knowledge of the falsity or with

11    a reckless disregard for their truth or falsity. The statements were intentionally, or minimally,

12    negligently made.

13          207.    The defamatory communications imputed Plaintiff's "lack of fitness for trade,

14    business, or profession," and injured the Plaintiff in her profession constituting defamation per se.

15          208.    The publication was not privileged.

16          209.    The publication is directly related to Plaintiff's business reputation.

17          210.    Even if the publication was privileged, as Defendants knew or should have known

18    about the falsity of the publication, their acts were reckless if not with malice.

19          211.    Defendants' actions were willful, wanton, reckless, and malicious, and further show

20    a complete and deliberate indifference to, and conscious disregard for, the rights of Plaintiff.

21          212.    Plaintiff is therefore entitled to an award of punitive or exemplary damages in an

22    amount to compensate her for mental anguish, humiliation, and outrage and to deter Defendants from

23    future similar conduct.

24          213.    Plaintiff has been required to retain the services of an attorney to pursue this action

25    and is entitled to recover attorney's fees and costs incurred.

26                        **TENTH CAUSE OF ACTION**

27         (Libel against City of Henderson, Ellington, Abernathy, Kerby and McCann)

28          214.    Plaintiff repeats and realleges each and every allegation contained in the foregoing

1   paragraphs, and incorporates the same herein by reference.

2       215.    Defendants caused the written reporting of matters regarding Plaintiff which were

3   false.

4       216.    Defendants published the remarks to third parties with knowledge of the falsity or

5   with a reckless disregard for their truth or falsity.

6       217.    The publication was not privileged.

7       218.    The publication has resulted in damages to Plaintiff.

8       219.    Even if the publication was privileged, as Defendant knew or should have known

9   about the falsity of the publication, their acts were reckless if not with malice.

10      220.    Defendant's actions were willful, wanton, reckless, and malicious, and further show

11  a complete and deliberate indifference to, and conscious disregard for, the rights of Plaintiff.

12  Plaintiff is therefore entitled to an award of punitive or exemplary damages in an amount to

13  compensate him for mental anguish, humiliation, and outrage and to deter Defendant from future

14  similar conduct.

15      221.    Plaintiff has been required to retain the services of an attorney to pursue this action

16  and is entitled to recover attorney's fees and costs incurred.

17                          **ELEVENTH CAUSE OF ACTION**

18                          (Conspiracy against all Defendants)

19      222.    Plaintiff repeats and realleges each and every allegation contained in the foregoing

20  paragraphs, and incorporates the same herein by reference.

21      223.    Upon information and belief at all times mentioned herein, Defendants, and each of

22  them, maliciously conspired together to commit the acts set forth above, including, but not limited

23  to, coordinating efforts to undermine and defame Plaintiff, cause her termination from HPD and ruin

24  her reputation and career.

25      224.    Defendants, and each of their acts, of conspiracy were malicious and with intent to

26  harm and injure Plaintiff.

27      225.    As a direct and proximate result of this conspiracy, Plaintiffs have been damaged in

28  an amount to be more specifically determined at the time of trial.

1    **WHEREFORE**, Plaintiff prays this Court for the following relief:

2       1.       By declaring the acts and practices of Defendants violations of state and federal laws

3    prohibiting discrimination and retaliation;

4       2.       By awarding Plaintiff all damages allowed by the aforementioned state and federal

5    statutes, and non-duplicative damages under his tort claims, in an amount to be determined at trial;

6       3.       By awarding Plaintiff an amount equal to any economic losses, past and future, she

7    may have suffered as a result of loss of opportunities as recoverable under Title VII in an amount

8    to be determined at trial;

9       4.       By awarding Plaintiff the costs of this action together with reasonable attorney's fees

10   and costs as provided by §706(k) of Title VII, 42 U.S.C. §2000e-6(k);

11      5.       For prejudgment interest as allowed by law;

12      6.       For costs incurred to collect any award;

13      7.       For such other and further relief as the Court deems just and proper.

14          DATED this 22 day of September, 2020.

15                                    COOK & KELESIS, LTD.

16

17          By:_____

18                                    MARC P. COOK, ESQ.
                                      Nevada Bar No. 004574
19                                    GEORGE P. KELESIS, ESQ.
                                      Nevada Bar No. 00069
20                                    JULIE L. SANPEI, ESQ.
                                      Nevada Bar No. 0005479
21                                    517 South Ninth Street
                                      Las Vegas, Nevada 89101
22                                    *Attorneys for Plaintiff, LATESHA WATSON*

23

24

25

26

27

28