# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| LATESHA WATSON, | Case No.: 2:20-cv-01761-APG-BNW |
| Plaintiff | **Order (1) Granting in Part Motions to Dismiss, (2) Granting in Part Motion for Leave to Amend, (3) Denying as Moot Anti-SLAPP Special Motion to Dismiss, and (5) Denying as Moot Motion for Leave for Discovery** |
| v. | |
| CITY OF HENDERSON, et al., | |
| Defendants. | [ECF Nos. 33, 35, 36, 49, 50] |

The City of Henderson (City) hired Dr. LaTesha Watson as Chief of Police to reform the police department's culture.  But she contends that when she took steps to change that culture, union members fought back and City officials enabled them while abandoning her.  Watson alleges she faced race and gender-motivated harassment, including the filing of numerous false complaints and leaks to the media designed to get her removed as Chief.  She alleges that City officials investigated each complaint against her but failed to investigate her complaints.  She also contends City officials undermined decisions within her purview.  She maintains that these events culminated in her termination and impacted her ability to obtain future jobs.

Watson sues the City and various City officials, including Mayor Debra March, City Manager Richard Derrick, Deputy City Manager Bristol Ellington,[1] City Attorney Nick Vaskov, and Assistant City Attorney Kristina Gilmore (individual, the City defendants). ECF No. 1 at 3-4.  She also sues union officials, including Kevin Abernathy, a peace officer and President of the Henderson Police Supervisors Association (HPSA); Kenneth Kerby, a peace officer and the

---

[1] Watson uses the term "Deputy City Manager" and "Assistant City Manager." ECF No. 1 at 3, 5.  I will refer to the role as "Deputy City Manager" in this order for consistency.

President of the Henderson Police Officers Association (HPOA); and Richard McCann, the

Executive Director and Chief Labor Representative of the Nevada Association of Public Safety

Officers (NAPSO). *Id.*  She asserts claims for disparate treatment based on race and gender, a

hostile work environment, due process violations, conspiracy, intentional interference with a

contractual relationship, intentional infliction of emotional distress (IIED), negligent infliction of

emotional distress (NIED), defamation, and libel. *Id.* at 22-29.

Abernathy, Kerby, and McCann (the union defendants) move to dismiss because they

believe Watson has failed to plausibly allege that their personal involvement gives rise to

liability for the claims against them and they are entitled to qualified immunity for the § 1983

claim. ECF No. 33.  The City defendants move to dismiss because they believe Watson has not

established *Monell* liability for the City, that the individual City defendants are entitled to

qualified immunity and discretionary immunity, and that Watson has not plausibly alleged her

claims. ECF No. 36.  In addition, Vaskov and Gilmore filed a special motion to dismiss the state

law claims under Nevada's anti-Strategic Lawsuit Against Public Participation (anti-SLAPP)

statute. ECF No. 35.  Watson opposes the motions and moves for leave to amend if I dismiss her

claims and for leave to conduct discovery to respond to the anti-SLAPP motion. ECF Nos. 46 to

50.

I grant the motions to dismiss in part.  I dismiss all claims against the individual City

defendants, Kerby, and McCann.  I dismiss all the claims against the City except for the hostile

work environment claim under 42 U.S.C. § 1981.  The hostile work environment and the IIED

claims will proceed against Abernathy, but I dismiss the rest of the claims against him.  I grant

Watson leave to amend all the claims I dismissed, except the tortious interference claim against

1   the City.  Because I dismiss all claims against Vaskov and Gilmore, I deny as moot both the

2   special anti-SLAPP motion to dismiss and Watson's motion for limited discovery related to it.

3   **I. BACKGROUND[2]**

4         Watson was hired as the City's Chief of Police in September 2017 after a nationwide

5   search. ECF No. 1 at 5.  The City Manager who hired Watson, Robert Murnane, told her that

6   "she was hired to facilitate a cultural change in the department." *Id.* at 5-6.  He explained that the

7   "police department operated as a 'good ol' boy' system where nepotism and favoritism was

8   rampant" and that "inappropriate personal conduct was overlooked if a police officer had the

9   right associates." *Id.* at 6.  At the time Watson was hired, she was the only Black female sworn

10   peace officer for the Henderson Police Department (HPD) and only Black department head. *Id.*

11         Prior to her arrival, Watson received an email from a former HPD employee who warned

12   her of HPD members "already discussing her inability to make changes to the agency, looking

13   for her to fail and openly discussing their disgust with her hiring." *Id.* at 7.  The email described

14   how administrative staff undermined a prior Chief of Police that had been hired outside the

15   organization by filing a multitude of complaints to "bully him out of office." *Id.* at 7-8.  During

16   receptions held for Watson when she arrived in Henderson, multiple people made comments to

17   her including: "you are going to have a hard time, they don't want you," "they don't accept

18   outsiders and they're definitely not going to accept a woman," and "they don't think women

19   belong in policing, especially command over White males." *Id.* at 8.

20         From the start, Watson enforced the existing Code of Conduct to discipline police

21   officers for improper personal conduct, which City officials approved initially. *Id.* at 7.  About

22   three months after Watson started, Murnane retired and defendant Derrick became City Manager.

23

---

[2] This section is based on the allegations in Watson's complaint. ECF No. 1.

*Id.* at 6.  Watson asked Derrick if he wanted to select a new Chief of Police to pursue his own goals, but he said he wanted her to "move forward with the planned cultural changes." *Id.*  About six months later, Watson was instructed to report directly to defendant Ellington. *Id.* at 7.

As Watson began making changes, she "became a target of systematic discrimination based upon her race and gender." *Id.* at 8.  Watson's changes "received push-back, insubordination or other inappropriate negative reactions." *Id.*  HPD officers posted "disparaging comments" about Watson on a racist website, but the City never investigated. *Id.* at 13.  Watson personally reported it to defendant March, who told her to "stay strong" but did nothing further. *Id.*  Watson contends that beginning in the summer of 2018, Abernathy encouraged HPD members to file false complaints about her. *Id.*  Abernathy told officers, "I want this black bitch out of here and we need to find complaints against her," but the City did not investigate it. *Id.* Numerous false complaints were filed against Watson, including that she created an environment of fear, violated ethics by accepting hockey tickets, cheated on an exam, hired a friend to evaluate HPD policies, discriminated against an officer, and made religious references. *Id.* at 13-14.  An outside law firm investigated the false complaints but found no violations. *Id.* at 14. Notwithstanding that, Watson contends that the false complaints were "eventually used against [her] as if they were valid." *Id.*

In a meeting discussing the false complaints, defendant Vaskov insisted that all the complaints had to be investigated despite their falsity and that an outside law firm investigated all complaints against City executives to ensure impartiality. *Id.*  Watson noted that the same process was not used to investigate her own complaints nor to investigate similar complaints made against a white female HPD employee. *Id.* at 14-15.  Watson later learned that defendant Gilmore had been present in a meeting investigating a complaint against Watson and that

1  Gilmore had been identified as the complainant's representative. *Id.* Vaskov told Watson that

2  Gilmore was in those meetings only to take notes. *Id.* at 15.

3      On September 26, 2018, Watson, Derrick, and Ellington called a meeting to discuss false

4  information that Kerby and Abernathy reported about Watson. *Id.* at 11.  During that meeting,

5  Kerby and Abernathy complained about Watson sometimes wearing business attire and having

6  her hair down and curled. *Id.* Derrick and Ellington did not address these "obviously sexist

7  comments," telling Watson it was her responsibility. *Id.* Ellington also directed Watson to

8  handle reprimanding Kerby and Abernathy for the false information. *Id.*

9      Two days after the meeting, Ellington informed Watson that a member of the police

10  union told him,"[s]ince we can't get anything on the Chief, we are going to target her daughter

11  and her husband now." *Id.* Ellington did not investigate the comment and refused to disclose to

12  Watson the identity of the person who made it. *Id.* Watson contends that his inaction "impliedly

13  sanction[ed] the conduct and sen[t] a message to the offenders that [Watson] would not be

14  protected." *Id.* at 11-12.

