MARC P. COOK, ESQ.
Nevada Bar No. 004574
GEORGE P. KELESIS, ESQ.
Nevada Bar No. 00069
JULIE L. SANPEI, ESQ.
Nevada Bar No. 0005479
COOK & KELESIS, LTD.
517 South Ninth Street
Las Vegas, Nevada 89101
Phone:         (702) 737-7702
Fax:           (702) 737-7712
E-mail:        law@bckltd.com
*Attorneys for Plaintiff, LATESHA WATSON*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| LATESHA WATSON, | Case No.: 2:20-CV-01761-APG-BNW |
| Plaintiff, | |
| v. | |
| CITY OF HENDERSON; BRISTOL ELLINGTON; KEVIN ABERNATHY; KENNETH KERBY; RICHARD DERRICK; RICHARD MCCANN; NICK VASKOV; KRISTINA GILMORE; DOES I through X, inclusive, | **FIRST AMENDED COMPLAINT AND JURY DEMAND** |
| Defendants. | |

COMES NOW, Plaintiff, LATESHA WATSON (hereinafter "Plaintiff" or "Dr. Watson") by and through counsel, the law firm of COOK & KELESIS, LTD., brings this action pursuant to 42 U.S.C. §1981, §1983, §1985, Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. §2000e, *et seq.* ("Title VII") and related claims for damages permitted by Nevada law.

### Preliminary Statement

1.      This is a civil action for monetary relief arising from injuries Plaintiff sustained as a result of Defendants' systematic discrimination based upon race and gender. During Plaintiff's employment with the City of Henderson, she was subjected to systemic discrimination, undermined, conspired against, harassed, dehumanized, exposed to centuries old bigotry, and experienced back-room retaliation from a city government and its cronies.

2.      Dr. Watson was immensely qualified for her job, with over 19 years experience as a police officer in Texas and a career trajectory and work history demonstrated her ability to be a successful chief of police.

3.      Upon taking her position as chief of police, Dr. Watson was quickly the subject of retaliation and discrimination from a "good old boy" network that seemed surprised that she was a Black woman – notwithstanding her interviews, photos, and memberships in the National Organization of Black Law Enforcement Executives (NOBLE) and International Association of Woman Police (IAWP) – and which was unwilling to allow her to perform her duties. Ironically, however, following Dr. Watson's  termination, Defendants continue to follow the policy changes implemented during her tenure.

4.      The City of Henderson, including, but not limited to the City of Henderson Police Department has a long history of unethical, illegal, and civilly culpable conduct and actions as well as hostile conditions.  The Defendants represented to Dr. Watson that she was being hired to help facilitate a cultural change in the police department but instead, sought a figurehead for the perception of change, while undermining any effort to diffuse the culture.

5.      While the City of Henderson and the Defendants gave Dr. Watson a seat at the table, they did not want her to have a voice.  Dr. Watsons's race and gender were the underlying basis for Defendants' discriminatory actions.  However, race is a construct.  As such, statutes, including, but not limited to 42 U.S.C. 1981, 42 U.S.C.1983 and Title VII hold such reprehensible conduct to be violations of federal law.

**Jurisdiction and Venue**

6.      This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1367.  Plaintiff has plead one or more federal questions.  See e.g. 42 U.S.C. §1981, §1983 and §1985, Title VII of the 1964 Civil Rights Act, *amended*, 42 U.S.C. §2000 et. seq.

7.      The acts set forth herein occurred in Henderson, Nevada.

8.      Plaintiff's causes of action arose in Henderson, Nevada.

9.      Venue is appropriate pursuant to 28 U.S.C. §1391(b)(2) because the events, acts and/or omissions giving rise to Plaintiff's claims occurred in the State of Nevada, County of Clark.

10.     Prior to filing this action, Plaintiff timely exhausted her administrative remedies by filing a charge of discrimination with the Nevada Equal Rights Commission (NERC) and the Equal Employment Opportunity Commission (EEOC).  Plaintiff received a right to sue letter dated July 16, 2020.

**Parties**

11.     Plaintiff, Dr. Watson, was the chief of police for the Henderson Police Department as defined by NRS 266.530 and was designated an executive officer for the City of Henderson pursuant to 1.090 of the Henderson City Charter.

12.     Defendant, City of Henderson ("City"), is a governmental entity organized and existing under the laws of the State of Nevada, is a political subdivision as defined by NRS Chapter 41 and was the local government employer of members of the Henderson Police Department ("HPD"), a law enforcement department/agency for the City.

13.     Defendant, Bristol Ellington ("Ellington"), is and was the Deputy City Manager for the City of Henderson appointed pursuant to Sec. 3.020 of the Henderson City Charter and is a public officer as defined by NRS 281A.160.

14.     Defendant, Kevin Abernathy ("Abernathy") is and was at all times relevant hereto, a peace officer as defined by NRS 289.010(4) and the President of the Henderson Police Supervisors Association ("HPSA"), an employee organization as defined by NRS 288.040, which acts as the collective bargaining unit for supervisory law enforcement officers of HPD.

15.     Defendant, Kenneth Kerby ("Kerby") is and was at all times relevant hereto, a peace officer as defined by NRS 289.010(4) and the President of the  Henderson Police Officers Association ("HPOA"), an employee organization as defined by NRS §288.040 which acts as the collective bargaining unit for rank and file police officers of HPD.

16.     Defendant Richard Derrick ("Derrick") is and was the City Manager for the City of Henderson as defined by Sec. 3.020 of the Henderson City Charter and is a public officer as defined by NRS 281A.160.

17.     Defendant Richard McCann ("McCann") is and was at all times relevant hereto, the Nevada Association of Public Safety Officers Executive Director & Chief Labor Representative.

18.     Defendant, Nick Vaskov, ("Vaskov") is and was at all times relevant hereto, the City Attorney for the City of Henderson as defined by NRS 266.465 to 266.470 tasked with acting as the legal advisor of the city council and all officers of the city.

19.     Defendant, Kristina Gilmore ("Gilmore") is and was at all times relevant hereto, an Assistant City Attorney for the City of Henderson as defined by NRS 266.465 to 266.470 tasked with acting as the legal advisor of the city council and all officers of the city.

20.     Each individual Defendant identified herein is included in both their individual and official capacities.

21.     The true names or capacities whether individual, corporate, associate or otherwise, of Defendants, DOES I through X are unknown to Plaintiff who, therefore, sue said Defendants by such fictitious names; Plaintiff is informed and believes and thereon allege that each of the Defendants designated herein as DOE are responsible in some manner for the events and happenings referred to and caused damages proximately to Plaintiff as herein alleged and that Plaintiff will ask leave of this Court to amend this Complaint to insert the true names and capacities of DOES I through X when the same have been ascertained and to join such Defendants in this action.  Further, Plaintiff designates all persons unknown claiming any interest in the property as Defendants, DOES I through X, inclusive.

22.     The acts performed by agents or employees of City, whether such representatives have been individually named herein as a defendant, or are yet to be identified, were ones which those representatives had the actual and/or apparent authority to perform, may have been within the scope of their employment, were of the kind they were authorized to perform, may have been within the scope of their employment, were of the kind they were authorized to perform, and were actuated at least in part by a desire to serve their employer, and therefore the City is liable for their acts pursuant to the doctrine of respondeat superior.

**Common Allegations**

23.     Dr. Watson began her law enforcement career in 1994 in Hutchins, Texas.  By 2002, she was a police officer in the Arlington, Texas and as of 2014, she had risen through the ranks to become the department's youngest deputy chief.

Page 4 of  44

24.     Dr. Watson had always been extremely hard-working and high achieving in every role she occupied.  In every context since grade school, she scored at or near the top of her class, including her promotional tests as she rose through the ranks of the police force. She was fully devoted to the goal of improving policing, including increasing diversity, equity, and inclusion in the profession.

25.     Her earliest exposure to policing was as a high school student, via a program to improve community relations and to expose Black and Latino youth to policing, and the profession became a calling for her, despite her deep understanding of the challenges of entrenched attitudes and exclusion.

26.     Dr. Watson holds a B.S. in Criminal Justice, a M.S. in Criminology and a Ph.D. in Management and Organizational Leadership. She is currently pursuing a Ph.D in International Psychology concentrating on Organizations and Systems.

27.     Dr. Watson has worked to advance women in policing and is in demand as a speaker at symposiums and conferences, and facilitates law enforcement courses regarding the value of diversity in the recruitment, retention, selection, and promotion of women in law enforcement.

28.     Additionally, Dr. Watson has conducted extensive research and published on the topics of women in policing, women as law enforcement executives, organizational leadership, gender disparities in law enforcement, police management, immigration enforcement, organizational performance and effectiveness, management and leadership.

29.     In approximately 2017, Plaintiff was recruited during a nationwide search soliciting candidates to apply to the City for the position of chief of police.

30.     Written search materials indicated, "[t]he ideal candidate will be a reform-minded leader who conveys a strong and effective command presence, combined with having outstanding people and management skills."

31.     Key responsibilities identified for the position were to establish departmental policies, review and interpret laws and regulations affecting the City, direct and perform complex management work in the enforcement of laws and the preservation of peace within the community; provide law enforcement advice, opinions and services to the city council, city manager, assistant

city manager and various department heads.

32.     Dr. Watson applied for the position and following a selection process during which 90 candidates were vetted, was hired by City Manager, Robert Murnane ("Murnane") on September 15, 2017.

33.     In February 2018, Murnane retired.  Plaintiff continued to report to Derrick as acting city manager until he was officially appointed city manager in July, 2018.

**An Organization in Crisis**

34.     Typically, the strong organizational culture of policing is characterized and nurtured by chain of command, discipline, and common values.  Breakdowns in values, discipline, or the command structure can be particularly toxic for organizational culture as their ripple effect is expected to be felt throughout the organization.

