# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

LaTesha Watson,

           Plaintiff

  v.

City of Henderson, et al.,

           Defendants

Case No. 2:20-cv-01761-CDS-BNW

**Order Resolving Pending Motions**

[ECF Nos. 157, 158, 162, 164, 205, 206]

This is an employment action brought by plaintiff LaTasha Watson, Henderson Police Department's (HPD) former chief of police. She alleges that defendants the City of Henderson (the City) and Kevin Abernathy, a peace officer, who was the president of the Henderson Police Supervisors Association (union) during most of Watson's tenure, discriminated against her on the basis of her race and sex.

Watson's claims against the City are: (1) racial discrimination and hostile work environment in violation of 42 U.S.C. § 1981 (first cause of action); (2) constitutional due process deprivation in violation of 42 U.S.C. § 1983 (second cause of action); (3) race and gender discrimination and hostile work environment in violation of Title VII[1] (third cause of action); (4) discrimination and hostile work environment in violation of Nevada Revised Statute (NRS) § 613.330 (fourth cause of action); (5) intentional infliction of emotional distress (IIED) (fifth cause of action); (6) negligence (sixth cause of action); (7) defamation (seventh cause of action); and (8) libel (eighth cause of action). First Am. Compl. (FAC), ECF No. 93.

---

[1] District Judge Andrew P. Gordon previously dismissed Watson's hostile work environment claim under Title VII and Nevada law. Judge Gordon denied the City's motion to dismiss the hostile work environment claim under § 1981 and gave Watson limited leave to amend it against individual defendants. *Id.* Watson ignored the narrow scope of this order and asserts a hostile work environment claim against the City under both Title VII and NRS § 613.330. Accordingly, I strike these arguments as a violation of Judge Gordon's order. *See* Fed. R. Civ. P. 15(a) (a party may amend only with the opposing party's consent or the court's leave). Thus, pursuant to Judge Gordon's order, only Watson's hostile work environment claim under § 1981 survived, but for the reasons set forth herein, is nonetheless dismissed.

Watson's claims against Abernathy are (1) racial discrimination and hostile work environment in violation of § 1981 (first cause of action); (2) due process (second cause of action); (3) IIED (fifth cause of action); (4) defamation (seventh cause of action); (5) libel (eighth cause of action); and (5) aiding and abetting defamation (ninth cause of action). *Id.*

Pending before the court are Watson's motion for partial summary judgment against the City (ECF No. 157) and motion for partial summary judgment against Abernathy (ECF No. 158), the City's motion for summary judgment (ECF No. 164), and Abernathy's motion for summary judgement (ECF No. 162). Also before the court are Watson's motion for leave to file (ECF No. 205) and the City's emergency motion to strike (ECF No. 206). For the reasons set forth herein, I deny both of Watson's motions for partial summary judgment and grant the City's and Abernathy's motions for summary judgment. I further grant the City's emergency motion to strike Watson's leave to file.

## I.    Background information[2]

The City hired Watson as the HDP police chief in September of 2017. FAC, ECF No. 93 at ¶ 32. Watson was the first Black police chief hired by the City (*id.* at ¶ 56) and was hired to reform and facilitate a cultural change within the HPD (*id.* at ¶ 37).

Watson testified that she was initially well supported by the City until she began to tell the union "no." Watson Dep., Defs.' Ex. 8, ECF No. 165-8 at 18. In her complaint, Watson claims that she "quickly received indications that City personnel preferred her presence as a token, signaling change, not as an active agent of change." FAC, ECF No. 93 at ¶ 50. Watson further claims that she began implementing changes "designed to reset the organizational culture including disciplining misconduct," causing her to receive backlash from City leadership and was "targeted" by union members. *Id.* at ¶¶ 37, 39, 45, 54–55. Watson also alleges that she was routinely confronted with varied forms of racial and gender discrimination from the City and

---

[2] The parties are familiar with the background of this case. I only address background information here that is relevant to resolving this motion.

Abernathy, including "undermining of her judgment, questioning of her competence, and acts of sabotage and exclusion that impacted her ability to perform the role of police chief and which eventually resulted in her termination." *Id.* at ¶ 72. Abernathy, as a peace officer, was Watson's subordinate. *See e.g.*, Investigation report regarding union retaliation, Ex. 27, ECF No. 165-27 at 22.

### A.  The City hires third party to investigate complaints concerning Watson.

Starting in June of 2018, the City received several complaints lodged by HPD employees about Watson, and at the same time, received complaints lodged by Watson concerning perceived racial and gender motivated bias against her at HPD. ECF No. 164 at 10. As the City had done with complaints concerning City employees, including Watson's predecessor, it hired attorney Wendy M. Krincek to investigate the complaints about Watson. Krincek Decl., Defs.' Ex. 4, ECF No. 165-4 at 3–4. The complaints investigated the following allegations, that:

1.  Watson violated the City's Ethics Policy and Chapter 281A of the Nevada Revised Statutes for allegedly hiring a friend as a consultant;

2.  Watson and Deputy Chief Thedrick Andres cheated on their POST Certification examination, in violation of the City's Ethics Policy and Chapter 281A of the Nevada Revised Statutes. This investigation also included investigating whether Jeb Bozarth, who proctored the test, had been solicited to falsify the test results, and whether he had falsified the results of that report;

3.  Watson and other employees had improperly accepted tickets to a hockey game in violation of the City's Ethics Policy. This investigation also included investigating whether Deputy Chief Michael Denning, Chief of Staff David Burns, and Jeb Bozarth also violated the City's Ethics Policy by accepting the tickets and attending the game;

4.  Watson had taken excessive time-off from work;

5.  morale within the HPD was low, due in part to a hostile work environment created by Watson and Andres;

6. an officer was not selected for a position because of her gender identity. This included a separate investigation into whether the new selection process implemented by Watson contributed to the lack of selection, and the basis for the selection committee's recommendation to select other officers;

7. a book chapter given to certain employees to read by Watson had religious overtones and that Watson had made religious references to an officer;

8. more than one employee felt disrespected and harassed by Watson's management style, including an allegation that Watson had humiliated an officer during a meeting in front of her peers;

9. the human resources department was being pushed out of key decisions within the police department;

10. members of union members were being unlawfully targeted and retaliated against for their union activity;

11. Watson announced that she had a "mole" on the union executive board;

12. Watson disregarded her supervisor's directions regarding the process for promoting captains;

13. Kevin Abernathy, the HPD union president at the time, called Watson a "black bitch";

14. Bristol Ellington, Deputy City Manager, conveyed to Watson that she should be concerned for her family's safety because they were being targeted by the union; and

15. complaints against Watson were made because of her race and gender.

