MARC P. COOK, ESQ.
Nevada Bar No. 004574
COOK & KELESIS, LTD.
517 South Ninth Street
Las Vegas, Nevada 89101
Phone: (702) 737-7702
Fax: (702) 737-7712
E-mail: law@bckltd.com
*Attorneys for Plaintiff, LaTesha Watson*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| LATESHA WATSON,<br><br>   Plaintiff,<br><br>v.<br><br>CITY OF HENDERSON; BRISTOL ELLINGTON; KEVIN ABERNATHY; KENNETH KERBY; RICHARD DERRICK; RICHARD MCCANN; NICK VASKOV; KRISTINA GILMORE; DOES I through X, inclusive,<br><br>   Defendants. | Case No.: 2:20-cv-01761-CDS-BNW<br><br>**PLAINTIFF'S EXHIBITS IN SUPPORT OF PLAINTIFF'S REPLY IN SUPPORT OF COUNTERMOTIONS FOR SUMMARY FINDINGS AS A MATTER OF LAW** |

COMES NOW, Plaintiff, LaTesha Watson, by and through her attorneys of record, the law firm of Cook & Kelesis, Ltd. and files the following exhibits in support of and cited in Plaintiff's Reply in Support of Countermotions for Summary Findings as a Matter of Law.[1]

---

[1] Plaintiff incorporates by reference those Exhibits previously submitted as Plaintiff's Exhibits to Motions for Partial Summary Judgment filed March 22, 2023 [Doc. 160](filed under seal); Plaintiff's Exhibits in Support of Responses to Motions for Summary Judgment filed April 14, 2023 [ECF 192]; Plaintiff's Exhibits in Support of Responses to Motions for Partial Summary Judgment filed May 12, 2023 [ECF203], and Plaintiff's Responses to City of Henderson's Motion for Summary Judgment and Kevin Abernathy's Motion to Dismiss. [ECF 234]

| Exhibit No. | Description | Bates/Pages |
|---|---|---|
| Supplement to Exhibit 76 | Selected Excerpts from Oct. 6, 2023 Deposition of Dominique Day, Esq. | Pages 60, 61, 65, 67, 72, 81-83, 103-104, 108, 114-115, 124, 143 |

DATED this 28th day of August, 2024.

COOK & KELESIS, LTD.

By: *Marc Cook/s*
MARC P. COOK, ESQ.
Nevada Bar No. 004574
517 South Ninth Street
Las Vegas, Nevada 89101
*Attorneys for Plaintiff, LaTesha Watson*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I am an employee of Cook & Kelesis, and that, on this 28th day of August, 2024, I caused to be served via the Court's e-filing/e-service system the above and foregoing Plaintiff's Exhibits to Motions for Partial Summary Judgment by electronically serving all parties via the Court's CM/ECF system:

*Sherrill Grotheer/s*
An Employee of Cook & Kelesis, Ltd.

Supplement to
EXHIBIT 76

# In the Matter Of:

2:20-cv-01761-CDS-BNW

## WATSON

vs

## CTY OF HENDERSON, et al.

**Virtual Videotaped Deposition Of:**

*DOMINIQUE DAY, ESQ.*

*October 06, 2023*



702-805-4800
scheduling@envision.legal

Nevada Firm No. 088F

1  general background and context in this case
2  pertaining to the glass cliff phenomenon and
3  counterstereotype penalties that you will utilize in
4  forming your opinions?
5      A.   Yes, they are.  I guess to be specific,
6  these are, you know, we're detailing the scientific
7  basis here, these paragraphs refer to peer reviewed
8  research setting forth these various phenomena,
9  counterstereotype penalty, glass cliff, precarity of
10 leadership, so this is like a scientific framework
11 for a lot of what comes later.
12     Q.   That's right.  Yeah, that really was my
13 next question, these paragraphs provide sort of a
14 survey of the glass cliff phenomenon based on the
15 science research that you've reviewed?
16     A.   That's correct.
17     Q.   Yeah.  Okay.  But again, these paragraphs,
18 and again I'm just referring to paragraph 16 through
19 23, I know you will apply them to Dr. Watson later,
20 but just these paragraphs here, these are providing
21 the general context and background, you are not
22 offering any opinions specifically in these
23 paragraphs about Dr. Watson; correct?
24          MR. COOK:  Excuse me, I'm sorry.  Object.
25 Again, it's a vague and unintelligible question.  I