15      The following week, defendant McCann filed an open records request for body camera

16  footage involving Watson's 16-year-old daughter in a minor car accident. *Id.* at 12.  McCann was

17  not a supervisor for any of the officers at the scene, nor did he have authority over Watson, and

18  Watson alleges on information and belief that he had never requested records of police officer

19  family members before. *Id.* McCann reviewed the footage and requested two copies even though

20  he had verified Watson's daughter had done nothing wrong. *Id.* Her daughter's accident was

21  subsequently reported by the media, and a reporter from the Las Vegas Review Journal

22  newspaper requested the footage after a "source" told the reporter that the video involved

23  wrongdoing. *Id.* Retired Police Chief Pat Moers also requested a copy of the footage. *Id.* In

1  April 2019, a reporter from Channel 13 requested the footage after she had been "tipped off"

2  about the incident and asked Watson why her daughter had not been charged with a hit and run.

3  *Id.*  After this happened, Watson asked Derrick if Ellington had told him about the threat against

4  her family. *Id.*  He indicated that Ellington had not but that the behavior was "unacceptable and

5  children were considered 'off limits,'" and that he would contact the City Attorney's Office to

6  stop the harassment. *Id.* at 12-13.  Nothing was done to protect Watson from harassment and

7  Watson's daughter was subsequently followed home by officers in police cars multiple times. *Id.*

8  at 13.

9      Watson alleges that various defendants were aware of anonymous letters detailing

10  discrimination against her.  One letter detailed prior events inside HPD and indicated that

11  Watson's race was "a problem for some people in the department." *Id.* at 15.  Another letter from

12  "Employees of Henderson Police Department" notified March and "Henderson Leaders" of a

13  "witch hunt" and "smear campaign" against Watson through "fake allegations and meritless

14  complaints." *Id.*  It explained that the "political shenanigans" were hurting officers, that no one

15  seemed to care, and postulated whether it was happening because she was Black. *Id.*  Another

16  letter asked for someone to intervene to stop the false complaints because the "constant

17  undermining" was "disheartening and embarrassing." *Id.*

18      Watson also alleges that various City officials interfered with her carrying out her duties.

19  She details specific instances where her decisions on promotions were undermined even though

20  prior Chiefs of Police had the final word on such matters. *Id.* at 17.  She also details several

21  situations where her disciplinary decisions were questioned. *Id.* at 8-9.  On one occasion, Vaskov

22  and Ellington presented Watson with a prewritten letter for her to sign that would remove a

23  "coaching and counseling" notice she had filed against Abernathy. *Id.* at 16.  They insisted she

do so because Abernathy and McCann were threatening to sue on the basis that Watson was preventing them from performing their union duties. *Id.*

Watson also alleges that City Human Resources personnel (HR) complained about her for failing to cooperate with investigations, even though she had been cooperative. *Id.* at 17.  On November 16, 2018, HPSA and HPOA initiated a complaint before the Local Government Employee Management Relations Board (LGEMRB) that contained false allegations. *Id.* at 16. They alleged Watson was attempting to diminish the role of labor associations by discriminating against labor members, interfering with union representation, and implementing excessive discipline. *Id.*

On January 24, 2019, Watson learned of another formal investigation based on false complaints. *Id.* at 17.  A few days later, Watson's City-assigned leadership coach warned her not to trust anyone and to be careful not to let Ellington or the City ruin her reputation. *Id.* at 18.  The leadership coach told Watson that she was ending her relationship with the City because "[C]ity management" wanted her to disclose details from Watson's coaching sessions. *Id.*  The coach had already provided Ellington a summary describing Watson favorably, but Ellington had not liked it. *Id.*

On March 5, 2019, an anonymous party filed a complaint reporting that the City Attorney's Office had treated Watson discriminatorily. *Id.*  A new firm was hired to investigate it, but Watson was placed on administrative leave before the initial interview could be held. *Id.* at 18-19.  Watson was placed on administrative leave for 21 days for her to consider a separation agreement. *Id.* at 19.  If she accepted, she would resign and collect pay until May 9. *Id.*  If she refused, she would be terminated April 4. *Id.*  When imposing the leave, Ellington told Watson,

1  "I respect you but you are not a good fit for me and [Derrick]." *Id.*  Watson's leave halted the

2  investigation, and she was prohibited from providing information for it. *Id.*

3      On April 8, Watson filed a discrimination complaint with Vaskov, expressing her desire

4  for continued employment and that she be allowed to continue her job without harassment. *Id.*

5  Watson was terminated on April 11, without any investigation. *Id.* at 20.  She was "reportedly

6  discharged for creating divisions between management and unions, undertaking policy changes

7  without the consent of the [City Attorney] or the [City's HR], failing to show respect to town

8  [sic] union members and not cooperating with an independent investigator." *Id.*  On April 16,

9  Watson's counsel sent a letter to various City officials requesting the preservation of evidence.

10  *Id.*  Vaskov replied that they did not have enough information as "to the nature of any claims,"

11  even though his office had recently received a detailed complaint about the discrimination

12  Watson had been facing and Watson had just days earlier filed a discrimination complaint with

13  Vaskov. *Id.*  The media obtained Watson's April 8 discrimination complaint and April 16 letter

14  even though she provided it only to select people. *Id.*

15      Watson filed a discrimination charge with the Nevada Equal Rights Commission (NERC)

16  and the Equal Employment Opportunity Commission (EEOC). *Id.* at 3.  The City provided the

17  media with its response to Watson's NERC/EEOC charges but refused to disclose it to Watson.

18  *Id.* at 20.  Watson received a right to sue letter on July 16, 2020. *Id.* at 3.

19      Following her termination, Watson was turned down for numerous Chief of Police

20  positions. *Id.* at 20.  Watson's recruiter told her that several jurisdictions did not hire her because

21  they were influenced by the news about her in Henderson. *Id.* at 20-21.  Watson alleges that

22  McCann called her current employer, the Sacramento Office of Public Safety and

23

1  Accountability, to dissuade it from hiring her. *Id.* at 21.  Watson has "undergone medical

2  treatment" and suffered loss of wages, seniority, benefits, and income. *Id.* at 21-22.

3         Watson asserts claims for disparate treatment under 42 U.S.C. § 1981, Title VII of the

4  Civil Rights Act of 1964, and Nevada Revised Statutes (NRS) § 613.330; a hostile work

5  environment under § 1981; due process violations under 42 U.S.C. § 1983; conspiracy under 42

6  U.S.C. § 1985 and state law; intentional interference with a contractual relationship; IIED;

7  NIED; defamation; and libel. *Id.* at 22-29.

8  **II. MOTIONS TO DISMISS AND FOR LEAVE TO AMEND [ECF NOS. 33, 36, 49]**

9         A complaint must have a "short and plain statement of the claim showing that the pleader

10  is entitled to relief." Fed. R. Civ. P. 8(a)(2).  A complaint may be dismissed for "failure to state a

11  claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  I apply a two-step process to

12  determine whether a party has stated a claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56

13  (2007).  First, I accept as true all the complaint's allegations and draw all reasonable inferences

14  in the plaintiff's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Legal conclusions and

15  "mere conclusory statements" are not entitled to an assumption of truth. *Id.* at 678-79.  Second, I

16  determine whether the allegations put forward a plausible claim for relief. *Id.* at 679.  I draw on

17  my judicial experience and common sense to make this context-specific determination. *Id.*

18         Leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a)(2).

19  In general, leave to amend should be granted unless amendment would be futile. *Albrecht v.*

20  *Lund*, 845 F.2d 193, 195 (9th Cir. 1988).  "Leave to amend can and should generally be given,

21  even in the absence of such a request by the party." *Hoang v. Bank of Am., N.A.*, 910 F.3d 1096,

22  1102 (9th Cir. 2018).

23

1    **A. Discrimination Claims**

2       Watson brings three claims based on race and gender discrimination in the workplace.

3    Claim one alleges all defendants except McCann violated § 1981 by subjecting Watson to

4    disparate treatment based on race and to a racially hostile work environment. ECF No 1. at 22.

5    Section 1981 provides that every person will have the same rights as White citizens in "the

6    making, performance, modification, and termination of contracts, and the enjoyment of all

7    benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(a)-

8    (b).  Claim four alleges that the City subjected Watson to disparate treatment based on race and

9    gender in violation of Title VII. ECF No. 1 at 25.  Title VII makes it unlawful for an employer

10   "to discharge any individual, or otherwise to discriminate against any individual with respect to

11   h[er] . . . terms, conditions, or privileges of employment, because of [her] race, color, . . . [or]

12   sex." 42 U.S.C. § 2000e-2(a)(1).  Claim five alleges that the City's disparate treatment also

13   violates Nevada's anti-discrimination statute NRS § 613.330. ECF No. 1 at 25-26.