35.     Thus, HPD was an organization in crisis at the time of Dr. Watson's hiring.  She was the fourth police chief in 12 years.

36.     The previous chief had been felled by sexual harassment allegations and additional misconduct. These allegations had been covered up and extended beyond the chief himself.

37.     Plaintiff's tenure was intended to reform the HPD.  Specifically, Murnane told Dr. Watson she was hired to facilitate a cultural change in the department.

38.     Murnane also told Plaintiff the police department operated as a "good ol' boy" system where nepotism and favoritism were rampant.  A select subculture enjoyed preferential treatment over many rank and file members, where promotions were based on friendships and connections, not necessarily merit, and where inappropriate personal conduct was overlooked if a police officer had the right associates.

39.     At her hiring, the City openly touted its choice to bring in Dr. Watson as a commitment to change and reform.

40.     However, it soon became apparent Dr. Watson was being installed merely as a figurehead and given a place at the executive table with no voice.

41.     When Dr. Watson took over as police chief, she was deluged with receptions, public events and photo opportunities as the City publicly touted its hiring of a Black female police chief.

42.     During those events, Dr. Watson was pulled aside by well-wishers who made comments to her about the challenges she would be facing: "you are going to have a hard time, they don't want you," "they don't accept outsiders and they're definitely not going to accept a woman," and "they don't think women belong in policing, especially command over White males."

43.     As Dr. Watson was told again and again, she was explicitly hired to clean up HPD with the understanding that the misconduct may not be limited to the former chief whom she was replacing.

44.     This mandate persisted even after the February 2018 retirement of Murnane. Upon assuming the City Manager role, Derrick confirmed that Dr. Watson was "his chief of police" and that he had been involved in her hiring process. He advised her that her "charge remains the same."

45.     Dr. Watson specifically clarified with Derrick that he understood that organizational reform meant changes and changes are met with resistance and complaints.  He advised her that he understood this and instructed her to move forward changing the organizational culture and reforming HPD.

46.     The circumstances of Dr. Watson's hiring, and the public framing of her as a change agent, is proven scientifically to be a component of the racial and gender discrimination that persists in leadership contexts. Research confirms that this sort of gender discrimination is not specific to a single profession, but instead specific to the incongruity of women leaders in the profession, like police chiefs. *See* Victoria L. Brescoll, et al., *Hard Won and Easily Lost: The Fragile Status of Leaders in Gender-Stereotype-Incongruent Occupations*, 21 Psychological Science 1640, 1642 (2010).

47.     For organizations in crisis, a stated commitment to change or reform may be limited to the hiring of a woman, i.e., a person who serves as a visible signal of change. *See* Clara Kulich, et al., *Signaling change during a crisis: Refining conditions for the glass cliff*. 61 J. Experimental Soc. Psychol. 96 (2015). A research-backed form of disparate treatment is the hiring of women merely as "virtue-signaling" or "window dressing" to the outside world.

48.     "[A]ccording to Dr. David Thomas, a retired detective and forensic studies professor at Florida Gulf Coast University[,] "There are two types of chiefs: There are the change agents, and

others who are there to pick up where the old chief left off." *See* Trone Dowd, *Do Black Women Have to Save the Police, Too*?, VICE (Jul. 20, 2021). "Black women bring a very particular skill set that should be very beneficial to any organization, because there's no doubt that they're not looking at policing through the same lens of those who came before." …. When Black women do manage to overcome discrimination and sexism and land leadership positions, they often face the same challenges while trying to institute change." *Id.*

49.     Thus, this is a form of crisis management that may belie stated commitments to change. "Token" or "window-dressing" hires may be penalized for interference in the politics and governance of the organization. *See* e.g., E. Helland, et al., *Regulation and the evolution of corporate boards: monitoring, advising, or window dressing?* 47 J. L. & Econ., 167 (2004). Women leadership hires, like Dr. Watson, "as non-traditional leaders, are strategic choices of companies with the aim to signal change to the outside world… when past leadership is held responsible for a crisis. However, they are not expected to actually impact on the company's performance through their leadership quality." *Id.*

50.     Dr. Watson quickly received indications that City personnel preferred her presence as a token, signaling change, not as an active agent of change.

51.     Although many women leaders struggle to balance work and family, Derrick told Dr. Watson that "he could not wait" for her family to arrive in the city.  He also asked her to "stop working so much," despite the wide scope of her mandate for change.

52.     From the start of her employment, Plaintiff began enforcing existing Code of Conduct policies which had previously been applied inconsistently pertaining to discipline of police officers for improper personal conduct: activity resulting in arrests, domestic abuse, DUI, or even use of prohibited holds.  Initially, her decisions to discipline officers were approved by the City.

53.     On or about July 26, 2018, Plaintiff's job was restructured to have her report directly to Deputy City Manager, Ellington.

54.     As Dr. Watson began to make changes designed to reset the organizational culture including disciplining misconduct, a backlash from the rank and file and the city leadership intensified. In a December 2018 meeting with Derrick and Ellington, Ellington told Dr. Watson that

he had concerns with her management style. During and immediately after that meeting, he also mandated that she work with a leadership coach, in addition to the coach all city leadership were using.

55.     Similarly, Dr. Watson's strong and steadfast vision was penalized when it began to challenge a status quo. For example, in this same period, when Dr. Watson canceled a meeting she had requested with Derrick, but which was set with only the Ellington and Vaskov, Ellington sent her an emotionally charged email and accused her of being argumentative and "not accepting responsibility" for her management style. Although they may believed what they said, these statements are also consistent with a specific racialized and gendered expectation for leadership.

### Glass Cliff, Bias and a Culture of Denial

56.     Dr. Watson was the first Black woman police chief ever hired in the City.

57.     She was also the first Black police chief. Later, she learned she was also the first Black woman to lead any public agency in the state of Nevada.

58.     Today, there are very few Black police chiefs or women police chiefs in the United States. According to the U.S. Department of Justice, in 2016, an estimated 3% of local police chiefs were Female. *See* Bureau of Justice Statistics, *Local Police Departments, 2013: Personnel, Policies, and Practices,*7. Among chiefs in local police departments, 90% were white, and 4% were Black. Id. at 8. This is consistent with 2020 records for Black chief executives generally in the United States. See Bureau of Labor Statistics, Current Population Survey, Household Data Annual Averages, T. 1.1, available at https://www.bls.gov/cps/cpsaat11.htm.  Black women police chiefs like Dr. Watson, are even rarer.  The role of police chief is traditionally white and male, i.e., subject to racialized and gendered expectations.

59.     Although she was aware that she was the first Black woman chief when she took the role, Dr. Watson was surprised to learn that there were no Black woman officers or "sworn" personnel in the ranks of HPD's police force.

60.     No HPD officers had seen a Black woman in any leadership role in any capacity the department.

61.     Most officers in the department had never worked with a sworn Black woman

colleague ever and had only interacted with Black women as administrative staff, if at all.

62.     Dr. Watson experienced a classic "glass cliff," a research-backed phenomenon where women or people of color are promoted to executive positions during a difficult period for an organization, and when the risk of failure is high. Like the "glass ceiling," it is a precarious and measurable, but often invisible type of gendered discrimination.

63.     As research shows, the glass cliff is a particularly important aspect of systemic bias as it relies on racialized and gendered assumptions relating to leadership and agency or capacity. "The fact that they are more likely to be offered precarious position not only means that their range of opportunities is limited but also that they may be more likely to fail if they take on the leadership position. Moreover, … this failure is more likely to be attributed to situational factors for white men, but to personal failings for members of under represented groups. In this way, the precariousness of the glass cliff, and the potentially high risk of failure, runs the risk of reinforcing and perpetuating stereotypes and inequalities in the workplace."

### Black Women Leaders Routinely Experience Common and Measurable forms of Racial and Gender Discrimination

64.     Research on employment separation and racial discrimination shows that even severe and pervasive bias in organizational decision-making often instrumentalizes aversive racism or pretextual rationalizations. Even where a glass cliff is not in evidence at the time of selection, i.e., the quality of opportunity received by leaders, ongoing racial discrimination may be deferred. Data analytics show quantitative evidence of racial discrimination in post-selection leadership outcomes, "even when an organization appears to be operating in an unbiased manner." William G. Obenauera and Nishtha Langerb, *Inclusion is not a slam dunk: A study of differential leadership outcomes in the absence of a glass cliff*. 30 Leadership Quarterly 1, 13-15.

65.     Dr. Watson's experience reflects documented norms of unfettered bias in the research on racial and gender discrimination in executive leadership. "Women of color are more likely to experience organizational barriers, perceived lack of credibility, tokenism, racism, sexism, and microaggressions than white men and women." Assertiveness is viewed negatively in women and as a result, women who wish to actively tackle a crisis - a male behavior - may face negative

"backlash" reactions. *See* e.g., Laurie A. Rudman & Kimberly Fairchild, *Reactions to counterstereotypic behavior: the role of backlash in cultural stereotype maintenance*. 87 J. Personal & Soc. Psychol. 157 (2004).

66.     In addition, research specific to female police chiefs demonstrates that the gender-incongruity of the role had a significant effect on the treatment of the police chiefs, rendering their status particularly fragile. "[W]hen female police chiefs … made a mistake, they were accorded significantly less status, and viewed as less competent, than their gender-congruent counterparts." See Victoria L. Brescoll, et al., *Hard Won and Easily Lost: The Fragile Status of Leaders in Gender-Stereotype-Incongruent Occupations*, 21 Psychological Science 1640 (2010).