*Id.* at 4–5.

As routine practice, Krincek assessed the credibility and veracity of each allegation brought forward and witness testimony. *Id.* at 6. Krincek made two sets of findings: (1) "whether the factual allegations within the complaint occurred" and (2) "whether the factual allegations that could be verified, amounted to a violation of City policy or other law." *Id.* Krincek was able

to substantiate the factual allegations that union members were being targeted and retaliated against for their union activity, that Waston stated she had a "mole" on the union executive board, and that Watson had disregarded her supervisor's directions regarding the process for promoting captains. *Id.* During her investigation, Krincek was able to substantiate some of the allegations that Watson had violated various City policies and as a result, recommended discipline for Watson, to include possible termination. *Id.*

One allegation Krincek was unable to substantiate was Watson's claim that Abernathy called her a "black bitch" because, even though Watson alleged that multiple people told her that Abernathy made this statement, she declined to provide the names of witnesses to support her allegation, making her the only person who made this report. *Id.*; Investigation report regarding union retaliation, Defs.' Ex. 27, ECF No. 165-27 at 8. Krincek was also unable to substantiate Watson's allegations that she was complained about because of her race and gender. Krincek Decl., Defs.' Ex. 4, ECF No. 165-4 at 6.

As part of her report, Krincek recommended Watson be counseled about her management style, specifically that Watson "should be counseled to immediately cease making broad-based negative critiques to supervisory staff at HPD about supervisory employees as a whole or subsets thereof . . . especially in group settings and to subordinates." Investigation report regarding disrespectful and harassing management style, Defs.' Ex. 13, ECF No. 165-13 at 7–8. Krincek further recommended that Watson receive coaching on positive management techniques. *Id.* at 8.

Regarding union retaliation, Krincek found that "Watson ha[d] engaged in inappropriate and ineffective leadership of HPD that [was] unlikely to be cured and create[d] vulnerability to the City." Investigation report regarding union retaliation, Defs.' Ex. 27, ECF No. 165-27 at 19. Krincek noted that it was "deeply concerning that [Watson] appear[ed] to intentionally be creating an atmosphere of distrust and division amongst employees – especially since the[] employees [were] law enforcement officers and trust and teamwork is presumably essential to

ensuring their own and the public's safety." *Id.* at 18. She further found that "based upon the totality of the circumstances and findings of the three investigations including [Watson's] disregard of her supervisor's orders, sowing mistrust and division amongst employees, attempting to influence employee communications, engaging in a promotional process in a manner that leads employees to reasonably question whether the results were pre-determined[.]" *Id.* at 19. Because it was "unlikely that coaching [would] change the inappropriate and ineffective decisions and behaviors [Watson] engaged in or that the City could put into place an effective mechanism to prevent the issues from reoccurring[,]" Krincek recommended that the City give "serious consideration" to terminating Watson. *Id.*

Krincek also authored a report about two additional issues that fell outside the scope of the investigation "given the risks that they posed." Krincek Decl., Defs.' Ex. 4, ECF No. 165-4 at 5. This included HR Director Jennifer Fenenema's concern that "there was ongoing conflict between HR and the Police Department" and that "Watson's comments that suggested she had complete and unilateral discretion over certain areas and that she did not appreciate uninvited involvement, including that she did not believe anyone beneath her should question her decisions" and that she "resented being investigated and claimed that the complaints were foolish." *Id.* at 5–6.

**B.  The City terminates Watson.**

The City found Krincek's reports "troubling" because Watson's management of the HPD posed "significant risks" to the department. ECF No. 164 at 14. Given Krincek's recommendations and "looming threats of litigation within the union for Watson's improper conduct," Bristol Ellington, Watson's direct supervisor, met with Watson about her management style. *Id.*; *see also* December 2018 email thread, Defs.' Ex. 26, ECF No. 165-26. Watson was not receptive to feedback and stated that it was "concerning" that Ellington, her direct supervisor, was questioning her management style because he had only been her supervisor for a short period of time. December 2018 email thread, Defs.' Ex. 26, ECF No. 165-26

at 3. In response, Ellington stated that he was "alarmed and concerned" with Watson's "argumentative response and failure to accept responsibility," stating that "[r]ather than focusing on rectifying the turmoil occurring in [her] department, [she] [chose] to argue and deflect everything that [they] discussed during [her] counseling and coaching session." *Id.* at 2. Ellington further stated that if Watson chose to "disregard [his] directives and continue [her] management style contrary to that of the City Manager's Office and City Policy, then [she] will be disciplined accordingly." *Id.*

On March 14, 2019, the City offered Watson a separation agreement, giving her the chance to resign rather than be terminated. Termination letter, Defs.' Ex. 36, ECF No. 166-1 at 2. Watson had 21 days to review and accept the agreement and was placed on paid administrative leave in the interim. *Id.* Watson requested a two-week extension of paid administrative leave, which the City rejected, but offered to put Watson on unpaid administrative leave with the understanding that Watson was to send a counteroffer to the terms of the agreement by April 8, 2019, and the parties would agree to final terms by April 11, 2019. *Id.* Watson and the City did not agree to the terms of the separation agreement by the deadline. As a result, the City terminated Watson for the following reasons:

1. Watson created of "an atmosphere of distrust and division between the command team and the unions, which caused more problems and distracted from the department's ability to focus on its job";

2. Watson disregarded Ellington's direction to work with the Human Resources Department and the City Attorney's Office on policy changes and department recruitment;

3. Watson refused to "work as a team with other departments of the City" and her failure to "respect other departments or their employees";

4.   Watson created "distrust and division within the organization, which led to a toxic environment" and encouraged her command team to distrust union members and told her command that there was a "war" with the union;

5.   Watson's lack of respect for sworn officers who were union members, stating they were "liars with badges" and felt that they were "despicable";

6.   Watson's lack of accountability and unwillingness to work with union members;

7.   Watson's inability to make changes to improve her leadership style, specifically, Watson's statement that there was "nothing" she could do to improve the relationship between management of the union; and

8.   Watson's refusal to provide Krincek with evidence to support Watson's serious allegations that Abernathy was pressuring others to "get information" on her or that Abernathy called her a "black bitch." Ellington noted that Watson had told employees "not to rely on or believe rumors, but without having any support for these accusations against [] Abernathy, [she] appeared to be relying on rumors as well." Ellington emphasized that when an investigator asked Watson a question, as chief of police, she is expected to provide "a complete and honest answer – not avoid or refuse the question."