1   think it also misstates the previous testimony. I
2   assume the answer is the same. If you want to go
3   through the same kind of circular thing again, Rick,
4   that's fine but can she just answer that it was the
5   same as the above or what are we doing here?
6   BY MR. GORDON:
7       Q.   Yeah, I mean, I think we're on the same
8   place. I mean, I don't see Dr. Watson specifically
9   referencing these paragraphs by name. Is that
10  accurate?
11      A.   Well, maybe this is very -- I could tell
12  you my legal training, right. This is sort of like
13  the rule, right. So these specific studies, this
14  scientific analysis, this scientific framework has
15  been selected because of its relevance and its
16  pertinent to the claims in this case. So Dr. -- the
17  various discovery and the facts of the case are
18  grappled with later in the report, but this is the
19  area where the rule, the scientific evidence, the
20  scientific basis for the opinions about specifically
21  Dr. Watson's situation and the City of Henderson's
22  situation is set forth. So it's hard for me, I know
23  what you're trying to say but it's really hard for
24  me to see it as separate from Dr. Watson since the
25  whole thing was different, it was a different

1  support a glass cliff, this glass cliff phenomenon?
2       A.   Yes, there are.  I'm sure there are.  I've
3  seen some of that.  I -- but I'm also aware -- well,
4  have I answered your question?
5       Q.   Yes.  So you are aware of people who
6  disagree with you that there isn't sufficient
7  evidence to support the glass cliff phenomenon.  Who
8  are they by name if you know any of those
9  individuals who disagree with you?
10      A.   I wouldn't be able to tell you by name.
11 The research that we do actually involves pulling in
12 already -- so I am not doing all the original
13 research, I usually rely on research that exist,
14 that's peer reviewed, that's credible and reliable
15 to support the phenomenon that we see -- that I see
16 in our work.  And so as you probably know, I'm not a
17 psychologist, I'm not a researcher.  I leverage and
18 I use research frameworks.  But I certainly have
19 seen that there are some researchers that do
20 disagree.
21      Q.   Okay.  And have you reviewed that
22 literature, the literature of researchers and
23 scholars that disagree with you about glass cliff
24 phenomenon?
25      A.   Oh, yeah.  Absolutely.  I think if I had

1   Q.  Okay.  So you've reviewed some of this
2   oppositional research, Ms. Day, but as you sit here
3   today you don't remember any of the authors who
4   authored the contrary positions to your position?
5   A.  I couldn't give you somebody by name.  Also
6   I probably couldn't tell you the actual names of the
7   people we relied on.
8   Q.  Okay.
9   A.  I only sort of can tell you the substantive
10  research.
11  Q.  Okay.  In preparing for this assignment in
12  preparing report for this litigation, did you review
13  any of the opposition research, that is the research
14  that disagrees with you on the position of glass
15  cliff phenomenon and perhaps other things that
16  you're going to opine?
17  A.  I think that's what I just said.  That,
18  yeah, in developing the report and developing the
19  expert opinion, I did a lot of research on all of
20  the topics and all of the issues that seemed
21  relevant to Dr. Watson's case including
22  organizations in crisis and selected the research
23  that I found most compelling, most credible, and
24  most relevant.  And so in that process there's a lot
25  of other stuff that was read just clicking through

1  general opinions, that is true. But I want to kind
2  of really pinpoint each specific opinion if we can.
3  And I heard a lot of things in your response,
4  Ms. Day, that we can -- we can, you know, try to,
5  you know, try to, you know, flush out a little bit
6  more. You know, I heard the City was an
7  organization in crisis, systemic racism existed,
8  City's tolerance -- the City was tolerant of that
9  behavior. Those are your -- some of your opinions
10 certainly. Is that accurate?
11       A.   Yes.
12       Q.   Okay. What -- what -- you know, are your
13 opinions, you know, based on Dr. Watson's, you know,
14 self-reporting to you of what went on?
15       A.   My opinions are based on quite a few
16 things. My -- so obviously, of course, the
17 conversation I had on early on with Dr. Watson, my
18 review of the various documents produced in
19 discovery, I reviewed several of the depositions.
20 And then I have quite a good amount of experience in
21 looking at how systemic racism shows up in various
22 context. Some of them are sort of executive. Some
23 of them are criminal justice, for example. But like
24 looking at how systemic racism shows up in systems
25 and systems approach to that is something I do quite

```
 1   is it your opinion, Ms. Day, that Dr. Watson was the
 2   victim of a counterstereotype penalty?
 3        A.   I think she experienced counterstereotype
 4   penalty in a variety of ways from a variety of
 5   people in her tenure at Henderson Police Department,
 6   yes.
 7        Q.   And what's your basis for that opinion?
 8        A.   Even some of the ways people responded to
 9   her, talked about her.  You have somebody bringing,
10   for example, clear best practice.  There's a program
11   that they had called Leads which is similar to a
12   globally recognized police intervention called
13   CompStat that I think was started with NYPD, and
14   this is a data driven intervention that looks to
15   actually reduce the amount of bias, nepotism, and
16   favoritism that informs policing decision-making.
17   You're looking at neighborhood-level, block-level
18   data on crime and trying to unravel the way
19   decisions are being made that may not be targeting
20   that appropriately.  And I've seen actually in
21   CompStat meeting, I've seen police commissioners and
22   deputy commissioners really target the ways that
23   biases towards black women leadership might actually
24   inform failures at crime prevention, failures at
25   good policing.  And similarly in this case, you
```

```
 1    know, you have Leads program coming in and this is a
 2    globally recognized best practice, hundreds are
 3    paying a lot of money for it and there's resistance.
 4            Dr. Watson is talking about the
 5    corporatization of policing culture.  Again, this is
 6    considered to be an innovative, cutting-edge,
 7    modern-day reform, people are pushing back about
 8    that.  Professionalism, increasing professionalism
 9    and education, there's pushback about that.  She's
10    uninterested -- like the idea that she won't promote
11    somebody who's involved in a really serious
12    excessive force claim or there was another person
13    who had a conviction for DUI who was sort of
14    uplifted under the prior leadership, and her kind of
15    de facto stance like no, the City, the policy
16    itself, I don't even have to go to best practice,
17    the policing policy itself in Henderson says this is
18    somebody who should have been terminated, I'm not
19    going to look at her as a candidate for a promotion.
20    That's just inside this policy itself.  This became
21    a space of resistance and at times to delegitimized
22    her authority.
23            I mean, there's really quite of lot of
24    examples.  But even, you know, with Sergeant
25    Abernathy at some point he says, well, I was
```