14       *1. Disparate Treatment*

15       To state a claim for disparate treatment, Watson must allege "(1) [she] belongs to a

16   protected class, (2) [s]he was performing according to h[er] employer's legitimate expectations,

17   (3) [s]he suffered an adverse employment action, and (4) similarly situated employees were

18   treated more favorably, or other circumstances surrounding the adverse employment action give

19   rise to an inference of discrimination." *Reynaga v. Roseburg Forest Prod.*, 847 F.3d 678, 691

20   (9th Cir. 2017) (applying to Title VII and § 1981).[3]       To determine if employees are

21   similarly situated, they need not have identical roles but they must be "similar in all material

22

23

---

[3] The City defendants argue that Watson cannot show that they acted for discriminatory reasons,
but Watson need satisfy only the prima facie elements to survive dismissal.

1 respects" as determined by the "context and facts of the case." *Hawn v. Exec. Jet Mgmt., Inc.*,

2 615 F.3d 1151, 1157 (9th Cir. 2010) (quotation omitted).  Because Nevada's law is similar to

3 Title VII, Nevada courts apply the same analysis. *See Pope v. Motel 6*, 114 P.3d 277, 280 (Nev.

4 2005).

5                                             a. Abernathy and Kerby

6          The disparate treatment claims against Abernathy and Kerby are brought only under

7 § 1981.  Abernathy and Kerby do not address a disparate treatment theory of liability for the

8 § 1981 claim, instead focusing on the hostile work environment.  Abernathy and Kerby bear the

9 burden of setting out the basis for their motion and so I consider only the issues they raise.  They

10 argue that the allegations against them were not based on Watson's race and that is required for a

11 § 1981 claim.  I therefore consider that argument even though they raise it in the context of a

12 hostile work environment.  Watson criticizes the union defendants for focusing on only the

13 allegations where defendants are identified by name and argues that they are liable for treatment

14 based on "systemic discrimination and harassment from the [C]ity and its cronies" as part of the

15 greater pattern of racial incidents that occurred. ECF No. 46 at 8.

16          I will not dismiss the disparate treatment claim under § 1981 against Abernathy because

17 Watson has alleged facts that can give rise to the inference that Abernathy was motivated by

18 race.  Abernathy calling Watson a "black bitch" when telling other officers to "find complaints

19 against her" plausibly supports the inference that he was motivated by Watson's race.  Because

20 this is the only basis for dismissal that Abernathy raised in response to the disparate treatment

21 theory of liability, I deny his motion to dismiss under that theory.

22          However, I dismiss the § 1981 disparate treatment claim against Kerby because Watson

23 does not allege any facts to show that he treated her differently because of her race.  Watson

1 alleges only that Kerby provided false information, that a meeting took place to discuss it, and

2 that Kerby made a comment about her business attire and how she wore her hair. ECF No. 1 at

3 11. None of these allegations involves race or gives rise to an inference of disparate treatment

4 based on race. While Watson identified the comment about her attire and hair as "sexist," that

5 does not give rise to a claim under § 1981. It is not sufficient for Watson to allege that Kerby is

6 liable simply because racial discrimination was happening all around him, particularly when he

7 is not alleged to be a supervisor or responsible for other people's behavior. To plausibly state a

8 claim, Watson must set out how each defendant's conduct violates the law. This ensures they

9 have fair notice of the claims against them. Because it is not clear that amendment would be

10 futile, I grant leave to amend her § 1981 disparate treatment claim against Kerby.

11 <u>b. The City and Individual City Defendants</u>

12 The § 1981 claim against the City and the individual City defendants alleges disparate

13 treatment based on race. The Title VII and Nevada anti-discrimination claims are brought only

14 against the City but include disparate treatment based on both race and gender. The City

15 defendants argue that all Watson's disparate treatment claims fail because she has not alleged

16 that similarly situated individuals outside of her protected class were treated more favorably.

17 They also contend that the City cannot be held liable under § 1981 because Watson has not

18 alleged a policy or custom under *Monell*. Finally, they argue the individual City defendants are

19 entitled to qualified immunity.[4]

20 Watson argues that she need not mention similarly situated individuals by name, but that

21 she has sufficiently alleged that complaints made by people employed at the same time were

22

23 [4] The City defendants further argue that the complaints show Watson was not performing
satisfactorily. But Watson has alleged that City officials praised her work, knew the complaints
were false, and other facts to show she was performing according to the City's expectations.

investigated while her own complaints were ignored.  She also argues that her decisions were challenged even though prior Chiefs of Police had no similar interference and that other circumstances show discrimination, such as the City using the false complaints against her.

Watson has not plausibly alleged that the City defendants treated similarly situated employees differently because she has not specified the other employees' roles or other allegations that would allow me to evaluate whether the roles are similar in all material respects. She contends that her complaints against others for harassment went unaddressed, while complaints against her were fully investigated by an outside law firm. ECF No. 1 at 14.  But she alleges the complaints came from within HPD, which would be her subordinates, and thus those individuals may not be similarly situated. *See, e.g.*, *id.* at 13.  Likewise, her allegation that the outside law firm was not used to investigate similar complaints against another white female employee at HPD does not provide enough information to assess whether that employee was similarly situated. *Id.* at 15. Watson alleges she was treated differently than other Chiefs of Police in the second-guessing of her decisions, but she has not alleged how they are outside of her protected class or that the interference constitutes an adverse employment action. *Id.* at 17.

Watson's alleged "other circumstances" do not give rise to an inference of discrimination because she does not connect the incidents back to the adverse employment action of her termination.  Watson's complaint has not attributed any race-based statements to her supervisors or other City officials, and there is no other basis to infer that the City defendants were motivated by race.  There are also no allegations that City officials were motivated by sex discrimination. Even if her termination was "erroneous, the complaint is missing any factual allegations that show that sex [or race] discrimination was the source of any error." *Austin v. Univ. of Oregon*, 925 F.3d 1133, 1138 (9th Cir. 2019).

1    Because the complaint alleges Title VII and NRS § 610.330 claims against the City under

2  only a disparate treatment theory of liability, those claims are dismissed.  I also dismiss the

3  § 1981 claim to the extent it raises a disparate treatment theory against the City and the

4  individual City defendants.  At this stage, Watson's claims are not sufficiently clear for me to

5  determine whether *Monell* liability, qualified immunity, state law discretionary immunity, or any

6  other basis would make amendment futile.  I thus grant leave to amend the claims based on a

7  disparate treatment theory.  Any amendment should set out how each defendant's conduct

8  amounts to a violation.

9              *2. Hostile Work Environment*

10   Watson brings her § 1981 hostile work environment claim[5] against all defendants except

11  McCann.  A hostile work environment is actionable under § 1981 because it "interferes with the

12  'enjoyment of all benefits . . .  and conditions of the contractual relationship' of employment."

13  *Manatt v. Bank of Am., NA*, 339 F.3d 792, 797 (9th Cir. 2003) (quoting 42 U.S.C. § 1981(b)).  A

14  § 1981 hostile work environment claim uses the same standard as Title VII, except a § 1981

15  claim can be based only on racial discrimination. *Id.* at 798.  To assert a hostile work

16  environment, Watson must allege that "(1) she was subjected to verbal or physical conduct

17  because of her race, (2) the conduct was unwelcome, and (3) the conduct was sufficiently severe

18  or pervasive to alter the conditions of [her] employment and create an abusive work

19  environment." *Id.* (quotations omitted).  In assessing whether conduct is "severe or pervasive," I

20  consider the "frequency of the discriminatory conduct; its severity; whether it is physically

21  threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes

22

23

---

[5] Watson's complaint does not allege a hostile work environment under Title VII or Nevada law. ECF No. 1 at 25-26.

with an employee's work performance." *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1122 (9th Cir. 2008) (quotation omitted).