67.     The research shows that "whether backlash is instantiated as sabotage, unfavorable competence ratings, or low likeability, it functions to preserve stereotypes by erecting strong, social barriers for atypical exemplars." As was the case for Dr. Watson, "people who seek to disconfirm stereotypes face substantial difficulties that allow cultural stereotypes to persist," rather than diluting these stereotypes in the face of gender bias. *See* Laurie A. Rudman & Kimberly Fairchild, *Reactions to counterstereotypic behavior: the role of backlash in cultural stereotype maintenance*. 87 J. Personal & Soc. Psychol. 157, 172 (2004).

68.     In addition, as Dr. Watson experienced, racial bias and intentional racial discrimination shows up in measurable and predictable ways for Black women in leadership, particularly related to likeability, perceived aggression, and in racial stereotypes relating to competence, judgment, and insight.     *See* e.g., Aisha Holder, et al., *Racial microaggression experiences and coping strategies of Black women in corporate leadership*, 2 Qualitative Psychology 164 (Aug 2015).

69.     As the research indicates, "A primary racial microaggression was related to the stereotype of being intellectually inferior, a common type of subtle bias African Americans encounter … Black women's overall competence, intellect, and capabilities are often challenged and undermined in the workplace." *Id.* at 174.

70.     Like Dr. Watson, Black women leaders experience more frequent questioning of their credibility and authority, greater visibility and scrutiny of their work, and more "exclusion in the

workplace such as not being invited to social gatherings and work-related meetings thus not being afforded key career opportunities as others in the group." *See id*. at 174; see also Catalyst, *Advancing African American Women in the Workplace* (2004). Each of these were a type of discrimination on the basis of race and gender that was found to disadvantage Black women in the workplace, including assessments of work performance, capacity, and retention.

71.    Additioanlly, the penalty for perceived errors in judgment or in performance were demonstrated to be particularly severe for Black women leaders, and greater than the penalty for mistakes made by either white women or Black men. *See* Ashleigh S. Rosette and Robert W. Livingston, *Failure is not an option for Black women: Effects of organizational performance on leaders with single versus dual-subordinate identities*. 48 Journal of Experimental Social Psychology 1162 (2012). "White men were shown to benefit separately from their race and their gender (i.e., an additive effect) resulting in more favorable evaluations than Black men and White women during organizational success." *Id*. at 1165. Alternatively, in times of organizational crisis or failure, Black women leaders face "double jeopardy," a harsher penalty for perceived missteps, when compared to as leaders who were Black men leaders or white women "benefitted from at least one predominant identity that is congruent with the leader role," i.e., stereotypical ideas of what leaders look like. *Id*. at 1165.

### Racialized and Gendered Backlash, Sabotage, and Undermining of Dr. Watson's Leadership

72.    Dr. Watson was routinely confronted with varied forms of racial and gender, i.e., intersectional, discrimination from Defendants, including undermining of her judgment, questioning of her competence, and acts of sabotage and exclusion that impacted her ability to perform the role of police chief and which eventually resulted in her termination.

73.    The resistance to change and corruption within the system was made evident to Dr. Watson in advance of her start date, but she was assured of the support and resources to clean up the department.

74.    On October 20, 2017, prior to assuming her role as chief, Plaintiff received an email warning her about the attitudes, comments, and plans to derail or sabotage her by her future

colleagues and leadership staff. The writer indicated the "tone, defiant stances and critical comments I've heard have given me some pause" and warned her of a coordinated campaign to oust her by policing colleagues whom he had worked with for over twenty-five years, i.e., very senior, veteran personnel.

75.     The sender was a former HPD employee who attended an annual training conference for law enforcement executives in Nevada and warned her that administrative members of the HPD were already discussing her inability to make changes to the agency, looking for her to fail and openly discussing their disgust with her hiring.

76.     Dr. Watson was not deterred by the information she received and rumors she heard before starting her role as chief. She believed the common values and goals of policing as a unifying tool and developed an approach designed to confront, address, and dispel concerns while shepherding in improvements to organizational culture.

77.     For example, Dr. Watson openly engaged the challenge before her, including the rumors, and embraced her assigned role as a change agent in this context. Yet, Dr. Watson's experience reflected the ongoing, systemic bias on the basis of gender and race in the City and in HPD.  Her direct approach, although considered a positive trait in leadership for men, was subject to a backlash precisely because of its counter-stereotypical nature.

78.     Once she started the role, people came up to her in person on a weekly basis, pulled her aside, and informed her of racial slurs and disparaging statements that old-timers in the department were saying about her, that she was being "called out her name," that she was referred to as a "n*gger" and that Abernathy called her a "Black bitch" and that he wanted her gone and "we need to find complaints against her,"  Consistently, she reported this to Derrick and Ellington, without any investigation or result.

79.     Despite Dr. Watson's advanced degrees, and even a doctorate, and a career in policing, her judgment was openly and routinely questioned even with respect to routine matters of discipline and officer misconduct. Dr. Watson's proactive approach and problem-solving orientation was held against her as she was labeled "punitive," excluded from key conversations and networking opportunities, and eventually terminated.

80.     Like police chiefs in Henderson prior to her, Dr. Watson expected to determine discipline for officer misconduct.  Prior White police chiefs had been supported and unquestioned in the meting out of discipline, even where later overturned or modified in arbitration.  This included many derogations form policy to avoid terminating officers who had committed serious misconduct. *See* e.g., Arthur Kane, *Flawed discipline: Henderson officers with years of misconduct kept their jobs. Confidential police records reveal why*, Las Vegas Review-Journal (April 24, 2021). However, Dr. Watson's discipline determinations were immediately and consistently subject to review, revision, and overturning by the Defendants, individually and in concert.

81.     In this regard, Dr. Watson's attempts to reset organizational culture and to restore discipline to a department in crisis were met by concerted, coordinated efforts to undermine her actions, question her judgement, and sabotage her authority.

82.     Dr. Watson's leadership was met with open defiance, acts of sabotage, and exclusion from key conversations and opportunities.

83.     Some of the coordinated efforts grew from networking and social gatherings of Deputy chiefs, police personnel, Ellington, and other municipal employees. Dr. Watson was routinely excluded from (although informed about and aware of) these quasi-social sessions, as she was frequently called to account for allegations made therein.

84.     During a meeting with Plaintiff on September 19, 2018, Ellington, in an off-topic comment, conveyed that his relationships with police department employees were professional except for a close friendship with HPD Captain Dave Mattoon ("Mattoon").  Ellington wanted Plaintiff to know that they never discussed Plaintiff and specifically pointed out that Mattoon "never said anything negative about [Plaintiff]."

85.     Notwithstanding that unsolicited representation, during meetings with Ellington it was apparent Ellington was being provided information from current HPD captains who were present during command team meetings because Ellington would repeat discussions that occurred there which he should not have otherwise been privy.

86.     Moreover, after such social events and conversations, Ellington would seek to discuss particular cases brought to his attention by her deputy chiefs and others, a derogation from the chain

of command. In many of these cases, discipline was set according to policy. Yet, Ellington would inform Dr. Watson that she was being too punitive and that these personnel had been in the department a long time, implying they deserved special treatment.

87.     Similarly, in their bi-weekly one-on-one meetings, Dr. Watson was made to explain over and over again the facts surrounding the same disciplinary cases. Ellington made multiple delays and extensions in resolving disciplinary cases even once explained, signaling discomfort with and disinclination to accredit Dr. Watson's leadership at even its most micro-level, i.e., the retention of department personnel.

88.     Her professional judgment and authority was further undermined.

89.     Although, Dr. Watson met with Kerby on a monthly basis, he reserved his complaints and concerns about issues related to personnel, her leadership or his conversations with the Mayor, instead of making allegations to Plaintiff's face. This was a serious derogation from the chain of command which he exercised for virtually every change in policy and procedure set by Dr. Watson.

90.     Additionally, in a manner wholly inconsistent with discipline that occurred under any prior chief of police, Plaintiff's decision to place an officer who lost her gun on administrative leave was subject to criticism, censure, and ultimately revision by Gilmore and the City's department of Human Resources.

91.     On May 15, 2018, the City's Human Resources Department and Gilmore attempted to interfere with Dr. Watson's decision to keep a police officer who, while unconscious lost her loaded gun, on administrative leave. While the cause of the officer's blackout was being investigated, Plaintiff expressed concern that she was unfit until her medical condition could be identified. Gilmore informed Plaintiff that HPD must instead accommodate the officer's preference to remain on duty, suggesting placing the officer in corrections. Eventually this officer was placed on family medical leave but never faced formal disciplined for losing the loaded gun, over the objection of Dr. Watson.

92.     Dr. Watson's judgment was further questioned, and her authority as chief constantly revised by Defendants.  In October 2018, Gilmore disagreed with Dr. Watson's decision to enforce a termination against an officer arrested for domestic battery with strangulation without any specific

1  justification to do so from the officer or the City Attorney's office.

2      93.    While Ellington was agreeable with Plaintiff's decisions to discipline certain

3  members of HPB. For others, Ellington told Dr. Watson discipline was unnecessary; that they were

4  "good people" who "sometimes make mistakes," and she could not be "punitive" with her decisions.

5  Irrespective of the fact that discipline was already predetermined based on existing policy in specific

6  situations, Ellington balked at its application in occasional cases for reasons which were not apparent

7  to Plaintiff other than her belief that they were probably associates of the "right" people in the

8  department.

9      94.    In one instance, Watson became aware of dash-cam video of an officer clearly

10  utilizing unnecessary force and then failing to follow appropriate procedures in reporting the force

11  used.  When Plaintiff moved to discipline the officer, Ellington stated Plaintiff's administration was

12  too punitive to officers under "the circumstances."

13      95.    In another example, her decision to proceed with discipline of Abernathy for

14  misconduct fell squarely within her authority as police chief. However, she was not allowed to

15  discipline Abernathy's individual, work-related misconduct, a limitation unheard of for a chief of

16  police.