*Id.* at 2–3.

## II.   Procedural history

Watson filed her first complaint in September of 2020. Compl., ECF No. 1. Original defendants, now voluntarily dismissed by Watson (ECF Nos. 93; 141; 147; 172), included Ellington in his role as the City's deputy manager; Kenneth Kerby in his role as peace officer and union president; Richard Derrick in his role as the City manager; Richard McCann in his role as the Nevada Association of Public Safety Officers executive director and chief labor representative; Nick Vaskov and Kristina Gilmore in their roles as the City assistant attorneys; and City mayor Debra March. ECF No. 93 at ¶¶ 11–20. The only remaining defendants are the

City and Abernathy. Watson filed partial motions for summary judgment against both the City and Abernathy. ECF Nos. 157; 158. Both parties cross-move for summary judgment. ECF Nos. 162; 164.

### III. Legal standard

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When the parties file simultaneous cross-motions for summary judgment on the same claims, "the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." *Tulalip Tribes of Wash. v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (internal quotation marks omitted) (quoting *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001)).

An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable factfinder could find for the nonmoving party, and a dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate. *Id.* at 250–51. "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968)). A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp.*, 477 U.S. at 323–24.

The moving party—the one seeking summary judgment—bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record that

demonstrate the absence of a genuine issue of material fact. *Id.* at 323. If the moving party fails to meet its initial burden, summary judgment must be denied, and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970). However, if the moving party satisfies Rule 56's requirements, then the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. At summary judgment, "a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial." *Assurance Co. of Am. v. Ironshore Specialty Ins. Co.*, 2015 WL 4579983, at *3 (D. Nev. July 29, 2015) (citing *Anderson*, 477 U.S. at 249). In evaluating a summary judgment motion, a court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fischbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

However, when, like here, the parties file cross-motions for summary judgment, "the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Fair Housing Council of Riverside County, Inc.*, 249 F.3d at 1136. Each motion must be considered on its own merits to determine whether a genuine issue of material fact exists precluding summary judgment for either party. Thus, "the court must review the evidence submitted in support of each cross-motion." *Id.*

## IV.   Discussion

### A.  Watson's motion to supplement her replies to her pending summary judgment motions is denied and the City's motion to strike is granted.

On February 5, 2024, four days shy of the one-year mark from the close of discovery and with pending motions for summary judgment fully briefed, Watson filed a supplemental disclosure of two new witnesses, affidavits from those witnesses, a news article, and an accompanying motion seeking to use the newly disclosed discovery as evidence, and to supplement her reply in support of replies to defendants' oppositions to her partial summary

judgment motions (ECF Nos. 200; 201). ECF No. 205. According to Watson's motion, former HPD officers Hector Villa and Xavier Johnson contacted Watson's counsel to provide information about this matter shortly after December 11, 2023, when the Las Vegas Review-Journal published an article[3] discussing HPD Detective Kevin LaPeer's disciplinary record. *Id.* at 2. Watson moves to include Villa and Johnson's affidavits with her supplemental replies. *Id.* The City moves to strike the late disclosures (ECF 207), which Abernathy joins (ECF No. 209). The court notes that this is not Watson's first supplemental disclosure. Rather, it is Watson's *fifteenth* supplemental disclosure, the fifth of which made after the close of discovery. ECF No. 207 at 3; *see* Christian Ogata Decl., Defs.' Ex. A, ECF No. 207-1 at 3.

### 1. Scope of supplemental discovery

Federal courts are guided by the Federal Rules of Civil Procedure to ensure a "just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. Rule 26 governs the scope and limits of discovery. "Rule 26 promotes fairness both in the discovery process and at trial. For Rule 26 to play its proper part in this salutary scheme, discovery must not be allowed to degenerate into a game of cat and mouse." *Thibeault v. Square D Co.*, 960 F.2d 239, 244 (1st Cir. 1992). Rule 26(e) outlines the requirements for supplementing disclosures and responses. It requires the parties to supplement or correct prior discovery responses "in a timely manner if the party learns that is some material respect the disclosure or response is incomplete or incorrect." Fed. R. Civ. P. 26(e).

Rule 26 does not mandate when the duty to supplement ends. Although the Ninth Circuit has not determined if the duty to supplement ends with the close of discovery, many courts have held that the duty to supplement extends past the close of discovery. *See Sanders v. Univ. of Idaho*, 2022 U.S. Dist. LEXIS 19012, at *8 (D. Idaho Jan. 31, 2022) (collecting cases).

---

[3] Las Vegas Law Review-Journal, *Fellow Detectives Accused Him of Racism. Henderson's New Police Chief Cleared Him of Discipline*, https://www.reviewjournal.com/investigations/fellow-detectives-accused-him-of-racism-hendersons-new-police-chief-cleared-him-of-discipline-2959041/#:~:text=Investigations-,Fellow%20detectives%20accused%20him%20of%20racism.,and%20Black%20Lives%20Matter%20protesters (last visited March 12, 2024).

However, courts have found that the duty to supplement is only triggered if a party's prior production is incorrect or incomplete. "The duty to supplement under Rule 26(e)(1) is directed to documents generated during **the relevant time frame** previously not produced but subsequently discovered. To say that the duty to supplement covers documents generated after that date would render meaningless any delineated time period for production . . . [N]othing in [] rule [26(e)(1)] imposes a never ending obligation to produce documents continuously as they are created . . ." *Dong Ah Tire & Rubber Co. v. Glasforms, Inc.*, 2008 WL 4786671, at *2 (N.D. Cal. Oct. 29, 2008) (emphasis added); *see Our Children's Earth v. Leland Stanford Junior Univ.*, 2015 WL 12964638, at *3 (N.D. Cal. Oct. 29, 2015) (noting that "the duty to supplement under Rule 26(e) does not automatically supersede the fact discovery cutoff as to developments thereafter that relate to prior requests for discovery made before the cutoff" and that "endless rolling production would undermine" the just, speedy, and inexpensive determination of cases and the need of proportionate discovery); *Kuhns v. City of Allentown*, 2010 WL 4236873, at *3 (E.D. Pa. Oct. 26, 2010) (noting that to allow supplementation "would be to invite rolling discovery in a way that would unfairly burden [Defendant] and indefinitely postpone trial").