1  supporting her but then I decided she was doing the
2  same old thing that Morris had done, and decided he
3  no longer supported her.  But his grounds for that
4  had a lot to do with it seemed in his deposition not
5  having a -- her not having gratitude and
6  appreciation for the ways in which he was showing up
7  or deferring to the ways in which he saw things or
8  wanted things to proceed.
9           And so a lot of the resistance we see
10 throughout from people both at very high levels and
11 at the working level really reflect, this resistance
12 really reflects the discomfort with her
13 authoritativeness, her confidence, her really
14 determined focused intention to sort of bring this
15 policing organization into the 21st Century, into
16 modern best practice.  And the discomfort she
17 triggers in that, we would call that
18 counterstereotype penalty in some regards when we
19 see a lot of evidence that they are not necessarily
20 reacting to the propriety of the interventions,
21 they're reacting to the perception that she's
22 aggressive or abrasive or an angry black woman.
23 These are all racial tropes we see invoked all the
24 time, globally in fact.  So maybe that's a good
25 summary of counterstereotype penalty in this

```
 1   asking her to testify as to the ultimate issue of
 2   fact?  I mean, if you want, I'll stipulate that we
 3   can do that but I'm not sure if that's what you're
 4   asking.
 5           MR. GORDON:  I'm asking what her opinions
 6   are.
 7   BY MR. GORDON:
 8      Q.   And so what I'm hearing is that you do not
 9   and you cannot opine as to, to be clear, that
10   Dr. Watson's termination was based on her race or
11   gender, that's not your opinion?
12      A.   My opinion is that based on the information
13   that I've received, assuming the credibility of --
14   assuming all sorts of things I'm not competent to
15   actually assume, the credibility of certain
16   witnesses, the -- the validity of certain issues of
17   fact that have been presented in the case and in the
18   discovery and in the depositions, like within the
19   cabin of my competence I can -- my competency as an
20   expert I can say based on the information I have,
21   systemic racism and misogyny both informed her
22   tenure and her termination.
23           That if what I've seen and what I've -- and
24   if a jury came back and said, oh sure, everything
25   Dominique has seen is 100 percent credible,
```

1  everything in Dominique's report is 100 percent
2  correct, then I think you do have that "because."
3  But until issues like credibility and outside facts
4  and whatever else, I'm not sure I can make a
5  universal "because" statement.
6           What I can say is that I have identified
7  and reported on a good number of instances and
8  examples of individual overt and covert systemic --
9  individual and systemic racism both in the police
10 department and at the city, that the City's failure
11 to investigate or mitigate and the City's enthusiasm
12 to investigate in certain cases evidences this as
13 well.  And that the termination of Dr. Watson, the
14 letter was -- contained references to many of these
15 things as bases for her termination.  And many of
16 these things when you dig down really reflect a
17 pervasive culture of impunity, a systemic racism and
18 gender discrimination and that sort of hostility and
19 impunity I was talking about before.  But to me but
20 because you're asking it does sound like it's asking
21 for the issue that's beyond the competence of an
22 expert opinion but also universal in a way that I,
23 of course, haven't had universal access in this
24 matter.
25          MR. GORDON:  Okay.  Let me just show my