The defendants contend that Watson's allegations do not amount to severe or pervasive discriminatory conduct because she does not allege any physical threats or humiliation and has not alleged dates and time-frames sufficient to show frequent racial conduct.  Watson responds that her claims depict a discriminatory culture that caused her to be the target of harassment and that City officials did nothing despite being aware of it.

At this stage, Watson has alleged facts sufficient to show a hostile work environment. She alleges she was subjected to unwelcome harassment through the posting of "disparaging comments" online, numerous false complaints designed to remove her from her position, and targeting of her daughter. ECF No. 1 at 12-14.  Watson also alleges facts that may give rise to the inference that these incidents were racially motivated.  She alleges HPD had a "good ol' boy" culture that "seemed surprised that she was a black woman," Abernathy allegedly called her a "black bitch" when encouraging others to "find complaints" against her, "disparaging comments" were posted on a racist website, and multiple anonymous letters indicated that the false complaints and harassment were likely motivated by race. *Id.* 2, 13, 15-16.  These incidents "impeded her ability to perform," impacted her relationship with the City, and shaped how she was viewed by the media. *See, e.g.*, *id.* at 12, 17, 19.  Considering the totality of circumstances, Watson has alleged enough facts to state a claim for a hostile work environment.  I now turn to whether Watson has sufficiently pleaded who can be liable for it.

### a. The City

To sue a local government under § 1981, it is not sufficient to allege a respondeat superior theory of liability for actions of a municipality's employees. *Monell v. N.Y.C. Dep't of*

1    *Soc. Servs.*, 436 U.S. 658, 691 (1978).  A plaintiff must allege that the government's policy or

2    custom caused the violation. *Id.* at 694 (applying to § 1983 claims); *Fed'n of Afr. Am.*

3    *Contractors v. City of Oakland*, 96 F.3d 1204, 1216 (9th Cir. 1996) (applying *Monell* to § 1981

4    claims).  The injuries must arise from a municipality's "deliberate action" made "pursuant to

5    (1) an official policy; (2) a pervasive practice or custom; (3) a failure to train, supervise, or

6    discipline; or (4) a decision or act by a final policymaker." *Horton by Horton v. City of Santa*

7    *Maria*, 915 F.3d 592, 602-03 (9th Cir. 2019).  Even if no individual employees violated a

8    plaintiff's rights, "constitutional deprivations may occur 'not . . . as a result of actions of the

9    individual officers, but as a result of the collective inaction' of the municipal defendant." *Id.* at

10    604 (quoting *Fairley v. Luman*, 281 F.3d 913, 917 (9th Cir. 2002)).

11       The City defendants argue that the § 1981 claim against the City fails because Watson

12    has not alleged that the violations can be attributed to an official policy or custom.  They contend

13    that her allegation that an unnamed former HPD employee informed her that a prior police chief

14    had been bullied out of his position by the filing of numerous complaints fails to establish a

15    custom because she did not identify the employee, how long ago it occurred, or whether it was

16    the same individuals lodging complaints.  They further argue that she has not shown that final

17    policymakers caused the harm because she has not articulated what each individual City

18    defendant did to violate her rights.  Watson responds that she has alleged a pervasive practice or

19    custom of a "good ol' boys" culture that created the hostile work environment and that the City

20    officials created and contributed to the harm as final policymakers.

21       Watson has sufficiently alleged a policy or custom under *Monell* for her § 1981 claim.

22    Watson alleges that Vaskov told her every complaint had to be investigated even if they were

23    meritless. ECF No. 1 at 14.  But Watson's own complaints about harassment went uninvestigated

1  by anyone in the City, even though high ranking officials were made aware of them.  Taken

2  together, these actions can be attributed to a City policy or custom of a hostile work

3  environment, whether through the failure of the City to act when Watson faced harassment or

4  through the decisions by final policymakers in handling the incidents.  I thus deny the City

5  defendants' motion to dismiss the § 1981 claim to the extent it alleges a hostile work

6  environment claim against the City.

7                              b. Abernathy and Kerby

8        The Ninth Circuit has not established when an individual can be held liable for a hostile

9  work environment claim under § 1981.  The Second Circuit has held that individuals are liable

10 when they are personally involved. *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 229 (2d Cir.

11 2004).  Personal involvement "includes not only direct participation in the alleged violation but

12 also gross negligence in the supervision of subordinates who committed the wrongful acts and

13 failure to take action upon receiving information that constitutional violations are occurring." *Id.*;

14 *cf. Bator v. State of Hawai'i*, 39 F.3d 1021, 1029 (9th Cir. 1994) ("[Under § 1983 and Title VII,]

15 [a] supervisor who has been apprised of unlawful harassment . . . should know that her failure to

16 investigate and stop the harassment is itself unlawful.").

17       Abernathy and Kerby contend they are not liable because they personally participated in,

18 at most, isolated incidents rather than severe or pervasive conduct, and that Watson's allegations

19 are "highly suspect" because they are not corroborated. ECF No. 33 at 16.  Abernathy contends

20 that his one race-based comment does not give rise to racial animus and that Watson does not

21 allege whether she heard the statement or when it was made such that she cannot show it was

22 severe and pervasive.  Watson responds that a hostile work environment claim does not require

23 setting out how each party independently satisfies the claim because the purpose of the claim is

1    to look at the cumulative effect of individual acts that may not be actionable on their own.  She

2    also argues that their individual acts constitute severe and pervasive conduct when considered in

3    the context of the overall hostile work environment.

4         Watson has stated a claim against Abernathy because he encouraged the false complaints

5    which set most of the events in motion.  Watson's complaint alleges that Abernathy stated to

6    officers that he wanted "this black bitch out of here" and that they needed "to find complaints

7    against her." ECF No. 1 at 13.  She alleges that Abernathy encouraged union members to lodge

8    various false complaints against her. *Id.*  He also personally participated in false reporting at least

9    once. *Id.* at 11.  Taken together, it can be inferred from the allegations that Abernathy was

10   motivated by race in encouraging the false complaints and that it was severe and pervasive

11   enough that it impacted Watson's ability to do her job.  Whether Watson's allegations are

12   "highly suspect" is not a matter for dismissal, as I must take her allegations as true.  I will not

13   dismiss the hostile work environment claim against Abernathy.

14        I dismiss the hostile work environment claim against Kerby for many of the same reasons

15   I dismiss the disparate treatment claim.  Watson's allegations of Kerby's personal involvement

16   are negligible.  She alleges Kerby complained about her appearance at work in a meeting to

17   address false information he and Abernathy had provided about Watson. *Id*.  Watson does not

18   explain the nature of the false information provided or how it was alone severe or pervasive

19   enough to alter the conditions of her employment.  And the comment about her appearance is not

20   alleged to be based on her race.  The only other allegation about Kerby could be an inference that

21   he initiated the complaint before the LGEMRB in his role as HPOA President. *Id.* at 16.  But

22   even assuming Kerby was the one who initiated it on behalf of HPOA, Watson does not allege

23   how this was motivated by race.  Watson has not alleged that Kerby's subordinates in HPOA

were involved in racially motivated complaints, or that he was deliberatively indifferent or grossly negligent in supervising them.  Therefore, I dismiss the hostile work environment claim against Kerby.  Because it is not clear that amendment would be futile, I grant Watson leave to amend if facts exist to do so.

### c. The Individual City Defendants

The individual City defendants argue that Watson has not identified race-based incidents that can be attributed to them and that they are entitled to qualified immunity.[6]  Officials are entitled to qualified immunity unless "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *D.C. v. Wesby*, 138 S. Ct. 577, 589 (2018) (quotation omitted); *see also Lowe v. City of Monrovia*, 775 F.2d 998, 1011 (9th Cir. 1985), *amended*, 784 F.2d 1407 (9th Cir. 1986) (assessing qualified immunity for a § 1981 claim).  I have discretion to decide which prong to address first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Conduct is "clearly established" if there is "controlling authority" or "a robust consensus of cases of persuasive authority" such that "every reasonable official would interpret it" as clearly established. *Wesby*, 138 S. Ct. at 589-90 (quotation omitted).  This cannot be defined "at a high level of generality" but instead must be tailored to the "particular circumstances." *Id.* at 590.  "[W]here unlawfulness is apparent, qualified immunity does not exist." *Kelly v. City of Oakland*, 198 F.3d 779, 785 (9th Cir. 1999), *as amended* (Jan. 12, 2000).  Watson has the "burden to prove that the defendants violated a right that was 'clearly established' at the time of the alleged misconduct." *Bator*, 39 F.3d at 1027.