17      96.    On November 1, 2018, Dr. Watson was summoned to a meeting with Vaskov and

18  Ellington that a 191A "Coaching & Counseling" notice written by her deputy chief regarding

19  Abernathy relating to a disrespectful email he sent needed to be removed from his file.  Plaintiff was

20  informed Abernathy and McCann were threatening to file a lawsuit claiming Abernathy was being

21  prevented from performing his union duties. Plaintiff pointed out that Abernathy was not reported

22  for or being prevented from performing union duties; the report was for being disrespectful. Vaskov

23  advised the 191A needed to be removed because he did not believe the City would win an

24  arbitration.  Plaintiff voiced her concern that the city management should not be involved with police

25  disciplinary matters and questioned why it was even concerned with low level discipline.

26      97.    Vaskov, a City Attorney outside of the police chain of command, directly challenged

27  Dr. Watson's judgment on the basis of a paper review of the claim and without seeking any input or

28  advice from Dr. Watson. At the time, Vaskov advised that he reviewed the documentation and that

1    he did not feel that the sergeant was being disrespectful, only very direct. His statements reflected

2    an analysis informed by Abernathy and others, but never by Dr. Watson or her deputy chief.

3         98.    When Dr. Watson informed Vaskov that his opinion was not determinative, as this

4    fell within her authority and that Abernathy's behavior directly countered the changes in

5    organizational behavior being established at the police department, Vaskov informed her that she

6    was required to rescind the discipline action and issue a coaching/counseling report.  He then

7    presented her with already-prepared documentation to this effect to sign.

8         99.    The documentation Dr. Watson was asked to endorse rescinded her ordered

9    discipline, but advised there was wrongdoing by the police department administration.

10        100.    Ellington, who hosted this meeting in his office, was involved in this matter at all

11   times.  He encouraged Plaintiff to comply with Vaskov's directive, offering to modify language in

12   the pre-printed documentation rescinding her orders to gain her signature, and advised Dr. Watson

13   of his intention to support the plan articulated by Vaskov.

14        101.    When Dr. Watson ultimately declined to sign the document later that day, Ellington

15   became angry, asked her to record her decision in writing and send it to him by email quickly so

16   Abernathy could be told the 191A had been destroyed.

17        102.    Plaintiff was forced to write a letter to Abernathy stating the 191A would not be in

18   his personnel file but that he was expected to remain respectful and professional in all forms of

19   communication. She also relayed her concern that if the City Manager's office and the City

20   Attorney's Office got involved in non-disciplinary issues it would open the door to larger issues

21   because it would undermine her authority.

22        103.    Dr. Watson was excluded from all further developments regarding the incident with

23   Abernathy, including its outcome, although Abernathy remained under her direct chain of command.

24        104.    One week later, Dr. Watson was contacted by Vaskov, who informed her a complaint

25   had been made against her by Abernathy. This was part of a coordinated campaign of complaints

26   filed against Dr. Watson by people under her command, often for conduct within the scope of her

27   authority as Chief.

28        105.    The backlash against Dr. Watson continued at all levels of the City, from those under

her command to those in City government. This represented a joint effort between the City Attorney's office, the City Manager's Office and others.

106.    Beginning in the summer of 2018, Abernathy encouraged union members to lodge numerous false complaints about Plaintiff, to wit, that she:

        a.     created an environment of fear within the command team;

        b.     violated ethics laws and policies by accepting NHL tickets;

        c.     cheated on a certification exam;

        d.     hired a friend to evaluate HPD policies; and,

        e.     was discriminatory.

107.    On September 28, 2018, Plaintiff was informed a complaint had been made after HPD participated in a lip-sync challenge. A second complaint was filed because an officer was not promoted to detective and made a discrimination allegation. A third complaint was asserted claiming the Plaintiff made religious references in a meeting.

108.    All complaints were investigated and ultimately no violations were found.

109.    On October 4, 2018, in response to a request from Dr. Watson, a meeting was held with Plaintiff, Derrick, Ellington, Vaskov, and Deputy Chief Thedrick Andres ("Andres") to discuss the attacks against Plaintiff and their investigation by an outside law firm even though the attacks all lacked merit or validity.

110.    Vaskov told Plaintiff that regardless of whether or not the complaints were meritless, every single one of them needed to be investigated, irrespective of whether the same individuals were responsible for the complaints. Unfairly, the meritless complaints were eventually used against Plaintiff as if they were valid.

111.    Vaskov further explained that the outside law firm was used to ensure that the investigatory process was "fair and impartial" necessitating the use of a third party, not interested entities or individuals.

112.    Vaskov stated that the same investigation procedure was followed for all City executives and the same outside law firm would conduct the investigations.

113.    Vaskov did not explain why none of the complaints Plaintiff made regarding the

harassment she received had been subject to the same process.

114.    Vaskov's comment justifying the use of the outside firm to ensure fairness and impartiality was false and misleading. Plaintiff later learned that Gilmore was present during the certain confidential investigatory interviews.

115.    For example, Gilmore was present for an investigation initiated by Lt. Mattingly and was identified as being Mattingly's representative although the City Attorney's Office purportedly represents department heads - i.e., the Chief of Police. Nevertheless, although Andres also received a formal notice, Gilmore did not attend his interview.

116.    When Plaintiff questioned why a City Attorney was present during investigatory interviews, especially when they were supposed to be conducted by a neutral third-party law firm, she was informed Gilmore was there to "take notes," which is inconsistent with the City Attorney being identified as Mattingly's representative, and the fact that the City Attorney was only present at certain interviews. Moreover, it is clear the City's presence was a clear conflict and undermined the stated purpose of having a fair and impartial third-party investigate the complaints.

117.    The outside legal firm was used to investigate Plaintiff while a White female employee of the HPD, Human Resources Supervisor, Jennifer Fennama, who held a senior management level position, had similar complaints filed against her which were not similarly investigated. In fact, the City denied complaints were ever filed against Fennama.

118.    On November 16, 2018, a complaint was initiated before the Local Government Employee Management Relations Board by the HPSA and HPOA against Plaintiff alleging she was attempting to diminish the role of the labor associations with the City by discriminating against labor association members, interfering with the association's representation of members, and implementing excessive discipline in "contravention of long established policies and practices."

119.    This complaint contained false and fabricated allegations that Plaintiff attempted to run HPD independently from the rest of the City, and was mistreating and disrespecting captains on the command team.

120.    Based on information and belief, the complaint did not proceed through proper channels before it was filed and both organizations were listed on it.

121.   On November 27, 2018, Dr. Watson and her executive team were called in for a mandatory "training" relating to decisions made since Dr. Watson took office. The training was referenced as being for the police department alone and continued the process of undermining Dr. Watson's authority and questioning her judgment in disciplining misconduct. She was criticized for the specific conduct mentioned in the complaint against her (the assigning of a leadership book's chapter written by a member of the clergy) and for specific acts of discipline, including terminating an officer found to have been driving under the influence of alcohol.

122.   At the end of the training, the instructor asked Gilmore, if he had covered everything that he was mandated by the City to say.

123.   In December, 2018, Dr. Watson was called into the Derrick's Office for a meeting with Derrick and Ellington.  In this meeting, Ellington discussed the results of the investigations into the complaints against Watson and acknowledged that none of the complaints could be substantiated. Nevertheless, Ellington made several recommendations directly relating to the complaints received, despite being aware these were a coordinated campaign against her, including the use of alternative materials and neglecting to acknowledge that the leadership chapter at issue had been provided in advance to the City Manager's Office for approval by Derrick and Ellington.

124.   Dr. Watson was also criticized for performing her role as a municipal employee accountable to city government. Throughout this period, Dr. Watson was meeting with the Mayor and the City Council every 4-6 weeks, as instructed by the city manager's office. In the same December 2018 meeting, Derrick listened but said little beyond stating his displeasure at hearing from a third-party that Dr. Watson had acknowledged the City Management Office was not supporting her leadership, requesting that she convey those concerns to him privately. Dr. Watson reminded Derrick of her multiple, direct indications to his office that her leadership was not supported by the city manager's office and his mandate to meet with City leadership, who had directly asked her this for this information.

125.   Subsequent to this, in February 2019, although all rumors and complaints had proven unfounded, Ellington emailed Dr. Watson to discuss a 'Quarterly Review Session,' but listed only unsubstantiated rumors against her as pending issues.  Plaintiff was asked to respond to questions

posed by Ellington prior to the meeting which did not pertain to the Plaintiff's job duties.

126.    The City also acted in a coordinated manner, with Ellington, Derrick, Vaskov, and Gilmore undermining command decisions made by Watson.  For example, two officers had been terminated for severe misconduct, Officers Peeler (Domestic Violence) and Holman (DUI). This was precisely the sort of culture change Dr. Watson was brought in to lead. The union filed a complaint against Dr. Watson, which the City indicated it intended to settle by restoring the terminated officers and issuing a warning that DUI would begin to be taken seriously in the department. Although such discipline decisions were with Dr. Watson's authority as Chief, her leadership and judgment were undermined by the Defendants' actions in concert.

127.    Dr. Watson was constantly and consistently treated differently from prior chiefs who were White; even Dr. Watson's decision to promote stellar officers, including a Black officer who had earned exemplary test scores, was undermined. Her planned promotion ceremony for the rank of sergeants, lieutenants, and captains was canceled and Ellington indicated he intended to re-conduct the selection process, a role clearly reserved for the police chief. Although prior Chiefs of Police all of whom where White and all but one were male, had been permitted to set criteria for promotion, Dr. Watson was asked to clear the selections with the Union. Although other chiefs in her position had been rewarded for promoting based on photos attached to applications, as opposed to test scores and merit-based criteria, Dr. Watson's selections under the appropriate framework were disallowed and undermined.