Watson seeks to use her fifth supplemental disclosure made after the discovery deadline to supplement her replies to her own summary judgment motions. *See* ECF No. 205. This is improper. The Ninth Circuit had long held that a district court should not consider new evidence presented for the first time in a reply because it deprives the opposing party an opportunity to respond or address it. *See Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) ("[W]here new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the non-movant an opportunity to respond.") The only way to cure this issue would be to permit defendants to file a sur-reply, but that may necessitate the reopening of discovery, further delaying resolution of the pending summary judgment motions, and potentially pushing out a trial even further: this is inapposite to the just, speedy, and inexpensive determination of cases and the need of proportionate

discovery. Even though Watson only recently obtained this additional discovery, this case has been pending for almost four years and Watson's termination had been public knowledge for approximately five years, which suggests the evidence could have been obtained long before December 2023. Regardless, permitting Watson to use the new evidence would render the now expired discovery cutoff deadline meaningless. Accordingly, Watson's motion for leave to supplement her replies is denied. Defendants' motion to exclude the supplemental disclosures under Federal Rule of Civil Procedure 37 is denied as moot as, for the reasons stated above, the court will not consider the additional disclosures in resolving the summary judgment motions.

> ### B. The court sua sponte dismisses Watson's § 1981 claim against the City and Abernathy without prejudice and with leave to amend, therefore mooting the competing motions for summary judgment on the first claim for relief.

In July of 2023, the Ninth Circuit, sitting *en banc* in *Yoshikawa v. Seguirant*, held that § 1981 creates federal rights but does not provide either an express or implied cause of action against state actors. 74 F.4th 1042 (9th Cir. 2023). Watson initiated this action (2020) and amended her complaint (2021) long before the *Yoshikawa* decision. *See* FAC, ECF No. 93. The parties also briefed their respective motions for summary judgment several months before the *Yoshikawa* decision was entered. *Yoshikawa* makes clear that Watson's § 1981 claim cannot survive as pled, so I *sua sponte* dismiss it. But because Watson did not have the benefit of *Yoshikawa* at the time she brought (or even amended) her complaint, this claim is dismissed without prejudice and with leave to amend. Therefore, the motions for summary judgment on Watson's § 1981 claim are denied as moot.

> ### C. The court grants summary judgment in favor of the City on Watson's disparate treatment claims.

Watson raises three claims based on race and gender discrimination against the City. FAC, ECF No. 93 at ¶¶ 199–211, 228–49. The first, now dismissed, claim is that the City violated § 1981 by subjecting her to disparate treatment based on race and a hostile work environment

based on the same. *Id.* at ¶¶ 199–211. The second claim alleges that the City violated Title VII by subjecting Watson to disparate treatment based on race and gender. *Id.* at ¶¶ 288–36. And the third claim alleges that the City violated Nevada's anti-discrimination statute NRS § 613.330 by subjecting Watson to disparate treatment based on race and gender. *Id.* at ¶¶ 237–49.

While the § 1981 claim is dismissed, that has no impact on the merits of two remaining claims. Because Title VII and NRS § 613.330 are coextensive, the court considers these claims together under Title VII. *See Stewart v. SBE Entm't Grp., LLC*, 239 F. Supp. 3d 1235, 1246 n.61 (D. Nev. 2017) (explaining that a discrimination claim under NRS § 613.330 proceeds under the same analysis as that of a Title VII claim). Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e–2(a)(1). In employment, a person may suffer disparate treatment "'when he or she is singled out and treated less favorably than others similarly situated on account of race.'" *See McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1121 (9th Cir. 2004) (quoting *Jauregui v. City of Glendale*, 852 F.2d 1128, 1134 (9th Cir. 1988)).

A plaintiff has the initial burden of establishing a prima facie case by introducing evidence that gives rise to an inference of unlawful discrimination and may do so by providing direct evidence of discriminatory intent or through the *McDonnell Douglas* framework. 411 U.S. 792, 802 (1973); *see also Cordova v. State Farm Ins. Companies*, 124 F.3d 1145, 1148 (9th Cir. 1997). Direct evidence of discriminatory intent "typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer." *Coghlan v. Am. Seafoods Co. LLC*, 413 F.3d 1090, 1095 (9th Cir. 2005). In the absence of direct evidence, a plaintiff must demonstrate that: (1) she is a member of a protected class; (2) she is qualified for her position; (3) she has experienced an adverse employment action; and (4) that similarly situated individuals outside her protected class were treated more favorably that she was. *McDonnell Douglas*, 411 U.S. at 802; *see also Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 847 (9th Cir. 2004).

Watson moves for summary judgment in her favor on her disparate treatment claims, arguing that she was treated less favorably than similarly situated employees and that the facts of this case give rise to an inference of discrimination. ECF No. 157 at 33. Specifically, she argues that it was shocking that no one in City leadership initiated or recommended an investigation into whether systematic racism or collective conduct was driving the complaints filed against her given (1) Waston had complained to Ellington that this was the case; (2) that Ellington acknowledged the complaints were skewed or petty; (3) that Ellington was on notice that Watson was being sabotaged; and (4) Watson's deputy chief Andres believed that the complaints were contrived, noting that complaints by Watson were not investigated when others, with seemingly less merit, made against her were investigated. *Id.* at 25. Watson argues that the failure to investigate the complaints against her facilitated a pattern of discrimination and harassment. *Id.* She also argues that summary judgment is appropriate because the City's proffered reasons for terminating her are pretextual. *Id.* at 36. The City opposes the motion, arguing that Watson cannot support her disparate treatment theory because she cannot prove a prima facie case of discrimination. ECF No. 193 at 7.