1  necessarily in preparation, but my recollection is
2  that there was some discretion that the chief had
3  not just in terms of the practice but even in terms
4  of the policy.  I want to get him out of that police
5  procedure that's being used in Henderson city.
6  There was some discretion that had always been there
7  in this area that was foreclosed to Dr. Watson
8  during the course of her tenure.  And that this
9  bullet point saying that she needed to defer to the
10 city -- to work closely with human rights -- I'm
11 sorry, not human rights but human resources and with
12 the city's attorney's office on policy and
13 recruitment was a shift from long-standing policy
14 where, you know, the police chief typically has
15 really significant authority in part because the
16 organizational culture is so specific and so strong.
17         So this language itself, right, doesn't
18 reflect bias necessarily but the underlying
19 motivations, the incidents that lead to it, and the
20 derogation from routine practice that it suggests as
21 I recall does offer a really interesting example of
22 what we're talking about here.  And I think I have a
23 paragraph about this, I don't know if I should look
24 at it.
25     Q.   Yeah, is the City entitled to shift as you

1  worked extensively on HR issues.
2      Q.  I mean, you've testified you don't consider
3  yourself a policing expert.  You've testified that
4  you have not worked directly in an HR role or
5  decision.
6      A.  So let me tell you why, because policing
7  is -- I'm sorry.
8      Q.  I haven't finished the question.
9      A.  Of course.  Of course.
10     Q.  I haven't finished the question.
11         And so, again, you've testified you don't
12 consider yourself a policing expert, you have
13 testified that you have not worked in an HR
14 position, and yet you are making some broad
15 conclusion that this paragraph which deals with an
16 organization, a large organization, you know, and
17 how certain promotional decisions should go --
18 through human resources is systemic racism.  And
19 that's what your testimony is I believe.  And so
20 unless you -- if I am misstating your testimony,
21 feel free to say that but I believe that's what you
22 testified to.
23     A.  I think you are misunderstanding or maybe I
24 should use believe it or not more words.  I don't
25 think you can be a real policing expert without

1  having been a police officer. You can barely train
2  police without having been a police officer. The
3  credibility and legitimacy of policing expertise
4  almost inevitably requires you to have worn a
5  uniform at some point. And that's my experience all
6  over the world. I have done some training of police
7  in Iraq, in Southern Iraq, in Basra. I've done some
8  work with policing in Afghanistan, in the West Bank,
9  in, obviously, in the U.S. And I understand quite a
10 lot about policing procedures and police
11 municipality relationships. And I worked quite a
12 lot on that because when you're looking at systemic
13 racism particularly in this country the history of
14 policing is directly implicated in really profound
15 ways. And so my work has had me looking very
16 closely at policing in a variety of ways for
17 decades, but to call yourself a policing expert
18 without having worn the uniform I think is
19 problematic and I think most police will call that
20 problematic.
21         With that said, I work with policing
22 experts who have worn the uniform, I work on
23 policing issues. I worked heavily on even the
24 reports I was telling you about from the United
25 Nations. And so my statements about it would be

1   opinions are not reflected in this report.
2       Q.   Okay.  Well, let's start with what is
3   reflected in your report and these six summary
4   opinions here, these six paragraphs rather.
5            What method did you use to formulate or
6   reach the opinions contained in this, these first
7   six paragraphs?
8       A.   So I did what I would normally do in any
9   kind of investigation, I did a tremendous amount of
10  factfinding on the front end, I looked for an
11  appropriate framework, in this case we looked
12  heavily at scientific -- available scientific
13  research, and then developed the analysis.  I think
14  you call this a qualitative, I don't want to say a
15  mixed-method research because we did very, very
16  little looking at anything quantitative, but I think
17  we would say it is a qualitative, a qualitative
18  analysis.
19      Q.   And has this method been tested that you
20  utilized in this case to form these opinions?
21      A.   I mean, I do think this is pretty standard
22  in qualitative interview-based research.  And so
23  like this is something I do in lots of context where
24  I do these factfindings for United Nations.  I was
25  telling you this year we did Australia and the UK.

```
 1   authority of a police chief, but then also this
 2   perception that the city could and should limit her
 3   authority without confronting its own bias in the
 4   process.  And those are some examples, there might
 5   be some more but certainly, yeah.
 6        Q.   Okay.  And you mentioned earlier that
 7   Sergeant Abernathy was president of the union.  Are
 8   you aware then that Sergeant Abernathy was wearing
 9   two hats at the time of serving with the city as
10   union president and then an officer?
11        A.   Yes, of course.
12        Q.   Okay.  And in recognizing that he was
13   wearing two hats, did you ever look into why the
14   city pulled or decided to reverse the 191A against
15   him?
16        A.   I may have.  I'm not -- I feel like there
17   was a question about whether or not, I probably
18   shouldn't be speculating, but there was a question
19   about whether or not he was acting in his union
20   capacity or policing capacity and he had some
21   authority to do union work during like some policing
22   computer terminals or like during the same period of
23   time he might be also on duty as a policeman maybe
24   before or after and so that had something to do with
25   the decision.
```