---

[6] Abernathy and Kerby do not argue for qualified immunity for the § 1981 claim.

1    The individual City defendants contend reasonable officials would not know they are

2 liable for a racially hostile work environment where they are not alleged to have made any race-

3 based statements or actions.  Watson argues that a reasonable person would know that disparate

4 treatment based on race and gender designed to get someone terminated would violate clearly

5 established rights and that application of qualified immunity here "offends common sense and

6 simple logic." ECF No. 47 at 9.

7    Watson has not met her burden in providing case law to show that the individual City

8 defendants' actions violated a clearly established right.  This is unlike most hostile work

9 environment cases because Watson was the head of the department, rather than an employee

10 facing harassment from her supervisor or peers.  Watson has not identified a case that would

11 have put the individual City defendants on notice that they may be liable on a hostile work

12 environment claim if they did not address subordinates' harassment of a supervisor.  Watson has

13 also not identified any case law finding a hostile work environment where employees file false

14 complaints against their supervisor, the false complaints were investigated, and the investigations

15 concluded the complaints were unfounded.  I cannot apply the qualified immunity standard with

16 a "high level of generality," and these "particular circumstances" impact whether "every

17 reasonable official" would know they violated a clearly established right. *Wesby*, 138 S. Ct. at

18 589-90.

19    Although Watson is correct that the unlawfulness of intentional discrimination is

20 apparent, she has not alleged facts to support an inference that the individual City defendants

21 were themselves motivated by race.  Further, her argument sets such a high level of generality

22 that any allegations of intentional discrimination would survive a motion to dismiss.  That is not

23 consistent with qualified immunity case law, which considers the context of the situation in

determining whether the right is clearly established. *See, e.g.*, *Sampson v. Cnty. of Los Angeles*, 974 F.3d 1012, 1024 (9th Cir. 2020) (applying qualified immunity to an official who sexually harassed someone while providing social services because the right to be free from harassment in that context had not yet been clearly established).  Because the individual City defendants are entitled to qualified immunity, I dismiss the § 1981 claim against them to the extent it is based on a hostile work environment.  I grant Watson leave to amend if facts exist to show the individual City defendants violated a clearly established right.

**B. Section 1983 Deprivation of Liberty Interest**

Watson's complaint alleges that all defendants except McCann violated § 1983 by depriving her of her "property interest in future employment" without due process guaranteed by the Fourteenth Amendment. ECF No. 1 at 23.  To establish a due process claim based on a property interest in employment, Watson must show she has a "protected property interest" in her job. *Clements v. Airport Auth. of Washoe Cnty.*, 69 F.3d 321, 331 (9th Cir. 1995).

The City defendants argue that Watson is not entitled to a property interest in at-will employment and that they provided her with due process.  They also contend Watson has failed to establish *Monell* liability for the City and that the individual City defendants are entitled to qualified immunity.  Kerby and Abernathy contend they cannot be liable because they had no part in terminating her contract and that they are also entitled to qualified immunity.  All defendants further argue that Watson has not stated a claim for a liberty interest because she has not identified stigmatizing statements and she was not barred from her field of employment.

Watson responds that her complaint "misstated" her "liberty interest" as a "property interest." ECF No. 47 at 12 n.4.  She contends that the defendants impaired her liberty interest in her reputation by not providing her with a name-clearing hearing when stigmatizing information

was publicly disclosed.  She separately argues that her rights were violated because the dismissal

effectively precluded her from her chosen profession.  She contends that she has established

*Monell* liability and that the individual defendants are not entitled to qualified immunity because

they acted in bad faith in violation of clearly established due process rights.

Watson has not plausibly alleged that she has a property interest in her employment.  The

only violation she alleges in her complaint is a deprivation of her "property interest in future

employment" without due process. ECF No. 1 at 23.  Because she has not alleged anything other

than at-will employment, she cannot have a property interest in future employment, and she has

not alleged facts to support a property interest in her job as Chief of Police. *See Clements*, 69

F.3d at 331.[7]  Because Watson has not alleged a valid basis for her § 1983 claim, I dismiss it.  If

facts exist for Watson to allege a valid basis for a deprivation of a property interest, I grant her

leave to amend to do so.

In assessing futility of amendment, I also consider whether it is possible for Watson to

state a claim based on a liberty interest.  There are two primary ways that a liberty interest may

be implicated when an employer terminates an employee: (1) the employer "makes a charge that

might seriously damage [the terminated employee's] standing and associations in h[er]

community" or (2) the employer "impose[s] on [a terminated employee] a stigma or other

disability that foreclose[s] h[er] freedom to take advantage of other opportunities." *Blantz v.*

*California Dep't of Corr. & Rehab., Div. of Corr. Health Care Servs.*, 727 F.3d 917, 925 (9th

---

[7] At-will employees do not have a property interest in employment. *Clements*, 69 F.3d at 331.
Watson does not allege the kind of employment contract she has, but "all employees in Nevada
are presumed to be at-will employees." *Am. Bank Stationery v. Farmer*, 799 P.2d 1100, 1101
(Nev. 1990).  Further, "[d]epartment directors" are not covered by civil service rules that might
otherwise provide a property interest. Henderson Ordinances § 6.01.020(A)(3); Henderson
Charter, ch. 266, art. IX, § 9.010(1).

Cir. 2013) (quotations omitted); *see also Llamas v. Butte Cmty. Coll. Dist.*, 238 F.3d 1123, 1128 (9th Cir. 2001) (treating these as separate bases for a liberty interest). In the first situation, a plaintiff may be entitled to a name-clearing hearing if the employer "levels a charge . . . that impairs [her] reputation for honesty or morality, . . . the accuracy of the charge is contested, [] there [was] some public disclosure of the charge, and [] the charge [was] made in connection with the termination of employment." *Kramer v. Cullinan*, 878 F.3d 1156, 1162 (9th Cir. 2018) (quotations omitted). In the second situation, "the government's stigmatizing statements [must] effectively exclude the employee completely from her chosen profession" to implicate a liberty interest. *Blantz*, 727 F.3d at 925. In either case, the plaintiff must identify the stigmatizing statements so that the defendants can be put on notice of the basis of the claim.

It is not clear that amendment with a liberty interest claim would be futile, so I give Watson leave to amend if facts exist to do so. Such amendment would need to identify the purported stigmatizing statements, each defendant's personal involvement, and any other required elements.[8] I decline to decide whether qualified immunity or *Monell* requirements would make amendment futile at this time without clarity on what interest Watson may allege, the facts to support that interest, and the process she did or did not receive in relation to it.

**C. Section 1985 Conspiracy**

Watson's § 1985 conspiracy claim alleges that the defendants conspired "to deprive [her] of the equal protection of, or equal privileges and immunities under the law." ECF No. 1 at 24.

---

[8] If Watson seeks to allege that her claim arises from the second situation, she will need to allege facts showing she was excluded from her chosen profession. Watson's contention that this "cannot be determined at this stage of the proceedings" neglects the pleading standard. ECF No. 47 at 13. Her allegation that she is employed as the Director of Sacramento's Office of Public Safety Accountability may belie the fact that she was "effectively excluded," and she has not alleged facts to show it is not in her chosen profession. ECF No. 1 at 21.

1 "[Section] 1985(3) provides a cause of action if two or more persons conspire to deprive an

2 individual of h[er] constitutional rights." *Pasadena Republican Club v. W. Just. Ctr.*, 985 F.3d

3 1161, 1171 (9th Cir. 2021).  A conspiracy claim must include "specific facts to support the

4 existence of the claimed conspiracy." *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 929 (9th

5 Cir. 2004) (quotation omitted).  A complaint fails to state a claim under § 1985 if it "is devoid of

6 any discussion of an agreement amongst the [defendants] to violate her constitutional rights." *Id.*

7 at 929-30.  As the Supreme Court in *Twombly* explained in the context of an anti-trust conspiracy

8 claim, "stating such a claim requires a complaint with enough factual matter (taken as true) to

9 suggest that an agreement was made. . . .  [I]t simply calls for enough fact to raise a reasonable

10 expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556.