128.    On January 14, 2019, Ellington emailed Plaintiff advising he was meeting with the unions the following morning and would be notifying the HPD that a scheduled police department promotion ceremony was being canceled. The promotion ceremony was for the rank of sergeants, lieutenants, and captains.  Ellington did not want the newly selected captains to be promoted and sought to have the selection process redone because HPSA filed a complaint with Human Resources.

129.    Ellington's behavior was alarming because beginning in December 2018, he  was involved with frequent communications and discussions with Plaintiff about the entire process and had approved the selections. However, pressure from HPSA caused Ellington to backtrack and act as if every decision made by Plaintiff was done without his knowledge.

130.    Dr. Watson was also consistently excluded from social networking opportunities, informal gatherings, and other spaces where City leadership and police interacted.  Yet, she was made aware of claims, often untrue, leveled against her directly to her City supervisors in these contexts.  In one example, when HPOA President Kerby and HPSA President Abernathy were asked to address false information they had provided to Ellington but denied making the statements when confronted and instead redirected their criticism to specific negative comments about Dr. Watson's wearing of business attire and how she wears her hair. Although these directly reflected on her ability to conduct her job and reflected racialized and gendered biases, Ellington declined to address this with Kerby or Abernathy.

131.    Ellington advised Plaintiff that it was her responsibility to deal with it and handle it on her own.

132.    Ellington also declined to investigate or discipline HPD member who reported to him that they planned to target Dr. Watson's family since they could not find misconduct on her part. After a series of threats and misconduct, Dr. Watson elevated her concerns for her daughter's safety to Derek, who indicated children were "off limits" and that he would put a stop to it, implicitly acknowledging his tolerance of the campaign of racial and gender harassment against Dr. Watson throughout this period. Yet, even in this egregious situation against a minor child, Derrick ultimately took no action to prevent this misconduct.

133.    On September 28, 2018, Ellington reported to Dr. Watson that a member of the Henderson Police Officer's Union told him, "Since we can't get anything on the Chief, we are going to target her daughter and her husband now."

134.    Shockingly, Ellington did not discipline or investigate the individuals who made the comment and further refused to disclose their identity ensuring no investigation could or would be conducted.

135.    Although Plaintiff implored Ellington to proceed with discipline or an investigation and take action to address the brazen threat against Plaintiff's family, he refused to do so thereby impliedly sanctioning the conduct and sending a message to the offenders that Plaintiff would not be protected.

136.    The following week, a series of events unfolded making it clear the threats to go after Plaintiff's family had been set in motion.

137.    Union representative Richard "Rick" McCann ("McCann") – who served as the representative for the officer union, HPOA, and the supervisor union, HPSA, for more than 11 years – filed an open records request for body worn camera footage of a minor accident call which the Office of Public Information determined pertained to a traffic accident involving Plaintiff's 16-year-old daughter.

138.    Based on information and belief, the footage request was the first time McCann had ever sought information related to an officer, supervisor, or a chief of police. Although other Henderson police officers have had family members involved in criminal activity, based on information and belief, McCann had never before sought to review video footage related to those incidents.

139.    Further, McCann held no supervisory position over Plaintiff or over the officers who were at the scene.

140.    McCann requested two copies of the footage, even though after viewing it in the presence of HPD staff he verified no wrongdoing by the Plaintiff's daughter.

141.    Thereafter, word of the accident was reported to the media.  A request for the footage was received from the LVRJ after a "source" informed it the video involved wrongdoing and a reporter indicated it would be used in a story about the Plaintiff violating ethics.

142.    A third request for the video was made by retired Police Chief Pat Moers.

143.    Finally, in April 2019, an investigative reporter for Channel 13 requested the video stating she had been "tipped off" about the incident and asked why Plaintiff's daughter had not been charged with a hit-and-run. The reporter was informed that there could be no enforcement activity in a parking lot and furthermore, no crime had been committed, all policies were followed and no one left the scene so it was not a hit-and-run.

144.    At this point, Plaintiff questioned Derrick and asked if Ellington had even notified Derrick of the threat made against Plaintiff's family. Derrick replied he had not and that since the behavior was unacceptable and children were considered "off limits." Derrick represented that he

1    would connect with the City Attorney's Office to put a stop to the harassment.

2        145.    As had been the case previously, Derrick's concern was feigned and nothing was ever

3    done to protect Dr. Watson from further harassment.

4        146.    Derrick took no action, even though on more than one occasion the Plaintiff's

5    daughter was followed home from school by officers in marked police vehicles.

6        147.    Derrick failed to address the hostile environment, the specific threats against Dr.

7    Watson's daughter, or the ongoing undermining of her authority and rolling back of her decisions by

8    his personnel, other city agencies, and the officers themselves.  On at least three separate occasions,

9    he was fully informed of the current and prior misconduct, backlash, sabotage, and undermining that

10   Dr. Watson was experienced by Dr. Watson herself.  On each occasion, he expressed surprise and

11   dismay, yet consistently failed to take any action to investigate, remediate, or mitigate the

12   wrongdoing. As City Manager, his knowing inaction in the face of ongoing harassment, racial and

13   gender discrimination, and an increasingly hostile environment further licensed this misconduct.

14       148.    The Defendants also failed to investigate, discipline, or take seriously racial and

15   gender slurs and threats from HPD officers anonymously and in person.  Instead, they suggested it

16   was Dr. Watson's responsibility rather than their obligation to stem racial and gender discrimination

17   and to ensure it did not compromise her performance or their evaluations of her. For example, racial

18   slurs and racist commentary on a website called N*#@**mania.com were never subject to

19   investigation or repudiation.

20       149.    Defendants, and each of them, were also advised by sources that the Plaintiff was

21   being discriminated against by other anonymous source(s) alleging false complaints and

22   discrimination.

23       a.    An anonymous December 22, 2018 letter detailed knowledge of prior events inside

24            the Henderson Police Department and indicated Plaintiff's race was "a problem for

25            some people in the department."

26       b.    A letter from "Employees of Henderson Police Department" addressed to March and

27            "City of Henderson Leaders" notified them of a "witch hunt" and "smear campaign"

28            against Plaintiff through "fake allegations and meritless complaints." The letter also

complained of "political shenanigans" that are hurting officers and that "no one seems to care." The letter suggested possible motives: "Is it because she's an 'outsider'? Is it because she's African-American? Or is it because they are cronies of Pat Moers and continuing to do his dirty work?"

    c.    A third letter, addressed to March, Ward III member John Marz, Derrick, and Vaskov, referred to "poisoning" directed at Plaintiff, and implored the city to intervene advising that "[i]t is a shame the City of Henderson in not SUPPORTING and BACKING Chief Watson" with regard to the false complaints by the same few individuals. This author also views the "constant undermining" as disheartening and embarrassing. Particularly as this author thanks "Chief Watson for this noticeable change" in the department under her leadership.

150. Nor did the City investigate, punish, or address the open campaign to push Dr. Watson out of office via the filing of false complaints. Nevertheless, this refusal to accept her authority or legitimacy in the role was linked to racial and gendered slurs, norms, and conduct by officers within HPD.

151. The Defendants also openly sought to develop evidence and information to sabotage Dr. Watson's performance and career. The coach assigned to Dr. Watson, who also worked with other municipal officials, reported that City management wanted her to disclose the details of coaching sessions notwithstanding ethical confidentiality considerations. This request came after her favorable summary of Dr. Watson's engagement was rejected by the City as inconsistent with the narrative they were looking to build.

152. Specifically, for a approximately a year, beginning in 2018, the city department heads participated in professional coaching since they were all new to their positions and had been hired by Derrick from outside the Henderson establishment.

153. The coaching was intended to assist them with leadership skills, help then coordinate and collaborate regarding the operation of the City, successfully work together, and develop a better understanding of each other's departments' perspectives.

154. The coach assigned to Plaintiff had a history of providing coaching for the City.

155.    On January 28, 2019, during the last one-on-one coaching session, the coach warned Dr. Watson, not to trust anyone and to be very careful not to let Ellington or the City ruin her reputation or career.

156.    The coach informed Plaintiff that she was terminating her relationship with the City because city management wanted her to disclose the details of coaching sessions notwithstanding ethical confidentiality considerations.

157.    This coach advised that she had already provided a written summary regarding Plaintiff to Ellington, that the report had been favorable to Plaintiff and that Ellington did not like the summary.  Plaintiff asked Ellington for a copy of the written summary but he refused to provide it.

158.    The City's treatment of Dr. Watson was so egregious and so outside the norm for similarly situated others that the City-assigned coach for Dr. Watson informed Dr. Watson that she felt compelled to terminate her relationship with the City and also warned her against trusting the Defendants with her reputation or career.

159.    Despite their inaction and tolerance of the campaign of race and gender discrimination designed to undermine Dr. Watson, during a February 12, 2019 meeting between Plaintiff and Ellington, Ellington made a number of statements to Dr. Watson which confirmed his knowledge of the existence of an attempt to get rid of her by any means necessary while simultaneously indicating the City would not intervene:

    a.    that the "nature of unions is to skew things," and that would be the "beast" Plaintiff would have to deal with;

    b.    that he personally believed the unions were in a "full out war" to get rid of Plaintiff;

    c.    that even if Plaintiff worked with the unions to find common ground to work out disputes, complaints about her would not go away because some union members wanted her gone;

    d.    that he believed the investigations were "ridiculous";

    e.    that he agreed HPD members had an issue with a Black woman being in charge of the department; and

1       f.    that he agreed the unions had a mission to file complaints and "take things out of

2           context."

3       160.   Ellington, informed Plaintiff that despite the problems she would have to reach out

4 and work with the unions and, "take that higher road," to "bring peace to the organization," and find

5 "common ground."

6       161.   Research confirms Dr. Watson's experience is discriminatory norm in many

7 organizations: "women who are successful in male domains not only are seen as unlikeable, but also

8 are viewed as less competent than their gender-congruent counterparts after making a single mistake.