Here, Watson has not produced direct evidence of discrimination. Rather, Watson only advances arguments that her termination was the consequence of systemic racism and that race and gender discrimination contributed to her unlawful termination. Specifically, Watson argues that Abernathy was racist because, through one witness, the department was able to substantiate that Abernathy had in fact referred to Watson derogatorily, and that instead of further investigating him, turned the investigation against her and her credibility. Watson further argues that the City's decision to reverse the decision to support "191A coaching and counseling [for] Abernathy who had sent a disrespectful email while on duty," which included "brashly noted misspellings and typographical errors in the paperwork," all while being coached by Watson's deputy chief (Andres), who is also Black, is further evidence of the department's systemic racism. ECF No. 157 at 30. Watson also claims that investigations into other

complaints against other members of City leaders, based hearsay and/or opinion, were subjected to shorter, less "rigorous investigations," and that unlike in her case, in those instances, the credibility of those City leaders was not questioned. *Id.* Finally, Watson claims that she was hired to "clean up" HPD, but instead of being supported by the City, she was subjected to gender and racial stereotypes, wrongfully penalized for counterstereotype behavior. *Id.*

Each of the complaints, whether taken individually or considered together, are not direct evidence that Watson was subjected to either race or gender discrimination. First, while Abernathy's statement was, in fact, substantiated, it was only in part. Watson claims that Abernathy called her a "black bitch," but the City's investigation was only able to substantiate he called her a "bitch." March 12, 2019 Investigation Report, Pl.'s Ex, 12, ECF No. 160-7 at 8.[4] Watson cites no other admissible evidence[5] that Abernathy did or said anything else that was rooted in race and gender discrimination.[6] Assuming arguendo that Abernathy did in fact go on

---

[4] During discovery, although having twice denied that Abernathy made such statement and denying that he informed Watson that Abernathy made such a statement, Tyndall submitted a declaration in which he stated that he recalled Abernathy referring to Watson as a "black bitch." Tyndall Decl., Pl.'s Ex. 7, ECF No. 160-2 at 8. This declaration was executed by Tyndall in Mississippi. Relevant here, an unsworn declaration may be used in lieu of affidavit, but when executed outside of Nevada must substantially state that the declaration is sworn "under penalty of perjury *under the law of the State of Nevada.*" *See* NRS § 53.045(2) (emphasis added). Thus, Tyndall's declaration was required to include language indicating that it was declared pursuant to Nevada law but does not include such language. As a result, Tyndall's declaration does not comply with NRS § 53.045(2) and will not be considered by the court. As noted *infra*, however, even to the extent the court considered the declaration, Watson still fails to proffer evidence which connects any discriminatory animus on the part of Abernathy—a non-decisionmaker—to the decisionmakers relevant here.

[5] In her opposition to the City's motion for summary judgment, Watson relies on two anonymous letters (Pl.'s Ex. 24, ECF No. 160-5 at 40; Pl.'s Ex. 25, ECF No. 160-5 at 44) to support the proposition that her termination was tied to her race and gender. *See, e.g.*, ECF No. 190 at 18–19. I will not consider these letters because, as anonymous out-of-court statements offered for the truth of the matters asserted within, they are inadmissible hearsay. *Arthur v. Windsor Shadows Homeowner's Ass'n*, 2024 U.S. App. LEXIS 6238 (9th Cir. Mar. 15, 2024) ("The district court did not abuse its discretion in declining to consider inadmissible hearsay in opposition to summary judgment.") (citing Fed. R. Evid. 802 and *Orr v. Bank of Am.*, 285 F.3d 764, 773 (9th Cir. 2002) (setting forth standard of review and explaining that courts may not consider inadmissible evidence at summary judgment)). While the court might have considered the letters to the extent it was clear there were witnesses with personal knowledge able to testify at trial to the veracity of its contents, the letters are anonymous and therefore without more, are inadmissible.

[6] This statement alone is direct evidence of gender animus, which the Ninth Circuit has held can be sufficient to preclude summary judgment in instances where the person making the derogatory comment is the plaintiff's supervisor or a decisionmaker. *Dominguez-Curry v. Nevada Transp. Dep't.*, 424 F.3d 1027, 1039 (9th Cir. 2005) ("[W]e have repeatedly held that a single discriminatory comment by a plaintiff's

a "witch hunt" against Watson, it is her burden to show that there is no genuine issue of material fact that the hunt was *because* she was a Black woman, as opposed to, for example, Abernathy working to ensure Watson was following the terms of the union's collective bargaining agreement (CBA). Watson would have been required—and failed—to proffer evidence that Abernathy, and any animus he harbored against Watson, was (1) the impetus for the HR complaints filed against her, or (2) that his statement and/or actions can be imputed to the decisionmakers' ultimate decision to her terminate her. *Cf. Dominguez–Curry*, 424 F.3d at 1039 ("Where, as here, the person who exhibited discriminatory animus influenced or participated in the decision-making process, a reasonable factfinder could conclude that the animus affected the employment decision."). Likewise, Watson fails to cite evidence that the decision not to support her "191A coaching and counseling" of Abernathy was *because of* racial or gender discrimination by the City. Finally, as discussed further below, Watson's assertion that she was treated differently than prior leaders is unavailing.

Because she fails to provide direct discrimination evidence, Watson must satisfy the *McDonnell Douglas* factors for her claim to survive. There is no dispute that Watson is a member of a protected class. And termination is an adverse employment action. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). But that is where Watson's claim begins to fall apart. Watson cannot establish a prima facie case under *McDonnell Douglas* because she fails to cite any evidence showing that similarly situated individuals outside her protected class were treated more favorably than she was. She merely states that "there is significant evidence [she] was treated differently from prior police chiefs," ECF No. 157 at 34, but for the following reasons, fails to support this claim.

---

supervisor or decisionmaker is sufficient to preclude summary judgment for the employer."); *Galdamez v. Potter*, 415 F.3d 1015, 1026 n.9 (9th Cir. 2005) (explaining that an employee can prove gender discrimination "where the ultimate decision-maker, lacking individual discriminatory intent, takes an adverse employment action in reliance on factors affected by another decision-maker's discriminatory animus"). Abernathy was not her supervisor and Watson does not cite evidence showing he was a decisionmaker or influenced the relevant decisionmakers.