11 Additionally, a § 1985 claim requires a plaintiff to have a cognizable § 1983 claim. *Id.* at 930.

12      The union defendants contend that Watson has not identified a cognizable § 1983 claim

13 and has not alleged that a conspiracy was formed.  The City defendants argue that she has not

14 alleged formation of a conspiracy, identified which right she believes was violated, alleged that

15 the City defendants acted with the intent to deprive her of that right, or that there was an act in

16 furtherance of the conspiracy.  Watson responds that she need not allege direct evidence of an

17 agreement because her allegations suggest the existence of an agreement by detailing the

18 defendants' coordinated efforts to interfere with her decisions and engage in a smear campaign.

19      Watson has not sufficiently alleged what constitutional deprivation provides the basis for

20 the alleged conspiracy.  Watson's broad allegations that she was deprived of equal protection and

21 equal privileges and immunities under the law is too vague to state a claim and does not give

22 defendants fair notice for the basis of the alleged conspiracy.  Although her factual allegations

23 are detailed, she does not explain how they show a deprivation of equal protection or privileges

1  and immunities.  These are legal concepts that can encompass a broad range of activities.

2  Without clarity on what right was deprived, I cannot assess whether the allegations show there

3  was an agreement to deprive her of that right.  Thus, I dismiss the § 1985 claim with leave to

4  amend to articulate the basis of the claim.

5  **D. Intentional Interference with Contractual Relations**

6  To state a claim for intentional interference with contractual relations, Watson must

7  allege "(1) a valid and existing contract; (2) the defendant[s'] knowledge of the contract;

8  (3) intentional acts intended or designed to disrupt the contractual relationship; (4) actual

9  disruption of the contract; and (5) resulting damage." *Sutherland v. Gross*, 772 P.2d 1287, 1290

10  (Nev. 1989).  Watson must assert that "the defendant[s] knew of the existing contract, or at the

11  very least, establish facts from which the existence of the contract can reasonably be inferred."

12  *J.J. Indus., LLC v. Bennett*, 71 P.3d 1264, 1267 (Nev. 2003) (internal quotations and citations

13  omitted).

14  The defendants contend they cannot be held liable for this tort because they are City

15  employees and the City cannot interfere with its own contract.  Watson argues that it is possible

16  for an agent to tortiously interfere even if they are not acting within the scope of employment but

17  instead for their own purpose.

18  The Supreme Court of Nevada has held that defendants cannot tortiously interfere with

19  their own contracts. *Bartsas Realty, Inc. v. Nash*, 402 P.2d 650, 651 (Nev. 1965).  Nevada courts

20  have yet to apply this principle to an agent-principal relationship.  But courts in this district have

21  held that "agents acting within the scope of their employment, i.e., the principal's interest, do not

22  constitute intervening third parties, and therefore cannot tortiously interfere with a contract to

23

1  which the principal is a party." *Blanck v. Hager*, 360 F. Supp. 2d 1137, 1154 (D. Nev. 2005)

2  (collecting cases), *aff'd*, 220 F. App'x 697 (9th Cir. 2007).

3      As a matter of law, the City could not have tortiously interfered with its own employment

4  relationship with Watson. *See Nash*, 402 P.2d at 651. As for the individual defendants, Watson's

5  complaint alleges that "[t]he acts performed by agents or employees of" the City "were ones

6  which those representatives had the actual and/or apparent authority to perform, may have been

7  within the scope of their employment . . . and were actuated at least in part by a desire to serve

8  their employer[.]" ECF No. 1 at 5. But in her conspiracy claim, she states that "[t]he actions of

9  the Defendants were outside of the scope of their employment with the City of Henderson and

10 the HPD." *Id.* at 25. Because of this contradiction, and without other factual details, Watson has

11 not plausibly alleged how any of the defendants were or were not acting within the scope of their

12 employment in their alleged tortious interference. I therefore dismiss the tortious interference

13 claim against the City, the individual City defendants, Abernathy, and Kerby.

14      I deny leave to amend the claim against the City because no amendment would change

15 the fact that it cannot be sued for interfering with its own contract. But I will Watson to amend

16 her claim against the other defendants because it is not clear that amendment addressing the

17 scope of employment would be futile.

18      Unlike the other defendants, McCann is not alleged to be an employee of HPD or the

19 City. Watson alleges he is the Executive Director and Chief Labor Representative of NAPSO.

20 ECF No. 1 at 4. As such, she has plausibly alleged that he is a third party. But Watson still fails

21 to state a claim against McCann. The only allegations against him involve him filing a Nevada

22 public records request and providing union representation for Abernathy in a disciplinary matter.

23 *Id.* at 12, 16. Watson has not alleged facts to show that McCann undertook these actions with

1  the intent to interfere with her employment or that they resulted in actual interference.  I thus

2  dismiss the claim as to McCann but grant leave to amend because it is not clear that amendment

3  would be futile.

4      **E. IIED**

5      To prevail on an IIED claim, Watson must show "(1) extreme and outrageous conduct on

6  the part of the defendant; (2) intent to cause emotional distress or reckless disregard for causing

7  emotional distress; (3) that the plaintiff actually suffered extreme or severe emotional distress;

8  and (4) causation." *Miller v. Jones*, 970 P.2d 571, 577 (Nev. 1998).  Extreme and outrageous

9  conduct is "that which is outside all possible bounds of decency and is regarded as utterly

10  intolerable in a civilized community." *Maduike v. Agency Rent-A-Car*, 953 P.2d 24, 26 (Nev.

11  1998) (internal quotations and citations omitted).  Termination of an employee, "even in the

12  context of a discriminatory [employee] policy, does not in itself amount to extreme and

13  outrageous conduct actionable under an [IIED] theory." *Hirschhorn v. Sizzler Restaurants*

14  *Intern., Inc.*, 913 F. Supp. 1393, 1401 (D. Nev. 1995) (internal quotations and citations omitted).

15      All defendants contend that their conduct does not rise to the level of extreme and

16  outrageous.[9]  Watson responds that the defendants engaged in a campaign to undermine her,

17  spread lies and rumors, and interfere with her job duties so that she would be terminated and that

18  this rises to the level of extreme and outrageous conduct.

19  ////

20  ////

21

22  [9] I decline to consider the union defendants' argument that Nevada does not recognize an IIED
claim in the at-will employment termination context because they raised it for the first time in
23  their reply and Watson thus did not have an opportunity to respond. *Rimini St., Inc. v. Oracle
Int'l Corp.*, 473 F. Supp. 3d 1158, 1227 (D. Nev. 2020) (declining to consider arguments raised
for the first time in a reply brief).

1          *1. Union Defendants*

2          I will allow the IIED claim against Abernathy to proceed because at this stage I decline to

3    find as a matter of law that his alleged conduct was not extreme and outrageous.  Abernathy is

4    alleged to have filed false complaints against Watson and encouraged others to do so in order to

5    get her removed from her position as Chief of Police.  His encouragement may also have led to

6    the targeting of her daughter.  This may be the "kind of targeted, scorched-earth tactics" that rise

7    to the level of extreme and outrageous. *Okeke v. Biomat USA, Inc.*, 927 F. Supp. 2d 1021, 1029

8    (D. Nev. 2013) (describing *Shoen v. Amerco, Inc.*, 896 P.2d 469 (Nev. 1995), which allowed an

9    IIED claim to proceed when there were verbal threats, frivolous litigation, and the withholding of

10   retirement funds designed to cause extreme financial hardship).  The union defendants' argument

11   that Watson cannot bring an IIED claim based on the same conduct as her discrimination claims

12   misstates the law.  The case they cite to merely points out that the conduct that formed the basis

13   of the IIED claim in that case also formed the basis of the plaintiff's discrimination claims.

14   *Braunling v. Countrywide Home Loans Inc.*, 220 F.3d 1154, 1158 (9th Cir. 2000).  The court

15   then explained why the details of the incident in that case amounted to "mere discomfort" that

16   did not rise to the level of extreme and outrageous. *Id.*

17         I dismiss the IIED claims against Kerby and McCann, however, because Watson has not

18   alleged how they engaged in extreme and outrageous conduct.  Watson has not alleged that

19   Kerby did anything more than file one false complaint and make a comment about her hair and

20   attire.  Similarly, McCann is alleged only to have acquired body camera footage through a public

21   records request related to an incident involving her daughter that the media then asked about.