9 Thus, the high status achieved by some men and women in gender-incongruent occupations can be

10 unstable, vulnerable, and ultimately fragile." *Hard Won and Easily Lost The Fragile Status of*

11 *Leaders in Gender-Stereotype-Incongruent Occupations*, 21 Psychological Science at 1642. Because

12 of her race and gender, Dr. Watson was also punished particularly harshly for perceived mistakes

13 or missteps in judgment. See *id.* Dr. Watson was prepared for the hard work of organizational change

14 and even of proving herself in a new department.  However, she was powerless against

15 discrimination on the basis of her race and gender because she occupied a role inconsistent with

16 toxic and pervasive social norms around gender.

17       162.   She was treated differently that similarly situated employees at the City.

18       163.   For example, prior (non-Black-female) chiefs did not have routine exercise of

19 discretion + authority, including discipline determinations pursuant to Henderson Police Department

20 Code of Conduct 1094.2, overruled.[1]

21       164.   Similarly situated chiefs' discipline determinations were not interfered with by City

22 leadership, even when they tolerated or turned a blind eye to misconduct.  For instance, a prior chief's

23 determination to retain an officer involved in a DUI accident was not reviewed or resisted by City

24 leadership.  Only Dr. Watson's judgment was consistently undermined.

25       165.   Previous chiefs, including the one immediately prior to Dr. Watson, were allowed to

26

27      [1]*See* e.g., Arthur Kane, *Flawed discipline: Henderson officers with years of misconduct kept their jobs. Confidential police records reveal why*, Las Vegas Review-Journal (April 24,

28 2021) suggesting prior chiefs did not seek to discipline and the City did not interfere.

1  exercise the discretion traditionally afforded to the police chief and not investigated nor terminated

2  for discipline of officers, policy changes, or cultural changes.[2] Even the prior chief who was subject

3  to investigation and constructively fired, indicated these allegations grew from expectations of

4  political favoritism, nepotism, and graft, not internal policy or discipline activities toward officers.

5  166.   The prior chief, similarly situated to Dr. Watson, resigned, but his allegations of City

6  interference in his 26 years with the Henderson City police department and 5 years as chief of police,

7  did not include the sorts of discipline review, trainings, and claims of excessively punitive adherence

8  to policy to which Dr. Watson was constantly subjected. *Id*. at 14.

9  167.   To the contrary, the same outside law firm which investigated complaints about

10 Plaintiff issued a Final Report and Recommendations of prior HPD Chief Moers' misconduct. It

11 shows not only sexual misconduct and expectation of sexual favors toward his employees, but also

12 his turning a blind eye to management issues, including hostile work environment issues, perpetrated

13 by a deputy, to favoritism and preferential treatment for people in the inner circle, targeting of

14 employees in disfavor, and retaliation and reprisals against certain employees. None of this

15 misconduct and mismanagement was ever interfered or investigated by the City Manager's office.[3]

16 168.   Although she was criticized and many of her attempts to implement and enforce

17 policies were undermined, the following changes Plaintiff introduced have continued to be utilized

18 by the current HPD administration:

19   a.   Use-of-Force Policy: a standard where only the amount of force necessary to bring

20       an incident under control, make an arrest, or protect police or others is used and

21       establishes that use-of-force is a last resort.

22   b.   De-escalation Policy: tactics and techniques to be used in order to minimize the

23       likelihood of use of force while increasing the chance of voluntary compliance.

24   c.   Concurrent Administrative Investigation and Criminal Investigation for Officer

25

26   [2]*See* e.g., Compl.  45, 54, *Moers v. City of Henderson*, No. 18-CV-1418 (D.N.V. 2018).

27   [3]*See* Final R&R, at 6-16. Eventually, a May 15-23, 2017 investigation uncovered this
     misconduct, and recommended termination. Id. at 20. However, this investigation occurred only
28   after Moers had been placed on administrative leave, in March, 2017. See e.g., Compl.  44.

Involved Shootings: in addition to the criminal investigation, the administrative investigation was a transparent determination of whether the officer's actions or inactions were justified in accordance with the organization's policies, procedures, rules, and training; an administrative investigation may lead to disciplinary action based on violations of organizational policies and/or procedures.

d.    Geographic-Based Policing: patrol officers and supervisors were assigned to defined geographic areas (beats) within the City in order to become subject matter experts (SME) within the area. Delivers a coordinated approach to solving crime concerns since personnel gain in-depth insight into recurring problems and trends. Establishes direct communication between community and HPD;

e.    Community-Oriented Policing: Used in conjunction with Geographic-Based Policing to create opportunities to strengthen the community/police relationship through continuous engagement and professional interaction. This resulted in historic reduction of response times, month-to-month reductions in crime categories (violent crimes and property crimes), and increases in prospective police work such as officer self-initiated activity.

f.    ComStat Process: In depth analysis of crime problems occurring throughout the City and the development and implementation of sustainable initiatives to address them.

g.    Restructuring of the Traffic Section: Plaintiff assigned new supervision and introduced intelligence-led policing which produced more than 1.1 million in increased revenue from enforcement actions.

169.    While Dr. Watson was subjected to harassment behind the scenes and her push for transparency within the department caused a faction within HPD/the Unions to conjure reasons to file complaints, City officials outwardly praised and commend her job performance:

a.    In July, 2018, City Manager Derrick approved Plaintiff for the highest percentage raise available for her position. The raise caused her to exceed the highest salary classification for the Chief of Police position and necessitated that she receive the difference as a bonus for the year;

b.     The following January, during an operations meeting with City department heads, City Manager Derrick informed the group that successes in the police department were a direct result of the change implemented by Plaintiff to policing efforts. Ellington also addressed the group to commend Plaintiff for outstanding job performance.

170.    On March 5, 2019 Plaintiff was notified that a complaint had been made to the City Attorney's Office by an unknown party reporting discriminatory treatment of the Plaintiff by the City Attorney's Office.  A new independent law firm was hired to investigate the complaint. However, before this law firm even held an initial interview which was scheduled for March 28, 2019, Dr. Watson was placed on administrative leave.

171.    The reason for the administrative leave was represented as being done to give the Plaintiff twenty-one (21) days to consider a Separation Agreement and Release of All Claims ("Agreement").  Plaintiff was notified that if she accepted the Agreement and resigned her position she could collect paid leave until May 9, 2019, while she found other employment. If she did not accept, she would be terminated as of April 4, 2019.

172.    When the administrative leave was imposed, Ellington told Plaintiff, "I respect you but you are not a good fit for me and [Derrick]."

173.    The administrative leave halted the independent investigation.  Plaintiff was not even allowed information about the substance of the complaint or identity of the complainant.

174.    After Plaintiff was placed on administrative leave, Ellington met with the HPD executive team, Deputy Chief Thedrick Andres; Deputy Chief Michael Denning and Chief of Staff David Burns, and informed them that Plaintiff had done a "great job" with HPD.  He stated that the programs Dr. Watson had implemented would be continued moving forward.

175.    On April 8, 2019, Plaintiff, through her counsel, filed a discrimination complaint with Vaskov. She expressed her desire for "continued employment with the opportunity to serve the Henderson community" and that she be allowed to continue the job that she was hired to perform without being harassed, conspired against, restricted based on backroom retaliatory deals, and with no further discrimination. Further, she demanded that the false and defamatory comments and hostile

1   work environment that impeded her ability to perform her job, immediately cease. She further sought

2   to eliminate the petty manner in which contrived allegations have been brought against her.

3        176.   Dr. Watson further advised that the "improper conduct and corruption [violated her]

4   rights, impeded her ability to perform her job for the community, and could no longer be tolerated

5   with impunity." She requested that steps be taken immediately to address the deprivation of rights,

6   privileges and immunities. Plaintiff specifically requested the implementation of a strict protocol to

7   prevent continued illegalities so she could perform her duties as originally intended at the time of

8   her hiring.

9        177.   In response to the complaint, on April 11, 2019, with no investigation of any nature,

10  Dr. Watson was disparately and unfairly terminated. She was reportedly discharged for creating

11  divisions between management and unions, undertaking policy changes without the consent of the

12  City Attorney's Office or the City's Human Resources Department, failing to show respect town

13  union members and not cooperating with an independent investigator.

14       178.   Post termination, Plaintiff was subjected to continued improper behavior.

15       179.   On April 16, 2019, Dr. Watson by and through her counsel forwarded a letter to

16  Defendants Vaskov, Derrick, Ellington and City Ward representatives requesting the preservation

17  of evidence, including but not limited to electronically stored information.

18       180.   The City Attorney's office responded on behalf of the Defendants on May 2, 2019.

19  Therein, it feigned ignorance and alleged it did not have sufficient information as to "the nature of

20  any claims" that would be made against the City.  This statement implied the City Attorney's office

21  was ignorant of Plaintiff's multiple complaints, was unaware of the substance of meeting attended

22  by its own employees, and had forgotten that a detailed discrimination complaint naming Plaintiff

23  as a victim had just weeks before been assigned to a third party law firm for investigation.  It was

24  confirmation Plaintiff's situation had been of no consequence to the City, as such behavior and a

25  hostile environment had always been tolerated and would continue to be tolerated with impunity.

26       181.   Further, Dr. Watson's letters of April 8, 2019 and April 16, 2019, which had only

27  been provided to the identified individuals somehow made it into the possession of the media.

28       182.   In ongoing efforts to harm Dr. Watson, the City also provided the media with its

response to Plaintiff's NERC/EEOC charges but refused to disclose them to Plaintiff or her representatives notwithstanding the confidential nature of this process set forth in NRS §233.190.