"In order to show that the [employees] allegedly receiving more favorable treatment are similarly situated . . ., the individuals seeking relief must demonstrate, at the least, that they are similarly situated to those employees *in all material respects*." *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006) (emphasis added). "[I]ndividuals are similarly situated when they have similar jobs and display similar conduct." *Vasquez v. County of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003), *as amended* (Jan. 2, 2004). The mere fact that employees hold the same title does not mean they are similarly situated. *See, e.g., Ajwani v. Hanmi Bank*, 2016 U.S. Dist. LEXIS 93173, at *24 (C.D. Cal. July 18, 2016) (collecting cases). As relevant here, "[e]mployees are similarly situated when they are involved in or accused of the *same offense* and are disciplined in different ways." *Whitley v. City of Portland*, 654 F. Supp. 2d 1194 (D. Or. 2009). In claims alleging race or gender discrimination, a plaintiff must also show that the similarly situated individual that was protected more favorably was outside of her protected class. *Leong v. Potter*, 347 F.3d 1117, 1124 (9th Cir. 2003).[7]

Watson raises four arguments in support of her claim that she was treated differently from prior chiefs. First, she argues that her authority to set promotion standards for captains was stripped by the City, even though policies gave chiefs the "ultimate final decisions relative to the promotional process" and "prior chiefs had been given the freedom to make promotional decisions without interference." ECF No. 157 at 34–35. This argument fails because Watson does not show that her authority was stripped. As noted above,[8] the evidence indicates that she was advised that her captain recruitment process needed to be redone because it did not comply with the procedures outlined in the union's CBA.[9] Defs.' Ex. 33, Email from Bristol Ellington to LaTesha Watson regarding cancellation of ceremony, ECF No. 165-33 at 2. In order for the court to determine whether a similarly situated chief was treated more favorably than Watson,

---

[7] Watson does not address the race or gender of prior chiefs, and only references one prior chief, Patrick Moers, by name. ECF No. 157 at 35. Nonetheless, because Watson was the first Black woman chief of police hired by HPD, I find this element is satisfied.

[8] *Supra* 17–18.

[9] The City's collective bargaining agreement with the union states that, before the police department may change any department policy, the proposed change must be submitted to the union for comment at least 30 days before the change. Article 26 of the CBA between the City and Union, Defs.' Ex. 30, ECF No. 165-30 at 2.

Watson was required to provide evidence that a prior chief(s) changed the captain promotional process in a way that (1) also violated the procedure outlined in the union's CBA and (2) that the City did not rescind or otherwise instruct that the policy needed to be redone. Watson fails to cite evidence of *any* change in policy by prior chief(s), much less the difference in treatment between herself and a prior chief, nor any policy change by prior chief(s) that either violated or were inconsistent with the CBA.

Second, Watson argues that, unlike her predecessors, her decisions regarding police officer discipline were subjected to reversal and interference. ECF No. 157 at 35. But again, Watson fails to explain or proffer any evidence as to how prior chiefs' similar course of discipline were accepted by the City while the City reversed hers.

Watson also claims that she was subjected to outside investigations and complaints, and that prior chiefs were treated differently. ECF No. 157 at 35. Watson relies on the testimony of former city manager Robert Murnane, whom she claims stated that "he could not recall" prior chiefs being subject to legitimized scrutiny with frequent outside investigations of complaints. *Id.* at 35. Watson oversimplifies Murnane's testimony to try to bolster her argument. Indeed, Murnane was asked a series of questions regarding complaints. Murnane Dep., Pl.'s Ex. 15, ECF No. 160-3 at 81–94. Murnane testified that the evaluation of complaints against a person in a management position, such police chief, depended on the nature of the complaint, stated that "complaints happen all the time," (*id.* at 86), could not recall if an anonymous complaint had been investigated by a third party (*id.* at 87), and that he could not comment on how he would have handled a situation where a chief felt as if they were being targeted by complaints because he never experienced a similar experience during his tenure with the City (*id.* at 91). Murnane's testimony is far from the type of evidence required at summary judgment that a prior chief of police was treated more favorably regarding the investigation of complaints filed against them. Instead, that testimony shows Watson disagrees with evidence showing that she was not treated less favorably than other chief(s). Further, and contrary to Watson's argument that she

was treated differently, the record shows that the City had previously hired a third-party investigator to investigate complaints against other department directors and City executives. *See generally* Vaskov Decl., Defs.' Ex. 2, ECF No. 165-2.

Fourth, Watson argues that she was treated differently for creating "her own human resources department within HPD" when her predecessor "had done something similar and it was considered a routine and normal practice for many departments in the City" but only Watson was terminated for it. ECF No. 157 at 35. First, Watson fails to cite any evidence that one of her predecessor's created his own HR department. In fact, when asked whether Watson's predecessor had "essentially started his own [HR] department. . . and was running [HR] at least somewhat separately through the police department," Murnane testified that he **was not aware of it ever occurring**. Murnane Dep., Pl.'s Ex. 15, ECF No. 160-3 at 84 (emphasis added). And the record reveals that Watson was not terminated for creating "her own HR department," but rather for "disregard[ing] Ellington's direction" to "work closely with the [HR] department and the City Attorney's Office (CAO) on policy changes and recruitments. Termination letter, Defs.' Ex. 36, ECF No. 166-1 at 2.

Finally, and fatal to Watson's disparate treatment claim, is her failure to establish a "nexus" between her race or gender and her termination. *Vasquez*, 349 F.3d at 640. Her claim is based on an assumption of race and gender discrimination, but Watson fails to supply the requisite evidence to support her claim. As the Ninth Circuit has held, even an erroneous firing does not give rise to a disparate treatment claim if a plaintiff cannot tie the termination to race or gender discrimination. *See, e.g., Austin v. Univ. of Oregon*, 925 F.3d 1133, 1138 (9th Cir. 2019). Accordingly, Watson failed to meet her burden showing that similarly situated individuals outside her protected class were treated more favorably that she was, so her motion for summary judgment is denied.

### 1. *The City's countermotion for summary judgment*

The City cross-moves for summary judgment on Watson's disparate treatment claims, arguing that Watson cannot provide any evidence that "'gives rise to an inference of unlawful discrimination either through the framework set forth in *McDonnell Douglas* or with direct or circumstantial evidence of discriminatory intent.'" ECF No. 164 at 22 (quoting *Freyd v. Univ. of Oregon*, 990 F.3d 1211, 1228 (9th Cir. 2021)). The City further argues that even if Watson meets her burden under *McDonnell Douglas*, it had legitimate, nondiscriminatory reasons to terminate Watson. *Id*. at 31. In response, Watson argues that the City is not entitled to summary judgment on the disparate treatment claims because its actions were undertaken with discriminatory intent. ECF No. 190 at 8. Watson further argues that the City's reasons for terminating her are "demonstratively pretextual." *Id*. at 28.