22   None of these allegations, even if motivated by discrimination, is "utterly intolerable in a

23

1   civilized society." *Maduike*, 953 P.2d at 26.  Thus, Watson has not stated an IIED claim against

2   Kerby or McCann.  I grant leave to amend because it is not clear amendment is futile.

3                           *2. Individual City Defendants*

4          Most of the allegations related to the individual City defendants involve their inaction.

5   Mayor March is said to have told Watson to "stay strong" when Watson reported a threat. ECF

6   No. 1 at 13.  The only other allegation against March is that she was aware of anonymous letters

7   discussing the harassment Watson was experiencing and did nothing in response. *Id.* at 15-16.

8   Neither of these allegations amounts to extreme and outrageous conduct.  Vaskov was alleged to

9   have informed Watson of the policy on investigating complaints and provided advice in meetings

10  in dealing with disciplinary issues. *Id.* at 14, 16.  He is also alleged to have received her

11  discrimination complaint and was aware of the anonymous letters. *Id.* at 16, 19.  Gilmore is only

12  alleged to have attended some investigative interviews. *Id.* at 14.  None of these allegations

13  plausibly alleges extreme and outrageous conduct.

14         The allegations against Derrick and Ellington involve more direct interference with

15  Watson's disciplinary and promotional decisions as well as inaction in the face of harassment

16  and threats against her family.  But again, this conduct is not so outside the bounds of decency

17  for a workplace even if the conduct appears unfair. *Welder v. Univ. of S. Nev.*, 833 F. Supp. 2d

18  1240, 1245 (D. Nev. 2011) ("A simple pleading of personnel management activity is insufficient

19  to support a claim of intentional infliction of emotional distress, even if improper motivation is

20  alleged." (quotation omitted)).

21         I therefore dismiss the IIED claims against the individual City defendants.  I grant leave

22  to amend because it is not clear that amendment would be futile.

23

1      *3. The City*

2      Because none of the individual City defendants is alleged to have engaged in extreme and

3  outrageous behavior, the City cannot be liable for an IIED claim based on their conduct.  The

4  City could be liable for Abernathy's conduct through respondeat superior, but Watson has not

5  plausibly alleged whether Abernathy was acting within the scope of his employment, as

6  discussed above.  Watson has not alleged any other actions showing the City engaged in extreme

7  and outrageous conduct, and the existence of a hostile work environment is not enough by itself

8  to give rise to an IIED claim. *See Torres v. Nat'l Frozen Foods Corp.*, No. 6:20-CV-01680-MC,

9  2021 WL 1740245, at *10 (D. Or. May 3, 2021) ("While the Court has left the door open on

10  Plaintiff's hostile work environment claim, the conduct alleged simply does not rise to the level

11  of an extraordinary transgression of the bounds of socially tolerable conduct.").  I thus dismiss

12  the IIED claim against the City but I grant leave to amend because it is not clear that amendment

13  would be futile.

14      **F. NIED**

15      A typical NIED claim involves a situation in which a bystander witnesses an accident

16  caused by negligence and is emotionally injured because they viewed it. *See Grotts v. Zahner*,

17  989 P.2d 415, 416 (Nev. 1999).  The Supreme Court of Nevada has, however, recognized that

18  direct victims may also recover damages for emotional distress in a negligence cause of action.

19  *Shoen*, 896 P.2d at 477.  That court has explained that "in cases where emotional distress

20  damages are not secondary to physical injuries, but rather, precipitate physical symptoms, either

21  a physical impact must have occurred or, in the absence of physical impact, proof of 'serious

22  emotional distress' causing physical injury or illness must be presented." *Barmettler v. Reno Air,*

23  *Inc.*, 956 P.2d 1382, 1387 (Nev. 1998).  I have previously interpreted the *Shoen* line of cases to

1    preclude a separate NIED claim but allow for the recovery of emotional damages for a

2    negligence claim so long as there is a separate harm or a physical impact. *Ballentine v. Las*

3    *Vegas Metro. Police Dep't*, No. 2:14-cv-01584-APG-GWF, 2016 WL 950920, at *4 (D. Nev.

4    Mar. 7, 2016); *see also Prescott v. Slide Fire Sols., LP*, 410 F. Supp. 3d 1123, 1143 (D. Nev.

5    2019); *Peterson v. Miranda*, 57 F. Supp. 3d 1271, 1280 (D. Nev. 2014).

6        I dismiss Watson's NIED claim because Nevada does not recognize a separate NIED

7    claim for direct emotional distress caused by negligence.  Further, Watson has failed to

8    sufficiently allege that there was a physical impact from the conduct.  Her claims that she

9    received "medical treatment" is not sufficient to show that there was a physical impact from her

10   emotional distress.  It is not clear that it would be futile for Watson to amend to state a

11   negligence claim that includes emotional distress damages, so I grant her leave to amend.

12   Amendment would need to include allegations sufficient to establish a physical impact and all

13   the negligence elements.

14       **G. Defamation and Libel**

15       To state a claim for defamation,[10] Watson must allege "(1) a false and defamatory

16   statement by [a] defendant concerning the plaintiff; (2) an unprivileged publication to a third

17   person; (3) fault, amounting to at least negligence; and (4) actual or presumed damages." *Rosen*

18   *v. Tarkanian*, 453 P.3d 1220, 1225 (Nev. 2019) (quotation omitted); *see also* Nev. Rev. Stat.

19   § 200.510(1) (defining libel).  When the plaintiff is a public figure or official, the First

20   Amendment requires that the fault must rise to the level of "actual malice." *Id.* & n.2; *see also*

21   *New York Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964).  Actual malice means "knowledge

22

23   [10] Defamation encompasses both slander (spoken) and libel (written) defamatory statements.
     *Flowers v. Carville*, 292 F. Supp. 2d 1225, 1232 n.1 (D. Nev. 2003), *aff'd*, 161 F. App'x 697
     (9th Cir. 2006).

1    that [the statement] was false or [made] with reckless disregard of whether it was false or not."

2    *Smith v. Zilverberg*, 481 P.3d 1222, 1229 (Nev. 2021) (alteration in the original) (quotation

3    omitted).  Watson was a public official as Chief of Police. *See Time, Inc. v. Pape*, 401 U.S. 279,

4    284 (1971) (holding a Deputy Chief of Detectives a public official); *Posadas v. City of Reno*,

5    851 P.2d 438, 442 (Nev. 1993) (holding a police officer as a public official).

6        Watson alleges that the City, Ellington, Abernathy, Kerby, and McCann "made false and

7    defamatory statements about" her and "published the remarks to third parties with knowledge of

8    the falsity or with a reckless disregard for their truth or falsity." ECF No. 1 at 28.  She alleges

9    "the publication" was "directly related to [Watson's] business reputation." *Id.*  Similarly, Watson

10   alleges those same defendants made libelous statements by "caus[ing] the written reporting of

11   matters regarding [Watson] which were false." *Id.* at 29.

12       The defendants argue Watson's defamation and libel claims should be dismissed because

13   she does not identify the defamatory statements that form the basis of her claims.  Watson

14   responds without further discussion that she has "stated the required *elements* of the defamation

15   and libel claims." ECF Nos. 46 at 23; 47 at 23 (emphasis in original).

16       Watson's complaint recites the elements of defamation and libel in a literal sense, but that

17   does not meet the pleading standard. *Twombly*, 550 U.S. at 545 ("[A] formulaic recitation of a

18   cause of action's elements will not do.").  Watson has failed to identify the defamatory

19   statements that form the basis of her claims, and it is not discernable from the complex narrative

20   of events in the complaint.  Watson's complaint does not give the defendants sufficient notice of

21

22

23

1  how she contends each defendant defamed her.  I also have no way to assess whether the

2  statements are defamatory, were made with actual malice, or were published to a third party.[11]

3        I cannot determine whether Watson can state a claim for defamation based on her general

4  allegation that all the defendants engaged in a "smear campaign against her which consisted of

5  leaking half-truths and outright falsehoods to the media and using a writer for a local paper as a

6  puppet to publish disparaging lies about her which continued even after her termination." ECF

7  No. 1 at 20.  Watson does not allege who leaked the letters and correspondence to the media and

8  whether those were false and defamatory.  She also has not alleged that the City's response to

9  Watson's NERC/EEOC charges provided to the media contained any false and defamatory

10  statements. *Id.*

11        Watson never identified what "false information" Abernathy and Kerby provided, only

12  that it was discussed at the September 26, 2018 meeting with Watson, Ellington, and Derrick. *Id.*

13  at 11.  As to the other false complaints, Watson does not identify the speakers, whether they had

14  actual malice, or how those statements were published. *Id.* at 13-14.  She also does not identify

15  the "HPD officers" who posted "disparaging remarks" on a racist website, nor does she identify

16  what remarks were made. *Id.* at 13.