183.    Subsequent to her termination from HPD, Plaintiff had great difficulty finding employment directly related to Defendants' smear campaign against her which consisted of leaking half-truths and outright falsehoods to the media and using a writer for a local paper as a puppet to publish disparaging lies about her which continued even after her termination.

184.    Although she submitted multiple applications for available Chief of Police positions and was the most qualified applicant in many instances, she was not hired.  Dr. Watson was informed in Columbus, Ohio that her application could not advance past an initial screening level and was told by her recruiter that several other jurisdictions had reviewed the publicly available information about her from Henderson and it factored in the decision not to hire her.

185.    Although Dr. Watson was the most qualified candidate applying for Chief of Police in many instances, the negative press available about her was "too much baggage" to overcome.

186.    Ultimately, Dr. Watson was considered, but not hired, in: Columbus, Ohio (Chief of Police); Frisco, Texas (Chief of Police); Keller, Texas (Chief of Police); Dallas Independent School District (Chief of Police); Federal Reserve Bank of Dallas (Las Enforcement Chief of Police); City of Dallas, Texas (Assistant Director, Strategic Implementation Projects); Boulder, Colorado (Chief of Police); Aurora, Colorado (Chief of Police); Vallejo, California (Chief of Police); Hayward California (Chief of Police); Fresno, California (Chief of Police); San Mateo, California (Chief of Police); Riverside, California (Chief of Police); Elk Grove, California (Chief of Police); Bay Area Rapid Transit, California (Chief of Police); Los Angeles World Airports, Los Angeles, California (Assistant Chief of Police); Dekalb County, Georgia (Chief of Police); University of Nevada Reno, Nevada (Assistant Vice President/Chief of Police); Greensboro, North Carolina (Chief of Police); North Carolina State University (Chief of Police); Charlotte-Mecklanberg, North Carolina (Chief of Police); Richmond, Virginia (Deputy Chief of Police); Oro Valley, Arizona (Chief of Police); FBI - LEEDA (FBI Law Enforcement Executive Development Association (Executive Director); Indianapolis International Airport, Indianapolis, Indiana (Assistant Chief of Police); Marysville, Washington (Chief of Police); and Smarthmore College, Pennsylvania (Assistant Public Safety

Director).

187.    Acts undertaken to smear Plaintiff included leaking correspondence between Plaintiff's counsel's office and the City of Henderson's City Attorney's office which continued beyond her employment and included confidential human resource meeting discussions.

188.    Disputes with HPD were reported in the press and resulted in extensive damage to Plaintiff's reputation and employment potential.

189.    Moreover, based on information and belief, McCann called Plaintiff's current employer to dissuade it from hiring her as the Director of Sacramento's Office of Public Safety Accountability.  The caller told the Sacramento it shouldn't want Plaintiff there.

190.    Since her termination from the City, Dr. Watson has been unable to find employment in her chosen profession as a sworn peace officer; specifically as Chief of Police, a position she worked to achieve her entire law enforcement career.

191.    Her prior career trajectory allowed her to achieve the highest ranking position within a law enforcement organization with job duties that included, but were not limited to:

a.    advising a city counsel regarding law enforcement and proposed policy and procedure changes;

b.    to establish, interpret and implement policies consistent with government objectives;

c.    evaluate and report on results of operations to government heads;

d.    police department spokesperson to the media;

e.    management of the department and to provide law enforcement advice to governmental heads;

f.    identify and implement public safety priorities, develop and implement programs to ensure compliance with laws and regulations;

g.    develop long range operational and capital improvement needs;

h.    direct cooperative efforts with local, state and federal law enforcement officials;

I.    research and develop grants, determine the scope of work for use of funds and propose administration of funds;

j.    direct and oversee the development and administration of annual police department

operating budget; assess needs and acquisitions for the department; and

k.      overseeing administration and operational functions of an entire police department - typically the largest department within any city.

192.    Following her termination by City, Plaintiff has been absolutely precluded from employment in her chosen profession.

193.    Her current position as the Sacramento Director of the Office of Public Safety Accountability is a non-sworn, professional staff civilian position.

194.    Minimum qualifications for Chief of Police position far exceed those required for a civilian director position.

195.    The Office of Pubic Safety Accountability is a civilian police oversight agency that is tasked with reviewing and improving public safety personnel conduct.

196.    It involves the independent oversight and review of police department actions designed to improve the quality of the police department's internal investigations of alleged misconduct, which is outside of Plaintiff's chosen professional field.

197.    In her current position, Plaintiff does not work for a police department.  She works directly for politicians, specifically the Sacramento Mayor and City Council.

198.    Plaintiff has undergone medical treatment as a result of the Defendants' conduct and suffered the loss of wages, seniority, health care benefits, retirement benefits as well as past and future income as a direct and proximate cause of the conduct of Defendants, and each of them.

## FIRST CAUSE OF ACTION

(Racial Discrimination and Hostile Work Environment in Violation of 42 USC §1981 against City of Henderson, Ellington, Derrick, Vaskov, Gilmore, Abernathy and Kerby)

199.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs, and incorporates the same herein by reference.

200.    Plaintiff is a person within the jurisdiction of the United States and has the right to make and enforce contracts.

201.    The United States Code, Title 42, Section 1981, 42 USC §1981, prohibits an employer from discriminating on the basis of race in the making, performance, modification and

termination of contracts and the enjoyment of all benefits of the contractual relationship. A racially hostile work environment is a form of race discrimination.

202. Plaintiff is a racial minority, African American. Defendants discriminated against Plaintiff on the basis of race in the performance of and enjoyment of all the benefits of her employment relationship with HPD.

203. Plaintiff was qualified to hold the position of Chief of Police.

204. The conduct to which Plaintiff was subjected was unwelcome.

205. Defendants also discriminated against Plaintiff based on race by subjecting her to a racially hostile work environment. The conduct of Defendants was both severe and pervasive, objectively and subjectively offensive, and negatively affected the terms and conditions of Plaintiff's employment.

206. But for Plaintiff's race, she would not have suffered the loss of her legally protected right.

207. Defendants also discriminated against Plaintiff by subjecting her to disparate treatment on the basis of race. HPD treated Plaintiff less favorably than similarly-situated non-black employees.

208. A policy making individual was involved in the discrimination, ratified the discrimination and allowed subordinates to continue the discriminatory conduct.

209. Defendants' actions, as described above, directly and proximately have caused and continue to cause Plaintiff to suffer loss of income and other financial benefits, pain and suffering, humiliation, indignity, loss of professional reputation, and personal embarrassment.

210. Defendants engaged in the discriminatory actions described above with malice or with reckless indifference to Plaintiff's legal rights.

211. Plaintiff has been required to retain the services of an attorney to pursue this action and is entitled to recover attorney's fees and costs incurred.

**SECOND CAUSE OF ACTION**

(Deprivation of Constitutional Rights in Violation of 42 USC 1983 against
City of Henderson, Ellington, Derrick, Vaskov, Gilmore, Abernathy and Kerby)

212.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs, and incorporates the same herein by reference.

213.    The United States Code, Title 42, Section 1983, 42 USC §1983 states that every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ...

214.    Defendants acting under color of state law deprived Plaintiff of rights secured by the Constitution.

215.    Each government official defendant, through the official's own actions, has violated the Constitution.

216.    Each Defendant acted with unlawful motives which caused individuals, including other defendants, to act to terminate Plaintiff's employment with the City.

217.    The Fourteenth Amendment of the U.S. Constitution secures certain rights, such as the right to due process, for U.S. citizens.

218.    42 USC 1983 provides a mechanism for the private enforcement of substantive rights conferred by the U.S. Constitution.

219.    Plaintiff had a liberty interest in employment which was violated when the City terminated her employment under circumstances which damaged Plaintiff's standing and associations, undermined her job performance, contributed to the perception that she caused a fractured department, did not make efforts to improve her relationships in the City, was an ineffective leader, could not perform her job, and imposed a stigma which foreclosed her opportunities to practice in her chosen profession in a law enforcement organization and impaired her reputation for honesty made in connection with her termination which was publicly disclosed.

220.    These statements include, but are not limited to: leadership which created distrust and division and led to fractions in HPD; failure to follow directions and unilateral actions that wasted time and required overhaul; refusing to work with other City departments; failure to respect other

City departments; causing distrust and division; demonstrated lack of respect for police department members; a lack of accountability and unwillingness to work with Union members or make changes to improve as a leader; refusal to provide information to investigators; failure to produce evidence to support her allegations; acting without proof; not being honest with investigators; making officers feel incompetent and that they were not properly trained.

221.    Moreover, when Plaintiff was terminated, she was not offered a name clearing hearing although stigmatizing information was contained in her personnel file, as detailed above, which was publicly available and which was publicly disclosed.

222.    As a result of the circumstances reported regarding Plaintiff's termination, she was rejected for employment and has been excluded completely from her chosen profession in a law enforcement organization as a result of the damage to her reputation caused by Defendants as set forth herein.

223.    Plaintiff's deprivation of liberty interest was a protected interest that cannot be revoked without constitutionally sufficient procedures.

224.    The reputational damage caused the loss of Plaintiff's liberty interest without due process of law.

225.    The Defendants made allegations against Plaintiff calculated to damage her standing and associations, the accuracy of those allegations is contested, the allegations were publicly disseminated and were made in connection with Plaintiff's termination.

226.    Actions undertaken in the course and scope of Defendants' employment are clothed with the authority of state law and are subject to liability for direct and personal participation in the acts set forth herein.

227.    Plaintiff has been required to retain the services of an attorney to pursue this action and is entitled to recover attorney's fees and costs incurred.

### THIRD CAUSE OF ACTION

(Race and Gender Discrimination and Hostile Work Environment in Violation of
42 USC 2000e-29(a)/Title VII against City of Henderson)

228.    Plaintiff repeats and realleges each and every allegation contained in the foregoing

1    paragraphs, and incorporates the same herein by reference.

2    229.    Title VII of the Civil Rights Act of 1964 forbids employment discrimination based

3    on "race, color and sex."

4    230.    Plaintiff is a member of protected classes.

5    231.    Plaintiff was subjected to inappropriate and unwelcome conduct.

6    232.    The unwelcome conduct was directed at Plaintiff's protected categories: her gender

7    and race.

8    233.    The unwelcome conduct was both objectively and subjectively offensive.

9    234.    The unwelcome conduct was sufficiently severe or pervasive to unreasonably interfere

10   with her work and which created an intimidating, hostile or offensive work environment.

11   235.    Plaintiff suffered disparate treatment in her employment when she was singled out

12   and treated less favorably than others similarly situated.

13   236.    Plaintiff has been required to retain the services of an attorney to pursue this action

14   and is entitled to recover attorney's fees and costs incurred.

15                              **FOURTH CAUSE OF ACTION**

16   (Discrimination and Hostile Work Environment in Violation of NRS 613.330
         against City of Henderson)

17
18   237.    Plaintiff repeats and realleges each and every allegation contained in the foregoing

     paragraphs, and incorporates the same herein by reference.
19
20   238.    Pursuant to NRS 613.330, it is unlawful for an employer discriminate against an

21   employee on the basis of race, color, or sex.

22   239.    As an employee of the HPD, Plaintiff is a person entitled to protection under

23   Nevada's anti-discrimination statute.

24   240.    Plaintiff is a member of protected classes.

25   241.    Plaintiff was subjected to inappropriate and unwelcome conduct.

26   242.    The unwelcome conduct was directed at Plaintiff's protected categories: her gender

27   and race.

28   243.    The unwelcome conduct was both objectively and subjectively offensive.

244.    The unwelcome conduct was sufficiently severe or pervasive to unreasonably interfere with her work and which created an intimidating, hostile or offensive work environment.

245.    Defendant, City of Henderson, had a legal obligation, pursuant to the aforementioned statute and its own internal policies, to maintain a workplace free of unlawful discrimination.

246.    Despite explicit provisions in Nevada discrimination law, the City subjected Plaintiff to different terms and conditions of employment because of her race, color and/or sex, all of which are violations of NRS 613.330.

247.    Plaintiff performed her job satisfactorily but nonetheless suffered illegal discrimination and harm and was treated differently as than a similarly situated employee who did not belong to the same protected class.

248.    As the proximate cause of the City of Henderson's discriminatory and illegal conduct, Plaintiff has been harmed.  Her damages include, but are not limited to, mental anguish, emotional harm and humiliation and economic losses due to loss of advance placement or promotional opportunities.

249.    Plaintiff has been required to retain the services of an attorney to pursue this action and is entitled to recover attorney's fees and costs incurred.

**FIFTH CAUSE OF ACTION**

(Intentional Infliction of Emotional Distress against all Defendants)

250.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs, and incorporates the same herein by reference.

251.    The acts of all Defendants, and each of them, as described herein, were extreme and outrageous.

252.    The acts of the Defendants, and each of them, either intentionally or recklessly caused Plaintiff emotional distress.

253.    The Plaintiff suffered severe trauma and emotional distress.

254.    The Defendants' conduct actually and proximately caused Plaintiff's suffering

255.    As a result of the acts of intentional emotional distress identified hereinabove, Defendants, and each of them, breached their duty to Plaintiff and Plaintiff is entitled, directly and

1  proximately, to damages in an amount to be more specifically determined at the time of trial.

2  256. Plaintiff has been required to retain the services of an attorney to pursue this action

3  and is entitled to recover attorney's fees and costs incurred.

4  **SIXTH CAUSE OF ACTION**

5  (Negligence against Ellington, Derrick and City of Henderson )

6  257. Plaintiff repeats and realleges each and every allegation contained in the foregoing

7  paragraphs, and incorporates the same herein by reference.

8  258. Defendants owed duties to Plaintiff.

9  259. As set forth herein, Defendants engaged in negligent conduct.

10  260. The Defendants' negligent conduct caused Plaintiff to suffer severe trauma and

11  emotional distress, including, but not limited to, depression, anxiety, stress, the development of high

12  blood pressure, hair loss, skin problems, insomnia, headaches, panic attacks, chest pain, agitation,

13  moodiness, low energy and racing thoughts.

14  261. The Defendants' conduct was the proximate cause of Plaintiff's severe trauma and

15  emotional distress.

16  262. As a result of the negligence of Defendants identified hereinabove, Plaintiff has been

17  directly and proximately damaged in an amount to be more specifically determined at the time of

18  trial.

19  263. Plaintiff has been required to retain the services of an attorney to pursue this action

20  and is entitled to recover attorney's fees and costs incurred.

21  **SEVENTH CAUSE OF ACTION**

22  (Defamation against City of Henderson, Ellington, Abernathy, Kerby and McCann)

23  264. Plaintiff repeats and realleges each and every allegation contained in the foregoing

24  paragraphs, and incorporates the same herein by reference.

25  265. Defendants made false and defamatory statements about Plaintiff.

26  266. The statements were unprivileged publications made to third persons.

27  267. Defendant published the remarks to third parties with knowledge of the falsity or with

28  a reckless disregard for their truth or falsity. The statements were intentionally, or minimally,

negligently made.

268.    The defamatory communications imputed Plaintiff's "lack of fitness for trade, business, or profession," and injured the Plaintiff in her profession constituting defamation per se.

269.    The publication was not privileged.

270.    The publication is directly related to Plaintiff's business reputation.

271.    Even if the publication was privileged, as Defendants knew or should have known about the falsity of the publication, their acts were reckless if not with malice.

272.    Defendants' actions were willful, wanton, reckless, and malicious, and further show a complete and deliberate indifference to, and conscious disregard for, the rights of Plaintiff.

273.    Plaintiff is therefore entitled to an award of punitive or exemplary damages in an amount to compensate her for mental anguish, humiliation, and outrage and to deter Defendants from future similar conduct.

274.    Plaintiff has been required to retain the services of an attorney to pursue this action and is entitled to recover attorney's fees and costs incurred.

**EIGHTH CAUSE OF ACTION**

(Libel against City of Henderson, Ellington, Abernathy, Kerby and McCann)

275.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs, and incorporates the same herein by reference.

276.    Defendants caused the written reporting of matters regarding Plaintiff which were false.

277.    Defendants published the remarks to third parties with knowledge of the falsity or with a reckless disregard for their truth or falsity.

278.    The publication was not privileged.

279.    The publication has resulted in damages to Plaintiff.

280.    Even if the publication was privileged, as Defendant knew or should have known about the falsity of the publication, their acts were reckless if not with malice.

281.    Defendant's actions were willful, wanton, reckless, and malicious, and further show a complete and deliberate indifference to, and conscious disregard for, the rights of Plaintiff.

Plaintiff is therefore entitled to an award of punitive or exemplary damages in an amount to compensate him for mental anguish, humiliation, and outrage and to deter Defendant from future similar conduct.

282.    Plaintiff has been required to retain the services of an attorney to pursue this action and is entitled to recover attorney's fees and costs incurred.

### NINTH CAUSE OF ACTION

(Aiding and Abetting Defamation against Abernathy)

283.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs, and incorporates the same herein by reference.

284.    Defendant actively encouraged and promoted members of HPD to file, assert and report false and misleading reports and activities, including but not limited to: claims that Plaintiff (1) created an environment of fear; (2) violated ethics laws and City policies; (3) cheated on a certification exam; (4) hired a friend to evaluate HPD policies: (5) and was discriminatory.

285.    At the time he encourage and promoted the assertion of false and misleading reports and activities, Defendants was aware of his role in promoting the defamation.

286.    Defendant knowingly and substantially assisted the members of HPD in filing, asserting and reporting the false and misleading reports and activities.

287.    Plaintiff has been required to retain the services of an attorney to pursue this action and is entitled to recover attorney's fees and costs incurred.

**WHEREFORE**, Plaintiff prays this Court for the following relief:

1.      By declaring the acts and practices of Defendants violations of state and federal laws prohibiting discrimination and retaliation;

2.      By awarding Plaintiff all damages allowed by the aforementioned state and federal statutes, and non-duplicative damages under his tort claims, in an amount to be determined at trial;

3.      By awarding Plaintiff an amount equal to any economic losses, past and future, she may have suffered as a result of loss of opportunities as recoverable under Title VII in an amount to be determined at trial;

4.      By awarding Plaintiff the costs of this action together with reasonable attorney's fees

1  and costs as provided by §706(k) of Title VII, 42 U.S.C. §2000e-6(k);

2          5.      For prejudgment interest as allowed by law;

3          6.      For costs incurred to collect any award;

4          7.      For such other and further relief as the Court deems just and proper.

5          DATED this 1st day of November, 2021.

6                                          COOK & KELESIS, LTD.

7

8                                  By:___/s/ Marc P. Cook_____
                                          MARC P. COOK, ESQ.
9                                          Nevada Bar No. 004574
                                          GEORGE P. KELESIS, ESQ.
10                                         Nevada Bar No. 00069
                                          JULIE L. SANPEI, ESQ.
11                                         Nevada Bar No. 0005479
                                          517 South Ninth Street
12                                         Las Vegas, Nevada 89101
                                          *Attorneys for Plaintiff, LATESHA WATSON*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2

I HEREBY CERTIFY that I am an employee of Cook & Kelesis, and that, on this 1st day of

3

November I caused to be served via the Court's e-filing/e-service system the above and foregoing

4

**FIRST AMENDED COMPLAINT AND JURY DEMAND** by electronically serving all parties

5

via the Court's CM/ECF system.

6

7

8

*Sherrill D. Grotheer /s*
_____
An Employee of Cook & Kelesis, Ltd.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28