As discussed above, Watson fails to make a prima facie case of discrimination. Moreover, even if she had, the City has proffered legitimate, nondiscriminatory reasons for its decision to terminate Watson, which she fails to rebut. Termination letter, Defs.' Ex. 36, ECF No. 166-1 (i.e., failing to follow directives, failing to work as a team, and encouraging distrust amongst team members). To overcome these proffered legitimate reasons, Watson would be required at this stage to proffer "specific [and] substantial evidence of pretext"—which she does not. *See Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996). Indeed, as discussed above, Watson has failed to demonstrate that the City's proffered reasons for termination are uncredible or tainted by racial or gender animus. As a result, I find that no reasonable jury could find that Watson was subject to disparate treatment so the City's motion for summary judgment on this claim is granted.

**D.  The court grants summary judgment in favor of the City on Watson's due process claim.**

Watson brings a § 1983 due process claim against the City, claiming that the City illegally deprived her of two liberty interests (1) a name-clearing hearing prior to termination and (2) freedom to work in her chosen profession. FAC, ECF No. 93 at ¶¶ 219–27.

A § 1983 claim may be brought against municipalities if the plaintiff proves (1) she had a property interest protected by the due process clause of the Constitution, and (2) an official policy or custom led to the deprivation of that right. *See, e.g., Neva v. Multi Agency Communs. Ctr.*, 2005 U.S. Dist. LEXIS 34742, at *8 (E.D. Wash. July 18, 2005). "A person's property interest in employment is created and defined by state law, but protected by the due process clause of the state and federal constitutions." *Id.* (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972).

### 1.  *Watson's motion for partial summary judgment*

Watson moves for summary judgment, arguing that there is no genuine issue of material fact that the City did not hold a hearing prior to her termination or that she is no longer able to obtain employment in her chosen profession because of her termination. ECF No. 157 at 39–42. In response, the City argues that Watson's due process claim fails because she does not point to any evidence in the record to support several elements of the claim and does not attempt to establish liability under *Monell*.[10] ECF No. 193 at 22. I agree. Watson failed to allege that a due process violation resulted from a City policy or custom as required by *Monell*. *See* ECF No. 157 at 39–41; *see also* ECF No. 200 at 10–15. Accordingly, I deny Watson's motion for summary judgment against the City.

### 2.  *The City's motion for summary judgment*

The City cross-moves for summary judgment, arguing that the court should grant summary judgment in its favor because (1) Watson does not have a liberty interest in a role as chief of police and has not provided any evidence that she is wholly excluded from policing and

---

[10] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978) (setting forth standard for municipal liability).

(2) Watson was not permanently excluded from being a police chief because she admits to rejecting a job offer of police chief in another jurisdiction. ECF No. 164 at 36. In response, Watson argues that her experience makes her "overqualified for most positions in a police department" and the inquiry here spins on exclusion from the position of police chief—rather than exclusion from the field. ECF No. 190 at 38. She also argues that the job she was offered "was actually a split of accepted chief of police duties and her title would have been a superintendent of police reform" and "[t]he position [was] created to lead the [police department] alongside the chief" not a job as the chief. *Id.* at 38–39.

While the Ninth Circuit has recognized a substantive right for a generalized right to employment, *there is no right to a specific job. See Armstrong v. Reynolds*, 22 F.4th 1058, 1079–80 (9th Cir. 2022). The court has also established that such a right is limited to "extreme cases," such as a "government blacklist, which when circulated or otherwise publicized to prospective employers effectively excludes the blacklisted individual from [their] occupation, much as if the government had yanked the license of an individual in an occupation that requires licensure." *Engquist v. Oregon Dep't of Agric.*, 478 F.3d 985, 997–98 (9th Cir. 2007). Stated otherwise, a plaintiff's liberty interest is not implicated unless "the government's stigmatizing statements effectively exclude the employee *completely from [their] chosen profession.*" *Blantz v. Cal. Dep't of Corr. & Rehab.*, 727 F.3d 917, 925 (9th Cir. 2013) (emphasis added).

Watson has not met her burden of demonstrating that this is an "extreme case." As a threshold matter, Watson's prior experience or qualifications is of no consequence because it does not entitle her to the right to hold the position of police chief, nor a police chief position where she alone has all decision-making responsibilities.[11] The proper inquiry is whether she was effectively excluded from a law enforcement job; she was not. Watson admits that her termination did not prevent her from being offered a job that was the role of police chief, but

---

[11] Watson's arguments suggest that her qualifications entitled her to a police chief position where she alone is in charge of all decisions simply falls flat given that she applied for and was offered a job to work *alongside* a police chief with split duties, demonstrating that police chiefs do not always work alone. Stated otherwise, unilateral decision-making is not always included in a police chief's job description.

"with a different title." Watson Dep., Defs.' Ex. 8, ECF No. 165-8 at 13:12–19. Watson declined this job offer even though it was similar to her position with HPD. *Id.* at 13:24–14:4. That decision lies with Watson, not the City.

Watson's argument that she is entitled to relief because she was denied a name-clearing hearing also fails. ECF No. 157 at 41. As a threshold matter, Watson fails to cite to any authority supporting her position that she was *entitled* to a name-clearing hearing; rather, her own motion admits that a person *may* be entitled to a hearing if certain conditions are met. *See id.* at 34 ("...a plaintiff may be entitled to a name clearing hearing if the employer....") (citing *Kramer v. Cullinan*, F.3d 1156, 1192 (9th Cir. 2018)). Further, as noted above, Watson fails to establish that the City caused a deprivation to her liberty interest in working in law enforcement. "Stigmatizing statements that merely cause reduced economic returns and diminished prestige, but not permanent exclusion from, or protracted interruption of, gainful employment within the trade or profession *do not constitute a deprivation of liberty*." *Blantz*, 727 F.3d at 925 (quoting *Stretten v. Wadsworth Veterans Hosp.*, 537 F.2d 361, 366 (9th Cir. 1976)) (emphasis added). Watson is clearly able to be employed in the law enforcement field and even turned down a job that—in her own words—was the *same role* she had in Henderson.

Even assuming arguendo that Watson had a right to a name-clearing hearing and had a liberty interest in a name-clearing hearing, in order to hold the City liable, Watson must have provided evidence of an official policy, custom, and practice of discharging employees while making stigmatizing statements. *See Monell*, 436 U.S. at 690 (holding that "local governing bodies . . . can be sued directly under § 1983" only where the unconstitutional action "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."). Watson fails to meet her evidentiary burden.

Watson's motion for summary judgment merely cites her own testimony as evidence that she "is no longer able to obtain employment in her chosen profession given the amount of negative information available about her" (*see* ECF No. 157 at 42) and does not discuss the lack

of such evidence in her reply (ECF No. 200 at 10–15). And as discussed above, Watson's argument that she is no longer able to obtain employment in her chosen profession is belied by the record; she was offered and declined a position in her chosen field (*see* Watson Dep., Defs.' Ex. 8, ECF No. 165-8 at 13:24–14:4) so she has not been deprived of a liberty interest. Watson's due process claim fails as a matter of law, so I grant summary judgment in favor of the City.

### E. Watson's motion for partial summary judgment against Abernathy is denied. Abernathy's motion for summary judgment is granted.

Watson and Abernathy cross-moved for summary judgment on Watson's due process, IIED, and aiding and abetting defamation claims. Abernathy also moves for summary judgment on Watson's defamation and libel claims. ECF No. 162.

#### 1. Watson's motion for partial summary judgment.

Watson argues Abernathy is liable for her alleged due process violation because "a subordinate can be liable 'if an improper motive sets in motion the events that lead to termination that would not otherwise occur'" and a "'subordinate cannot use the non-qualifying motive of a superior as a shield against liability if that superior never would have considered a dismissal but for the subordinate's retaliatory conduct.'" ECF No. 158 at 22 (quoting *Gilbrook v. City of Westminster*, 177 F.3d 839, 854–55 (9th Cir. 1999)). Watson further argues that Abernathy is individually liable under § 1983 as a subordinate governmental employee with an unlawful motive who caused the real decisionmakers to act. *Id.*

There is no dispute that Abernathy was Watson's subordinate. But Watson's claim that "Abernathy was a primary driving force for the scheme that generated numerous false complaints about [her] in an attempt to get her terminated" (*id.* at 22), is unsupported by the record. There is no way for the court to know whether the complaints Watson references were filed by Abernathy, because of Abernathy, or for unrelated reasons. Watson avers that "Abernathy himself encouraged and furthered efforts by approaching HPD members and encouraging them to file complaints about [Watson]." *Id.* at 8. She cites the inadmissible

anonymous letters and the Tyndall declaration, which states that "[b]ased on my observations, and in the absence of any other tangible explanation, I believe there was a concerted effort by the City and Union Representatives to go after the Chief by any means necessary." *Id.* (citing and quoting Tyndall Decl., Pl.'s Ex. 7, ECF No. 160-2 at 7). Even if the court considered the declaration, it does not state that *Abernathy* encouraged or furthered efforts for union members to file complaints against Watson.

Watson's termination letter shows she was not only terminated based on the complaints filed against her, but also because of her lack of accountability and inability to make changes and failure to follow directives. *See* Termination letter, Defs.' Ex. 36, ECF No. 166-1 at 2–3 ("I gave you time to make changes and bring the organization together, but unfortunately the police department only became more fractioned. . .You refused to acknowledge your weaknesses and were unwilling to make changes to improve yourself as a leader. I specifically asked you what you could do to improve the relationship between PD management and the unions and you said, 'nothing.' This was extremely concerning and unacceptable to me. . .*I saw no effort on your part to improve your leadership style or follow my guidance over the last eight months*, I have made the decision to terminate your employment as the Chief of Police.") (emphasis added). Watson fails to meet her burden showing there is no genuine issue of material fact, so her summary judgment motion is denied.

### 2.  *Abernathy's motion for summary judgment*

Abernathy cross-moves for summary judgment, arguing that Watson's due process claim fails because he had no affect or control over Watson's claimed liberty interest in future employment as he had no power to terminate her employment, negotiate circumstances of her employment or any other minutia related to Watson. ECF No. 162 at 17. He also argues that he is entitled to summary judgment because Watson's due process claim fails as a matter of law since Watson has no liberty interest in being chief of police. *Id.* Summary judgment in favor of Abernathy is appropriate because the record supports that Watson's due process claim fails as a

matter of law and because no reasonable jury could find that, as Watson's subordinate, he was liable for her termination or any alleged due process violation. Accordingly, I grant summary judgment in favor of Abernathy.

**F. The court declines to exercise pendant jurisdiction on the remaining state law claims.**

Remaining are Watson's claims against the City for IIED, negligence, defamation, libel, and aiding and abetting defamation, and claims against Abernathy for IIED, negligence, defamation, libel, and aiding and abetting defamation. Federal courts are courts of limited jurisdiction, and they may exercise supplemental jurisdiction over state-law claims that "are so related to claims in the action" that they form the same case or controversy with the claims over which the court has jurisdiction. 28 U.S.C. § 1367(a). Once a plaintiff's federal claims are gone, the court may decline to exercise supplemental jurisdiction over remaining state-law claims. *Id.* at § 1367(c)(3); *Harrell v. 20th Century Ins. Co.*, 934 F.2d 203, 205 (9th Cir. 1991) ("[I]t is generally preferable for a district court to remand remaining pendent claims to state court.").

Because I have granted summary judgment on or dismissed Watson's federal claims, I am not inclined to exercise supplemental jurisdiction over the remaining state-law claims at this time, so I dismiss them without prejudice. The court may reconsider dismissal if Watson files an amended complaint.

## V. Conclusion

IT IS HEREBY ORDERED THAT:

1. Watson's § 1981 claim against the City and Abernathy is dismissed without prejudice and with leave to amend;

2. Watson's motion for partial summary judgment against the City **[ECF No. 157] is denied** as set forth in this order;

3. Watson's motion for partial summary judgment against Abernathy **[ECF No. 158] is denied** as set forth in this order;

4.  Abernathy's motion for summary judgement **[ECF No. 162] is granted** as set forth in this order;

5.  The City's motion for summary judgment **[ECF No. 164] is granted** as set forth in this order;

6.  Watson's motion for leave to file supplemental replies to defendants' motions for summary judgment **[ECF No. 205] is denied**;

7.  The City's emergency motion to strike **[ECF No. 206] is granted**. Watson's motion for leave **[ECF No. 205] is stricken**; and

8.  Watson's state law claims are dismissed without prejudice.

IT IS FURTHER ORDERED that, if Watson amends her complaint in light of this decision, the parties must meet and confer, by April 24, 2024, to agree on a proposed briefing schedule.

IT IS FURTHER ORDERED that the parties must appear for a status conference on April 30, 2024 at 10:00 am to discuss the status of the case and, if applicable, the agreed upon briefing schedule.

Dated: April 5, 2024

_____
Cristina D. Silva
United States District Judge