17        To the extent that the claim against McCann is based on his public records request,

18  Watson never alleges that McCann contacted the media, only that "word of the accident was

19  reported to the media" sometime following his footage request and that the Las Vegas Review

20

---

21  [11] In the context of her § 1983 claim, Watson contends that investigations of the complaints were in her personnel file, and that those are "published" because City personnel files are public

22  records under Nevada law. ECF No. 46 at 13.  But Watson does not make such an argument, let alone provide case law, to support that theory in the context of her defamation claims.  Even if

23  she had, she has not alleged in her complaint that the investigations were placed in her personnel file, which defendants were responsible for such placement, and whether this was done with actual malice.

Journal requested the footage after an unspecified "source" informed it that the footage "involved wrongdoing." *Id.* at 12.  Watson also does not allege that McCann alerted Channel 13, nor does she allege that he made any false statements to Channel 13. *Id.*  Her allegation that McCann called her current employer to dissuade it from hiring her because it "shouldn't want" Watson also contains no actionable false statement. *Id.* at 21; *see Pegasus v. Reno Newspapers*, *Inc.*, 57 P.3d 82, 87 (Nev. 2002) ("Statements of opinion cannot be defamatory[.]").

I therefore dismiss Watson's defamation and libel claims.  I grant her leave to amend to identify the statements that form the basis of her claims if facts exist to satisfy all the elements.[12]

## H. Conspiracy

"In Nevada, . . . civil conspiracy liability may attach where two or more persons undertake some concerted action with the intent to commit an unlawful objective, not necessarily a tort." *Cadle Co. v. Woods & Erickson, LLP*, 345 P.3d 1049, 1052 (Nev. 2015).  "Thus, a plaintiff must provide evidence of an explicit or tacit agreement between the alleged conspirators." *Guilfoyle v. Olde Monmouth Stock Transfer Co.*, 335 P.3d 190, 198 (Nev. 2014). A civil conspiracy claim will fail if there is no cognizable civil wrong. *See Jordan v. State ex rel. Dep't of Motor Vehicles & Pub. Safety*, 110 P.3d 30, 51 (Nev. 2005), *disavowed on other grounds by Buzz Stew, LLC v. City of N. Las Vegas*, 181 P.3d 670, 672 n.6 (Nev. 2008).

Watson contends that all the defendants engaged in common law conspiracy to "commit acts set forth above, including, but not limited to, coordinating efforts to undermine and defame [Watson], cause her termination from HPD and ruin her reputation and career." ECF No. 1 at 29.

---

[12] Because I have dismissed her defamation and libel claims, I need not strike Watson's prayer for punitive damages as the union defendants request.  If Watson seeks to include punitive damages for these claims in her amended complaint, she must plausibly allege facts to support such a request under Nevada law. *See, e.g., Countrywide Home Loans, Inc. v. Thitchener*, 192 P.3d 243, 252 (Nev. 2008).

Like the defects in her § 1985 conspiracy claim, she has not alleged a cognizable unlawful objective.  I have dismissed her defamation and tortious interference claims, and it is unclear what other unlawful objectives are meant from her contention that defendants conspired to undermine her, cause her termination from HPD, or ruin her reputation and career.  I thus dismiss her claim but grant her leave to amend if she can set forth the unlawful objectives she contends the defendants agreed to as well as all other required elements.

## I. State Law Discretionary Immunity

Nevada confers immunity on any officer or employee for claims "[b]ased upon the exercise or performance or the failure to exercise or perform a discretionary function or duty." Nev. Rev. Stat. § 41.032(2).  A decision falls within the scope of discretionary immunity if it "(1) involve[s] an element of individual judgment or choice and (2) [is] based on considerations of social, economic, or political policy." *Martinez v. Maruszczak*, 168 P.3d 720, 729 (Nev. 2007).  Discretionary immunity "does not include intentional torts and bad-faith conduct." *Franchise Tax Bd. of Cal. v. Hyatt*, 407 P.3d 717, 733 (Nev. 2017), *rev'd on other grounds*, 139 S. Ct. 1485 (2019).

Because I have dismissed all Watson's state law claims, I need not reach whether the individual City defendants are entitled to discretionary immunity.  Although discretionary immunity could impact whether amendment would be futile, it is not clear at this stage whether discretionary immunity would bar every possible amendment.  There must be further clarity on the actions that form the bases of the claims and whether those actions were taken in bad faith.

## III. ANTI-SLAPP MOTION AND MOTION FOR DISCOVERY [ECF NOS. 35, 50]

Gilmore and Vaskov separately filed a special motion to dismiss Watson's state law claims against them because they contend that the anti-SLAPP statute applies to their good faith

communications of legal advice to the City. ECF No. 35 at 1.  Watson responds that the anti-SLAPP statute should not apply because Gilmore and Vaskov participated in a scheme to disparately treat her and the legal advice communications are only tangential to her claims. ECF No. 48 at 13.  Watson also requests leave to perform limited discovery under NRS § 41.660(4) to respond to the anti-SLAPP motion because the evidentiary basis to support her claims is within the possession of another party or a third party. ECF No. 50.

Because I have dismissed all the state law claims against Gilmore and Vaskov, I deny their anti-SLAPP motion as moot.[13]  This denial is without prejudice to refile if necessary.  I also deny as moot Watson's motion for discovery because it is based on the anti-SLAPP motion.

**IV. CONCLUSION**

I THEREFORE ORDER that defendants Kevin Abernathy, Kenneth Kerby, and Richard McCann's motion to dismiss **(ECF No. 33) is granted in part**.  I dismiss all claims against Kerby and McCann.  For Abernathy, I deny the motion to dismiss as to the § 1981 hostile work environment and the intentional infliction of emotional distress claims, but I grant the motion to dismiss as to the other claims brought against him.

I FURTHER ORDER that defendants City of Henderson, Debra March, Bristol Ellington, Nicholas Vaskov, and Kristina Gilmore's motion to dismiss **(ECF No. 36) is granted in part**. For the City of Henderson, I deny the motion to dismiss as to the § 1981 hostile work

---

[13] It is challenging to assess whether Watson's claims are based on "good faith communications" made "in direct connection with an issue of public concern" under the anti-SLAPP statute because she does not make clear what actions form the bases of her claims. Nev. Rev. Stat. § 41.650.  Watson's response to the anti-SLAPP motion contends that her allegations are not based on Vaskov and Gilmore providing legal advice to the City but instead are based on "their conduct, through activity or inaction, [that] was done in a manner which was disparate." ECF No. 48 at 13.  Yet it is unclear what "conduct" she is referring to if not their advice to the City regarding handling complaints or union disputes.

environment claim, but I grant the motion to dismiss as to the other claims brought against it. I grant the motion to dismiss all claims against March, Derrick, Ellington, Vaskov, and Gilmore.

I FURTHER ORDER that defendants Nicholas Vaskov and Kristina Gilmore's special motion to dismiss **(ECF No. 35) is denied as moot**, without prejudice to refile.

I FURTHER ORDER that plaintiff LaTesha Watson's motion for leave to perform discovery in connection with the special motion to dismiss **(ECF No. 71) is denied as moot.**

I FURTHER ORDER that plaintiff LaTesha Watson's motion for leave to amend **(ECF No. 49) is granted in part.** I grant leave to amend all her claims as set forth in this order except for the intentional interference with a contractual relationship claim brought against the City of Henderson.

I FURTHER ORDER that plaintiff LaTesha Watson may file an amended complaint by October 15, 2021. If she fails to do so, the case will proceed on the remaining claims.

DATED this 23rd day of September, 2021.

ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE