**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| LaTesha Watson, | Case No. 2:20-cv-01761-CDS-CLB |
| Plaintiff | **Order Granting Defendants' Motions for Summary Judgment and Denying Defendants' Motion to Strike** |
| v. | |
| City of Henderson, et al., | [ECF Nos. 229, 230, 232, 233, 246, 247] |
| Defendants | |

This is an employment action brought by plaintiff LaTesha Watson, Henderson Police Department's (HPD) former chief of police. She alleges that defendants City of Henderson (the City) and Kevin Abernathy, a peace officer who was the president of the Henderson Police Supervisors Association ("the union") during most of Watson's tenure, discriminated against her on the basis of her race and sex.

Watson's claims against the City are: (1) racial discrimination and hostile work environment in violation of 42 U.S.C. § 1981; (2) intentional infliction of emotional distress (IIED); (3) negligence; (4) defamation; and (5) libel. Sec. am. compl. (SAC), ECF No. 223. Watson's claims against Abernathy are (1) deprivation of constitutional rights in violation of 42 U.S.C. § 1983; (2); IIED; (3) defamation; (4) libel; and (5) aiding and abetting defamation.

Pending before the court are Abernathy's motion to dismiss (ECF No. 229), which the court converts to a motion for summary judgment,[1] and the City's motion for summary judgment (ECF No. 230). Both motions are fully briefed.[2] Watson's responses to both Abernathy's and the

---

[1] "A district court has discretion to convert a motion to dismiss under Rule 12(b)(6) to a motion for summary judgment." *Burgess v. San Francisco*, 1992 U.S. App. LEXIS 2070, at *4 (9th Cir. Feb. 18, 1992). In Watson's response, she requested that this motion be converted to a motion for summary judgment. ECF No. 233 at 6. At the March 6, 2025 hearing on these motions, Watson confirmed the motion should be converted to one for summary judgment, and Abernathy agreed. Given the intertwined nature of the claims against the City and Abernathy, and the extensive record present in this case, I find it is appropriate to convert Abernathy's motion to dismiss into one for summary judgment.

[2] Resp. to Abernathy's mot. to dismiss, ECF No. 229; Resp. to City's mot. for summ. j., ECF No. 230; Abernathy reply, ECF No. 235; City reply, ECF No. 237.

City's motions operate as an opposition and countermotion for summary judgment. As part of her countermotion, Watson asks the court to consider an expert report by Ms. Dominique Day. ECF No. 232 at 9; ECF No. 233 at 7. Also pending before the court are Abernathy's and the City's requests that I strike Watson's reply docketed at ECF No. 244. Mot., ECF No. 246; Joinder, ECF No. 247.

On March 6, 2025, I heard oral argument on both motions for summary judgment, and also conducted a *Daubert*[3] hearing to determine the reliability and relevancy of Day's purported testimony. For the reasons herein, I deny the motion to strike and grant both motions for summary judgment.

I.    **Background**[4]

The City hired Watson as the HPD police chief in September of 2017. ECF No. 223 at ¶ 25. Watson was the first Black female police chief hired by the City (*id.* at ¶ 63) and was hired to reform and facilitate a cultural change within the HPD (*id.* at ¶ 30). Watson testified that she was initially supported by the City until she began to tell the union "no." Watson dep., Defs.' Ex. 8, ECF No. 165-8 at 18. In her complaint, Watson claims that she "quickly received indications that City personnel preferred her presence as a token, signaling change, not as an active agent of change." ECF No. 223 at ¶ 50. Watson further claims that she began implementing changes "designed to reset the organizational culture including disciplining misconduct," causing her to receive backlash from City leadership and was "targeted" by union members. *Id.* at ¶¶ 54, 125, 244. Watson alleges that she was routinely confronted with varied forms of race and gender discrimination from the City and Abernathy, including "undermining of her judgment, questioning of her competence, and acts of sabotage and exclusion that impacted her ability to perform the role of police chief and which eventually resulted in her termination." *Id.* at ¶ 80. Abernathy, as a peace officer, was Watson's subordinate. *See, e.g.,*

---

[3] *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993).

[4] The parties are familiar with the background of this case. I only address background information here that is relevant to resolving this motion.

Investigation rep. regarding union retaliation, Defs.' Ex. 27, ECF No. 165-27 at 22. At all times relevant to the facts of this case, Abernathy was serving as the president of Henderson Police Department police union. ECF No. 223 at ¶ 13 ("Defendant, Kevin Abernathy ("Abernathy") is and was at all times relevant hereto, a peace officer as defined by NRS 289.010(4) and the President of the Henderson Police Supervisors Association ("HPSA"), an employee organization as defined by NRS 288.040, which acts as the collective bargaining unit for supervisory law enforcement officers of HPD.")

### A. The City hires a third party to investigate complaints concerning Watson

Starting in June 2018, the City received several complaints lodged by HPD employees about Watson and, at the same time, received complaints lodged by Watson concerning perceived race-and gender-motivated bias against her at HPD. ECF No. 223 at ¶ 224. As the City had done with complaints concerning City employees, including Watson's predecessor, it hired an attorney—Wendy M. Krincek—to investigate both the complaints about Watson and complaints Watson filed . Krincek decl., Defs.' Ex. 4, ECF No. 165-4 at 3–4. Krincek investigated the following allegations:

1. that Watson violated the City's Ethics Policy and Chapter 281A of the Nevada Revised Statutes for allegedly hiring a friend as a consultant;

2. that Watson and Deputy Chief Thedrick Andres cheated on their POST Certification examination, in violation of the City's Ethics Policy and Chapter 281A of the Nevada Revised Statutes. This investigation also included investigating whether Jeb Bozarth, who proctored the test, had been solicited to falsify the test results, and whether he falsified the results of that report;

3. that Watson and other employees had improperly accepted tickets to a hockey game in violation of the City's Ethics Policy. This investigation also included investigating whether Deputy Chief Michael Denning, Chief of Staff David Burns, and Jeb Bozarth also violated the City's Ethics Policy by accepting the tickets and attending the game;

4. that Watson had taken excessive time off from work;

5. that morale within the HPD was low, due in part to a hostile work environment created by Watson and Andres;

6. that an officer was not selected for a position because of her gender identity. This included a separate investigation into whether the new selection process implemented by Watson contributed to the lack of selection, and the basis for the selection committee's recommendation to select other officers;

7. if a book chapter given to certain employees to read by Watson had religious overtones and if Watson made religious references to an officer;

8. if more than one employee felt disrespected and harassed by Watson's management style, including whether Watson humiliated an officer during a meeting in front of the officer's peers;

9. if the City's human resources department was being pushed out of key decisions within the police department;

10. if union members were being unlawfully targeted and retaliated against for their union activity;

11. if Watson announced that she had a "mole" on the union executive board;

12. if Watson disregarded her supervisor's directions regarding the process for promoting captains;

13. if Kevin Abernathy, the HPD union president at the time, called Watson a "black bitch";

14. if Bristol Ellington, Deputy City Manager, conveyed to Watson that she should be concerned for her family's safety because they were being targeted by the union; and

15. if complaints lodged against Watson were because of her race and gender.

*Id.* at 4–5.

As routine practice, Krincek assessed the credibility and veracity of each allegation brought forward, largely by collecting witness testimony. *Id.* at 6. Krincek made two sets of findings: (1) "whether the factual allegations within the complaint[s] occurred" and (2) "whether the factual allegations that could be verified, amounted to a violation of any City policy or other law." *Id.* Krincek was able to substantiate the factual allegations that union members were being targeted and retaliated against for their union activity, that Watson stated she had a "mole on the union executive board," and that Watson had disregarded her supervisor's directions regarding the process for promoting captains. *Id.* Krincek also substantiated that Watson's communications with her subordinates were "overly harsh" and "disrespectful[.]" Invest. report regarding hostile work environment, ECF No. 165-11 at 7. During her investigation, Krincek was also able to substantiate some of the allegations that Watson had violated various City policies and, as a result, recommended Watson be disciplined, to include termination. ECF No. 165-4 at 6.

One allegation Krincek was unable to substantiate was Watson's claim that Abernathy called her a "black bitch" because, even though Watson alleged that multiple people told her that Abernathy made this statement, she declined to provide the names of witnesses to support her allegation, making her the only person who made or could verify this report. *Id.*; ECF No. 165-27 at 8. Krincek was also unable to substantiate Watson's allegations that she was complained about because of her race and gender. Krincek Decl., Defs.' Ex. 4, ECF No. 165-4 at 6.

As part of her report, Krincek recommended Watson be counseled about her management style, specifically noting that Watson "should be counseled to immediately cease making broad-based negative critiques to supervisory staff at HPD about supervisory employees as a whole or subsets thereof . . . especially in group settings and to subordinates." Investigation rep. regarding disrespectful and harassing mgmt. style, Defs.' Ex. 13, ECF No. 165-13 at 7–8. Krincek further recommended that Watson receive coaching on positive management techniques. *Id.* at 8.

Regarding union retaliation, Krincek found that "Watson ha[d] engaged in inappropriate and ineffective leadership of HPD that [was] unlikely to be cured and create[d] vulnerability to the City." ECF No. 165-27 at 19. Krincek noted that it was "deeply concerning that [Watson] appear[ed] to intentionally be creating an atmosphere of distrust and division amongst employees – especially since the[] employees [were] law enforcement officers and trust and teamwork is presumably essential to ensuring their own and the public's safety." *Id.* at 18. She further found, based on findings that Watson's "disregard of her supervisor's orders, sow[ed] mistrust and division amongst employees, attempt[ed] to influence employee communications, engag[ed] in a promotional process in a manner that [led] employees to reasonably question whether the [promotions] were pre-determined," and that Watson had "engaged in inappropriate and ineffective leadership of HPD that is unlikely to be cured[.]" *Id.* at 19. Because it was "unlikely that coaching [would] change the inappropriate and ineffective decisions and behaviors [Watson] engaged in or that the City could put into place an effective mechanism to prevent the issues from reoccurring[,]" Krincek recommended that the City give "serious consideration" to terminating Watson. *Id.*

Krincek also authored a report about two additional issues that fell outside the scope of the investigation "given the risks that they posed." ECF No. 165-4 at 5. This included HR Director Jennifer Fenenema's concern that "there was ongoing conflict between HR and the Police Department" and that Watson had made "comments that suggested she had complete and unilateral discretion over certain areas and that she did not appreciate uninvited involvement, including that she did not believe anyone beneath her should question her decisions" and that she "resented being investigated and claimed that the complaints were foolish." *Id.* at 5–6.

**B.  The City terminates Watson**

Given Krincek's recommendations and "looming threats of litigation within the union for Watson's improper conduct," Bristol Ellington, Watson's direct supervisor, met with Watson about her management style. ECF No. 230 at 7; *see also* Dec. 2018 emails, Defs.' Ex. 26, ECF No.

165-26. Watson was not receptive to the feedback, stating it was "concerning" that Ellington was questioning her management style because he had only been her supervisor for a short time. ECF No. 165-26 at 3.

In response, Ellington stated that he was "alarmed and concerned" with Watson's "argumentative response and failure to accept responsibility," stating that "[r]ather than focusing on rectifying the turmoil occurring in [her] department, [she] [chose] to argue and deflect everything that [they] discussed during [her] counseling and coaching session." *Id.* at 2. Ellington further stated that if Watson chose to "disregard [his] directives and continue [her] management style contrary to that of the City Manager's Office and City Policy, then [she] will be disciplined accordingly." *Id.*

On March 14, 2019, the City offered Watson a separation agreement, giving her the chance to resign rather than be terminated. Termination letter, Defs.' Ex. 36, ECF No. 166-1. Watson had twenty-one days to review and accept the agreement and was placed on paid administrative leave in the interim. *Id.* at 2. Watson requested a two-week extension of paid administrative leave, which the City rejected, but offered to put Watson on unpaid administrative leave with the understanding that Watson was to send a counteroffer to the terms of the agreement by April 8, 2019, and the parties would agree to final terms by April 11, 2019. *Id.* Watson and the City did not agree to the terms of the separation agreement by the deadline. As a result, the City terminated Watson for the following reasons:

1. Watson's creation of "an atmosphere of distrust and division between the command team and the unions, which caused more problems and distracted from the department's ability to focus on its job";

2. Watson disregarding Ellington's direction to work with the Human Resources Department and the City Attorney's Office on policy changes and department recruitment;

3. Watson's refusal to "work as a team with other departments of the City" and failure to "respect other departments or their employees";

4. Watson's creation of "distrust and division within the organization, which led to a toxic environment" and her encouraging her command team to distrust union members, telling the team that there was a "war" with the union;

5. Watson's lack of respect for sworn officers who were union members, calling them "liars with badges" and stating they were "despicable";

6. Watson's lack of accountability and unwillingness to work with union members;

7. Watson's inability to make changes to improve her leadership style, specifically, Watson's own statement that there was "nothing" she could do to improve the relationship between management and the union; and

8. Watson's refusal to provide Krincek with evidence to support Watson's serious allegations that Abernathy was pressuring others to "get information" on her or that Abernathy called her a "black bitch." Ellington noted that Watson had told employees "not to rely on or believe rumors, but without having any support for these accusations against [ ] Abernathy, [she] appeared to be relying on rumors as well." Ellington emphasized that when an investigator asked Watson a question, as chief of police, she is expected to provide "a complete and honest answer – not avoid or refuse the question."

*Id.* at 2–3.

## II.    Legal standard

Summary judgment is appropriate when the pleadings and admissible evidence "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). At the summary judgment stage, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). If reasonable minds could differ on material facts, summary judgment is inappropriate because its purpose is to avoid unnecessary trials when the facts are undisputed; the case must then proceed to the trier of fact. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995); *see also Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). Once the moving party satisfies Rule 56 by demonstrating the absence of any genuine issue of material fact, the burden shifts to the party resisting summary judgment to "set forth specific facts

showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Celotex*, 477 U.S. at 323. "To defeat summary judgment, the nonmoving party must produce evidence of a genuine dispute of material fact that could satisfy its burden at trial." *Sonner v. Schwabe N. Am., Inc.*, 911 F.3d 989, 992 (9th Cir. 2018). "When simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of"—and against—"both motions before ruling on each of them." *Tulalip Tribes of Wash. v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (citing *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001)).

## III. Discussion

### A. Defendants' motion to strike Watson's reply is denied.

As a threshold matter, Abernathy and the City ask that I strike Watson's "Reply in Support of Countermotions for Summary Findings as a Matter of law" (ECF No. 244) as an unauthorized surreply filed without the court's permission. ECF No. 246; ECF No. 247. Defendants argue that Watson's initial response violated several of this district's local rules and therefore the reply is an unauthorized surreply. Watson disagrees. ECF No. 248 at 4.

A review of Watson's response makes clear that it does, in fact, violate local rules. Local Rule IC 2-2(b) requires that for each type of relief requested, a separate document must be filed. Therefore, it is improper for Watson to put her response and countermotion in one document. However, the City's joinder motion is also procedurally improper as it includes additional arguments without seeking leave of court. *See Snow Covered Cap., LLC v. Fonfa*, 2023 U.S. Dist. LEXIS 99823, at *2 (D. Nev. June 8, 2023) ("Because [the party] filed two 'joinders' that contain additional argument beyond merely adopting that in [the co-party's] briefs, he was required to seek leave of court to do so. But he never did, so the two joinders amount to rogue filings."). Considering both parties' improper filings, together with consideration of judicial efficiency and

the preference to adjudicate cases on the merits, I deny defendants' request to strike Watson's reply.

### B.  The City's motion for summary judgment is granted.

The City argues it is entitled to summary judgment on all of Watson's claims. I address each claim in turn.

### 1.  *The City is entitled to summary judgment on Watson's claim for hostile work environment in violation of 42 U.S.C. § 1981.*

In my prior order, I sua sponte dismissed Watson's § 1981 claim with leave to amend in light of the Ninth Circuit's decision in *Yoshikawa v. Seguirant*, which was decided after this action was initiated. *Yoshikawa* found that § 1981 creates federal rights but does not provide either an express or implied cause of action against state actors. Order, ECF No. 221 (citing 74 F.4th 1042 (9th Cir. 2023)). Accordingly, applying that decision, in order for Watson to allege a violation of § 1981 against the City, she must allege it as a § 1983 violation.

To allege a hostile work environment claim in violation of § 1981, a plaintiff must allege "(1) the defendants subjected her to verbal or physical conduct based on race; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment." *Freeling v. PCX, Inc.*, 2023 U.S. Dist. LEXIS 143796, at *11–12 (C.D. Cal. Aug. 15, 2023) (citing *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1108 (9th Cir. 2008)).[5] To successfully allege a § 1983 violation against a city, a plaintiff must demonstrate that a policy, practice, or custom of the city is the moving force behind a violation of constitutional rights. *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658, 694 (1978). Thus, *Yoshikawa* requires that Watson demonstrate that the City's actions (1) violated

---

[5] The Ninth Circuit allows hostile work environment claims to be brought under § 1981. *See Manatt v. Bank of Am.*, NA, 339 F.3d 792, 797 (9th Cir. 2003) ("We now join every other circuit to have decided this issue and hold that the congressional amendment to § 1981 evinced congressional intent to permit hostile work environment claims under § 1981"). Additionally, the "legal principles guiding a court in a Title VII dispute apply with equal force in a § 1981 action." *Id.*

§ 1981, and (2) that violation was a result of the City's policy, practice, or custom. *See Lockett v. Cnty. of Los Angeles*, 977 F.3d 737, 741 (9th Cir. 2020).

The City seeks summary judgment on this claim, arguing that it fails because Watson cannot prove there was a violation of a City policy, practice, or custom. Specifically, the City argues that it "does not have an official policy of investigating people for complaints made against them because of their race, nor does it have a policy of making discipline decisions based on race." ECF No. 230 at 14. In her response, Watson argues that the City maintained a policy of "examining every single complaint lodged against Dr. Watson" but purposefully failed to investigate complaints filed by Watson. ECF No. 232 at 21. In its reply, the City states that it "*did* investigate Watson's complaints and complaints from others that she was being treated unfairly" and it "did *not* conduct a formal investigation into every single complaint against Watson." ECF No. 237 at 11–12 (emphasis in original). The City also argues that Watson did not put forth any evidence of an official policy that the City investigates or makes any decisions due to race and that Watson does not "identify any other instance of the City making decisions to investigate, or to supervise and manages its employees because of race[.]" *Id.* at 12.

The City is correct: Watson's hostile work environment claim fails because she does not identify a policy, practice, or custom as the moving force behind the alleged § 1981 violation. Neither in the SAC, nor in her opposition to summary judgment, does Watson allege, cite, or identify an express City policy that is unconstitutional. Therefore, to surpass the summary judgment stage, she must "produce evidence creating a triable issue of fact regarding the existence of an unconstitutional practice or custom." *Gordon v. Cnty. of Orange*, 6 F.4th 961, 974 (9th Cir. 2021). Watson fails to do so. Again, neither the SAC, nor the response to the motion for summary judgment, provides any evidence creating a triable issue of fact as to whether the City had an unconstitutional practice or custom. The lack of an identifiable practice or custom was further confirmed at oral argument, where, despite being asked several times, Watson's counsel was unable to identify any evidence supporting the argument that the City engaged in an

unconstitutional practice or custom. Instead, she relied only on the argument that they did not investigate Watson's complaints and only investigated claims against Watson. This argument is demonstrably refuted by the record. *See* ECF No. 165-4 at ¶ 11(o)–(q) (stating that Krincek investigated Watson's complaints). The record further demonstrates that the City investigated directors and other high level City employees of all races for alleged policy violations regardless of their race. *See* ECF No. 165-3 at ¶ 8; ECF No. 165-4 at ¶ 10. This further diminishes Watson's *Monell* liability argument. *See Gillette v. Delmore*, 979 F.2d 1342, 1349 (9th Cir. 1992) (finding no *Monell* liability where plaintiff did not present (1) "evidence of repeated constitutional violations for which the errant municipal officials were not discharged or reprimanded" or (2) "evidence of a pattern of similar dismissals in violation of employees' First Amendment rights"); *Jefferson v. City of Fremont*, 73 F. Supp. 3d 1133, 1149–50 (N.D. Cal. 2014) (finding no *Monell* liability where a plaintiff did not show a "pattern of repeated discrimination with respect to other players").

Because Watson fails to demonstrate a triable issue of fact exists as to whether the City has an unconstitutional policy, practice, or custom, the City is entitled to summary judgment on the § 1981 claim.

### 2. *The City is entitled to summary judgment on all of Watson's state law claims.*

The City asks that I exercise supplemental jurisdiction over all of the state law claims against it. ECF No. 230 at 14. Federal courts are courts of limited jurisdiction, and they may exercise supplemental jurisdiction over state-law claims that "are so related to claims in the action" that they form the same case or controversy with the claims over which the court has jurisdiction. 28 U.S.C. § 1367(a). District courts have discretion in deciding whether to decline or whether to retain supplemental jurisdiction. *Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997) *supplemented*, 121 F.3d 714 (9th Cir. 1997) *as amended* (Oct. 1, 1997). At the hearing following my last order granting summary judgment on some of Watson's claims, I stated that I

would exercise supplemental jurisdiction over the state law claims. Accordingly, I exercise my discretion and address each claim in turn.

### a. *Watson's IIED claim fails.*

To prevail on an IIED claim, a plaintiff must show "(1) extreme and outrageous conduct on the part of the defendant; (2) intent to cause emotional distress or reckless disregard for causing emotional distress; (3) that the plaintiff actually suffered extreme or severe emotional distress; and (4) causation." *Miller v. Jones*, 970 P.2d 571, 577 (Nev. 1998). Extreme or outrageous conduct is conduct "outside all possible bounds of decency" and is deemed "utterly intolerable in a civilized community." *Maduike v. Agency Rent-A-Car*, 953 P.2d 24, 26 (Nev. 1998) (per curium) (internal citation omitted).

The City argues that Watson's IIED claim fails because she cannot demonstrate that the City's conduct was "beyond the bounds of human decency" because her claim "centers around either her termination or how she was managed, making the acts 'normal employment relations.'" ECF No. 230 at 17–18 (citing *Welder v. Univ. of S. Nev.*, 833 F. Supp. 2d 1240, 1245 (D. Nev. 2011)). Watson, in response, argues that she was "subjected to targeted attempts to undermine her authority and prevent her from adequately performing her job through a series of lies, rumors, false allegations, deliberate interference and direct attempts to have her terminated." ECF No. 232 at 26. She also argues that this took place over a period of nineteen months and was "constant and systematic" and that the City "improperly and unfairly criticized her, treated her differently tha[n] similarly situated individuals, failed to address discrimination it knew existed, investigated complaints it knew were petty and frivolous against her and then pretextually used the complaints as a basis to terminate her" all while "ignoring her own reports of harassment and discrimination[.]" *Id.* All of this, Watson surmises, constitutes "extreme and outrageous" conduct. *Id.* In its reply, the City argues that "Watson asserts that she can state a claim through alleged 'attempts to undermine her authority' . . . and her belief that the City 'fail[ed] to investigate Plaintiff's reports and the reports of third parties in support of her,'" but

that these assertions have already been deemed to be unsupported and untrue by the Court. ECF No. 237 at 15.

Watson's IIED claim is based on her allegation that she was the subject of a targeted campaign leading to her termination, and that her complaints were not properly investigated.[6] As to the latter, the record refutes the statement that her complaints were not properly investigated. *See* ECF No. 165-4 at 5 (stating that Krincek investigated the following allegations (1) that Abernathy called Watson a "black bitch"; (2) that Ellington told Watson she should be concerned for her family's safety because the Union was targeting them; and (3) complaints were made against Watson because of her race and gender). Additionally, Watson's allegation that she was improperly terminated is not extreme or outrageous conduct as a matter of law. *Alam v. Reno Hilton Corp.*, 819 F. Supp. 905, 911 (D. Nev. 1993) ("[T]ermination of employees, even in the context of a discriminatory policy, does not in itself amount to extreme and outrageous conduct actionable under an intentional infliction of emotional distress theory."); *See Welder*, 833 F. Supp. 2d at 1245 ("[A] simple pleading of [termination] is insufficient to support a claim of [IIED], *even if* improper motivation is alleged." (emphasis added)). *Cf. Hoffman v. Red Wing Brands of Am., Inc.*, 2015 U.S. Dist. LEXIS 82741, at *30 (D. Nev. June 24, 2015) (finding a material issue of fact exists as to plaintiff's IIED claim when her supervisor reported graphic details of sexual acts to plaintiff, and showed her nude photographs of herself, among other things). Watson has not demonstrated that a genuine issue of material fact exists as to her IIED claim. Therefore, the City is entitled to summary judgment on this claim.

---

[6] These same allegations were dismissed at the pleading stage. U.S. District Judge Andrew P. Gordon dismissed Watson's IIED claim against the City because "Watson has not alleged any other actions showing the City engaged in extreme and outrageous conduct, and the existence of a hostile work environment is not enough by itself to give rise to an IIED claim." ECF No. 84 at 30 (citing *Torres v. Nat'l Frozen Foods Corp.*, 2021 WL 1740245, at *10 (D. Or. May 3, 2021)). He also explained that termination of an employee, "even in the context of a discriminatory [employee] policy, does not in itself amount to extreme and outrageous conduct actionable under an [IIED] theory." *Id.* (quoting *Hirschhorn v. Sizzler Rests. Intern., Inc.*, 913 F. Supp. 1393, 1401 (D. Nev. 1995)). Despite being given the opportunity to amend her complaint, and dismissal under the 12(b)(6) standard, Watson brings no additional allegations, much less evidence or authority, to support her IIED claim.

### b. *Watson's negligence claim fails.*

In the SAC, Watson brings a negligence claim against the City. ECF No. 223 at 52. In its motion for summary judgment, the City construes the negligence claim as one for negligent training and supervision. ECF No. 230 at 18 n.94 ("Watson merely regurgitates the threadbare elements of a negligence claim in her amended complaints . . . [t]he City assumes . . . that this claim is a negligent training and supervision claim, as articulated by her in her response to the City's motion to dismiss her first amended complaint.") Watson appears to agree. *See* ECF No. 232 at 26 ("There is ample evidence supporting the negligent training and supervision claim."). Therefore, I will construe the negligence claim as one for negligent training and supervision.

To state a claim for negligent training and supervision in Nevada, a plaintiff must show (1) "a general duty on the employer to use reasonable care in training and/or supervision of employees to ensure that they are fit for their positions," (2) breach of that duty, (3) injury, and (4) causation. *Bradford v. Owens*, 2023 Nev. App. Unpub. LEXIS 328, at *4 (Nev. Ct. App. Aug. 11, 2023) (quoting *Okeke v. Biomat USA, Inc.*, 927 F. Supp. 2d 1021, 1028 (D. Nev. 2013)). The City argues that it is entitled to summary judgment on this claim because (1) "there is no support in the record that any of Watson's supervisors were improperly trained or supervised" and (2) "the City's policies and practices for training its employees is a discretionary act immune from suit under Nevada Revised Statute 41.032." ECF No. 230 at 18. In response, Watson argues that there is, in fact, ample evidence to support that her complaints were not investigated, and that the City failed to maintain an investigation policy or train its employees regarding guidelines for investigation. ECF No. 232 at 26. Watson does not address the issue of discretionary act immunity.

Nevada Revised Statute § 41.032(2) states

[N]o action may be brought under NRS 41.031 or against an immune contractor or an officer or employee of the State or any of its agencies or political subdivisions which is:

. . .

> (2) Based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of the State or any of its agencies or political subdivisions or of any officer, employee or immune contractor of any of these, whether or not the discretion involved is abused.

Nev. Rev. Stat. § 41.032(2). To give rise to discretionary-act immunity, the act must (1) "involve an element of individual judgment or choice" and (2) "be based on considerations of social, economic, or political policy." *Martinez v. Maruszczak*, 168 P.3d 720, 729 (Nev. 2007). Although the statute at issue is a Nevada statute, the Supreme Court of Nevada has stated that "because NRS 41.032(2) mirrors the Federal Tort Claims Act (FTCA), we turn to federal decisions to aid formulating a workable test for analyzing claims of immunity under NRS 41.032(2)." *Id.* at 727. The Ninth Circuit has consistently held that "decisions relating to the hiring, training, and supervision of employees usually involve policy judgments of the type Congress intended the discretionary function exception to shield." *Vickers v. United States*, 228 F.3d 944, 950 (9th Cir. 2000); *see Neal-Lomax v. Las Vegas Metro. Police Dep't*, 574 F. Supp. 2d 1170, 1192 (D. Nev. 2008) ("Because Nevada looks to federal case law to determine the scope of discretionary immunity, and because federal case law consistently holds training and supervision are acts entitled to such immunity, LVMPD is entitled to discretionary immunity on this claim."). The City's decisions to adopt (or not adopt) an investigation policy for complaints, or whether to train employees regarding investigation procedure, are decisions that involve policy-type judgments. Therefore, I find that the negligent training and supervision claim is barred by § 41.032(2).

Even if I did not find that the claim is barred, Watson does not provide any evidence to support a negligent training or supervision claim. As I have explained, the record demonstrates that Watson's complaints were, in fact, investigated. Additionally, the record does not provide any facts to demonstrate that the City engaged in any acts that would show a breach of training or supervision of duty. Thus, the City is entitled to summary judgment on this claim.

### c. *Watson's defamation and libel claims fail.*

Watson next argues that the City's statements about her were defamatory and libelous. ECF No. 223 at 53. The City argues that it is entitled to summary judgment on both of these claims because Watson has not demonstrated that any of the City's employees acted with actual malice when allegedly making these statements. ECF No. 230 at 21. I agree.

To state a claim for defamation,[7] a plaintiff must allege "(1) a false and defamatory statement by [a] defendant concerning the plaintiff; (2) an unprivileged publication to a third person; (3) fault, amounting to at least negligence; and (4) actual or presumed damages." *Rosen v. Tarkanian*, 453 P.3d 1220, 1225 (Nev. 2019) (quotation omitted); *see also* Nev. Rev. Stat. § 200.510(1) (defining libel). When the plaintiff is a public figure or official, the First Amendment requires that the fault must rise to the level of "actual malice." *Rosen*, 453 P.3d at 1225; *see also N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964). Actual malice means "knowledge that [the statement] was false or [made] with reckless disregard of whether it was false or not." *Smith v. Zilverberg*, 481 P.3d 1222, 1229 (Nev. 2021) (alteration in the original) (quotation omitted). Watson was a public official as Chief of Police. *See Time, Inc. v. Pape*, 401 U.S. 279, 284 (1971) (treating a Deputy Chief of Detectives as a public official); *Posadas v. City of Reno*, 851 P.2d 438, 442 (Nev. 1993) (treating a police officer as a public official).

Watson alleges that the City leaked statements with malicious intent to damage her because the statements contained false information which included:

> Plaintiff's leadership created an atmosphere of distrust and division between management and the unions, that Plaintiff improperly changed promotional policies, that she did not work as a team with other City departments, that she created distrust and division within the police department, that she created a toxic environment and demonstrated a lack of respect for officers, that she called officers liars with badges, that she had no accountability, could not effectively lead HPD, that she unfairly disciplined an officer for engaging in Union duties and believed HPD members were not properly trained.

---

[7] Defamation encompasses both slander (spoken defamation) and libel (written defamation). *Flowers v. Carville*, 292 F. Supp. 2d 1225, 1232 n.1 (D. Nev. 2003) *aff'd* 161 F. App'x 697 (9th Cir. 2006).

ECF No. 232 at 27. Watson fails to meet her burden demonstrating that the City acted with actual malice. Evaluating the evidence in the light most favorable to Watson, there is no evidence that the City knew these statements were false or that the City acted with a reckless disregard for the truth. *See Pegasus v. Reno Newspapers, Inc.*, 57 P.3d 82, 87 (Nev. 2002) (granting summary judgment in favor of the defendant when the plaintiff had not met its burden demonstrating that the defendant acted with actual malice). Without any evidence to support her argument, Watson cannot demonstrate that there is a triable issue of material fact as to whether the City engaged in defamation or libel. The City is entitled to summary judgment on both the defamation and libel claims.

Watson has failed to demonstrate that there is a genuine issue of material fact as to any of her claims against the City. Therefore the City's summary judgment motion is granted in its entirety.[8]

### C. Abernathy's motion for summary judgment is granted.

Abernathy argues that he is entitled to summary judgment on all of Watson's claims. I address each claim in turn.

#### 1. Abernathy is entitled to summary judgment on Watson's § 1983 claim.

To bring a valid § 1983 claim against Abernathy, Watson must demonstrate (1) a violation of constitutional rights or rights created by a federal statute, (2) proximately caused, (3) by the conduct of a person, (4) acting under color of state law. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). In her response to Abernathy's motion, Watson claims that she is arguing a § 1981 hostile work environment claim. *See* ECF No. 233 at 17 ("Material issues of fact exist regarding whether Abernathy's conduct toward Plaintiff was sufficiently severe or pervasive so as to alter the conditions of her employment and create a hostile work environment."). Watson's response is perplexing because the SAC does not allege a § 1981 hostile

---

[8] Because I grant the City's motion for summary judgment, I deny Watson's "countermotion for summary findings as a matter of law" as there is no genuine issue as to any material fact showing she is entitled to judgment as a matter of law.

work environment claim. Rather, the SAC alleges that Abernathy violated her *property rights* guaranteed to her under 42 U.S.C. § 1981. ECF No. 223 at ¶ 306 (emphasis added). She also alleges that she "had a liberty interest in employment which was violated when the City terminated her employment under circumstances set in motion by [Abernathy] [.]" *Id.* at ¶ 309. The only allegation that could be construed as one claiming a hostile work environment is the allegation that her property rights were violated "[d]ue to Defendant's conduct subjecting her to conduct based on her race which was unwelcome and sufficiently severe and pervasive to alter the conditions of her employment and create an abusive work environment." *Id.* at ¶ 306. Although this one allegation, in one sentence, mimics the language of a § 1981 hostile work environment claim,[9] taken together with the rest of the allegations against Abernathy, it fails to satisfy the Rule 8 pleading requirement to allow me to find that Watson has pled a hostile work environment claim. *See* Fed. R. Civ. P. 8(a)(2) (A claim must include a "short and plain statement of the claim showing that the pleader is entitled to relief[.]"). The structure of the complaint further supports the conclusion that Watson does not plead a § 1981 hostile work environment claim against Abernathy. By comparison, Watson's § 1981 claim against the City is titled "Hostile Work Environment in Violation of 42 USC § 1981" whereas the claim against Abernathy is titled "Deprivation of Constitutional Rights in Violation of 42 USC § 1983." The title of the claim against Abernathy, combined with the discussion of the violation of her property rights and the violation of her liberty interest of her employment, leads me to conclude that Watson has not brought a § 1981 hostile work environment claim against Abernathy.

Even if I did find Watson intended to bring a hostile work environment claim against Abernathy, it would fail at summary judgment. "Hostile environment" harassment refers to situations where employees work in offensive or abusive environments. *Ellison v. Brady*, 924 F.2d

---

[9] "To state a hostile work environment claim based on race, a plaintiff must allege that (1) he was subjected to verbal or physical conduct because of his race, (2) the conduct was unwelcome, and (3) the conduct was **sufficiently severe or pervasive to alter the conditions of his employment** and create an abusive work environment. *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1122 (9th Cir. 2008) (internal citation omitted) (emphasis added).

872, 875 (9th Cir. 1991). Whether an environment is "hostile" or "abusive" is a matter that "can be determined only by looking at all the circumstances." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). "The working environment must both subjectively and objectively be perceived as abusive." *Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir. 1995) (citing *id.* at 21–22). The circumstances that determine whether an environment is abusive "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. In determining whether a work environment is considered objectively "hostile," courts analyze the facts by asking whether a reasonable person under the same or similar circumstances with the same fundamental characteristics as the plaintiff, would find the work environment to be hostile. *See Crowe v. Wiltel Commc'ns Sys.*, 103 F.3d 897, 900 (9th Cir. 1996). It is well established that "'simple teasing, offhand comments, and isolated incidents (unless extremely serious)' do not constitute a hostile or abusive work environment." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1095 (9th Cir. 2008) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

Watson argues that "the situation beginning with the anonymous complaints which were lies, fabrications, exaggerations and misleading; the outside investigations which took place in a manner which was unusual and disparate; the failures to take Dr. Watson's reports of discrimination seriously; and the pretextual termination, all created a hostile work environment." ECF No. 233 at 18. Watson argues that Abernathy "direct[ly] participat[ed]" in the hostile work environment because "[i]t was known in the department that Abernathy, a union leader, was approaching [union] members to file anything on the Plaintiff regardless of whether they were false or frivolous." *Id.*

Turning first to the allegation that the anonymous complaints were "lies, fabrications, exaggerations, and misleading," evidence before the court indicates that although some of the complaints could not be substantiated, the independent investigator *did* substantiate several of

the complaints, and also identified that Watson had violated certain policies. *See* Krincek decl., ECF No. 165-4 at ¶¶ 14, 15, 16. Therefore, even if all of the anonymous complaints were from Abernathy, which is not alleged by Watson, only *some* of the complaints were unsubstantiated. It is also unclear what evidence Watson would present to support her argument that the complaints were "lies, fabrications, exaggerations, and misleading" because the complaints were anonymous. Further, the Ninth Circuit has held that this sort of conduct, as alleged by Watson, is neither severe nor pervasive. *See Surrell*, 518 F.3d at 1109 (holding that the plaintiff's claims that a supervisor lodged false accusations against her and publicly reprimanded her was not severe or pervasive); *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 643 (9th Cir. 2004) (finding that plaintiff's allegations that her supervisor made "continual, false" accusations against her was not severe or pervasive to support a hostile work environment claim).

Next, it is unclear how Abernathy—Watson's subordinate—could be responsible for "the outside investigations which took place in a manner which was unusual and disparate; the failures to take Dr. Watson's reports of discrimination seriously; and the pretextual termination." ECF No. 233 at 18.  Indeed, Watson fails to point to any evidence in the record as to how Abernathy would be or could be responsible for the outside investigations, nor the outcome of those investigations. Instead, Watson seemingly attempts to shoehorn her complaints against the City and impute them onto Abernathy. But it was the City that conducted the investigations into the complaints against Watson, not Abernathy.

Watson also fails to point to any admissible evidence in the record that Abernathy "directly participated" in the hostile work environment by encouraging the filing of false and frivolous claims against Watson. Although the record makes clear that Abernathy did file complaints, the only evidence suggesting that Abernathy encouraged others to "file anything" — regardless of whether it was "false or frivolous"—is a statement in a declaration from Captain Edward Tyndall. The statement reads "[t]here were discussions among [union] members that Kevin Abernathy was encouraging or furthering efforts by union members to file complaints

against the Chief." Tyndall decl., Pl.'s Ex. 74, ECF No. 234-6 at 3, ¶ 13. But that paragraph is unclear because Tyndall does not identify which union members said this, or how he knew about these discussions, or when these discussions alleged took place, or if he even heard these discussions or if he only heard of *others* discussing what they heard. As the identities of the union members are not disclosed, and it is unclear how he came to know about these discussions, this statement, as it is presented, is inadmissible hearsay and I cannot consider it. *See Terminalift LLC v. Int'l Longshore & Warehouse Union Local 29*, 34 F. Supp. 3d 1099, 1115 (S.D. Cal. 2013) (explaining that hearsay statements of unidentified individuals do not create a genuine issue of material fact). Additionally, the record shows that Krincek investigated whether Abernathy was encouraging others to file complaints against Watson and could not find anyone who had firsthand knowledge of this conduct to corroborate Watson's claim. Investigation rep. regarding union retaliation, Pl.'s Ex. 27, ECF No. 165-27 at 7. When Krincek asked Watson how she heard about these allegations and who told her that Abernathy was engaging in this behavior, Watson *refused* to identify sources, despite being asked multiple times. *Id.* Consequently there is no admissible evidence in the record to support that Abernathy engaged in any coordinated scheme to file complaints against Watson. Without any admissible evidence demonstrating that Abernathy encouraged union members to file complaints against Watson, the court is only left with the allegation that Abernathy called Watson a "Black bitch." ECF No. 233 at 17. To support this allegation, Watson points to the Tyndall declaration where he stated, "[d]uring [a] rant, Sgt. Abernathy made the statement about a 'Black bitch' in reference to the Chief." ECF No. 234-6 at 4, ¶ 17. Although not wholly clear, looking at the evidence in the light most favorable to Watson, it appears Tyndall was present during this alleged rant. Taking the allegation as true, filing a handful of complaints and one isolated incident that Abernathy called Watson a Black bitch, although wholly inappropriate, does not give rise to a hostile work environment as a matter of law. *See Ellison*, 924 F.2d at 876 (the "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee is not, by itself, actionable[.]") (quoting

*Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986); *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1110 (9th Cir. 2000) (finding that one instance of being called a "castrating bitch" did not give rise to a hostile work environment). Therefore, even if Watson had properly plead a § 1981 hostile work environment claim—which she did not—there is no admissible evidence in the record to support such a finding.

I now analyze Watson's claim, as pled, that she was deprived of her property rights and liberty interests under § 1981. Section 1981 prohibits race discrimination in the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Flores v. City of Westminster*, 873 F.3d 739, 752 (9th Cir. 2017). A claim brought under § 1981, therefore, must initially identify an impaired "contractual relationship," under which the plaintiff has rights. *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006) (quoting 42 U.S.C. § 1981(b)). Watson's SAC alleges that she has a property right and a liberty interest in her employment with the City. ECF No. 223 at ¶¶ 300–17.

Abernathy first argues that Watson has failed to identify a protected property interest. ECF No. 229 at 13. Specifically, Abernathy argues that Watson was an at-will employee by law and that the Supreme Court has held that "government employment, in the absence of legislation, can be revoked at the will of the appointing officer." ECF No. 229 at 13; *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 606 (2008) (quoting *Cafeteria & Rest. Workers v. McElroy*, 367 U.S. 886, 896 (1961)). Abernathy surmises that because Watson was an at-will employee, she could not have had a property interest in her job. ECF No. 229 at 13. Watson does not directly respond to this argument.

"If under state law, employment is at-will, then the claimant has no property interest in the job." *Portman v. Cnty. of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993). In Nevada, all employees are presumed to be at-will. *Am. Bank Stationary v. Farmer*, 799 P.2d 1100, 1101 (Nev. 1990). An employee can rebut this presumption by "proving by a preponderance of the evidence that there

was an express or implied contract between his employer and himself that his employer would fire him only for cause." *Id.* at 1101–02 (citing *Bally's Grand Employees' Credit Union v. Wallen*, 779 P.2d 956, 957 (Nev. 1989)). The record does not provide any evidence that the City could only fire Watson for cause. Therefore, even evaluating the evidence in the light most favorable to Watson, it supports that she was an at-will employee and that she did not have a property interest in her employment.

Watson's claim that she has a liberty interest in her employment fails for the same reasons it did in my prior order granting summary judgment in favor of both the City and Abernathy, which is incorporated herein by reference. *See* Order, ECF No. 221 at 23–24, 26–27. Indeed, Watson's claim against Abernathy in the SAC is identical to her claim against Abernathy in the FAC. *Compare* SAC, ECF No. 223 at ¶¶ 309–14, *with* FAC, ECF No. 93 at ¶¶ 219–24. Despite this, Watson's SAC does not cite any additional evidence, nor provide any new evidence, indicating there is a genuine issue of material fact as to whether Watson had a liberty interest in her employment. Therefore I find that she has no liberty interest in the job for the same reasons I made this conclusion in my prior order.

Even if Watson had identified a liberty interest or property right in her contract, Abernathy argues that "as a subordinate employee, Defendant Abernathy had no effect or control over Watson's claimed liberty interest in future employment as he had no power to terminate her employment, negotiate circumstances of her employment or any other minutia related to her position as Chief of Police with the City of Henderson." ECF No. 229 at 16. In response, Watson argues that "subordinate employment is not a defense to liability" because

> Courts have concluded that a subordinate employee with an unlawful motive may be individually liable for intentionally causing the employer to take an adverse employment action against a fellow employee. Such individual liability flows from the "cat's paw" theory of employer liability, under which the employer can be liable "when a biased subordinate who lacks decision-making power uses the formal decision-maker as a dupe in a deliberate scheme to trigger a discriminatory employment action.

ECF No. 233 at 21 (citing *Smith v. Bray*, 681 F.3d 888, 899 (7th Cir. 2012)). However, Watson's own argument acknowledges that the "cat's paw theory" can be used to demonstrate **employer** liability, not the employee. *See Baker v. UPS*, 2024 U.S. App. LEXIS 30874, at *5 (9th Cir. Dec. 6, 2024) ("But if an employer takes an action 'for reasons unrelated to the supervisor's original biased action,' as proven by the employer, 'then the employer will not be liable.'" (citing *Staub v. Proctor Hosp.*, 562 U.S. 411, 417 (2011)). Therefore, although Watson could hypothetically use Abernathy's alleged behavior to hold the City liable, she cannot use the cat's paw theory to hold Abernathy himself liable.

The Ninth Circuit has held that the question of whether a subordinate can be liable for an employment action turns on whether the superior never would have made the decision "but for the subordinate's retaliatory conduct." *Lakeside-Scott v. Multnomah Cnty.*, 556 F.3d 797, 805 (9th Cir. 2009) (citing *Giltbrook v. City of Westminster*, 177 F.3d 839, 854 (9th Cir. 1999)). The record demonstrates that, after the City received complaints about Watson, it hired an independent investigator to assess the various complaints. ECF No. 165-4 at 4. The independent investigator "found Watson had violated various City policies, and [ ] recommended discipline, including termination, in [her] reports." *Id.* at 6. Additionally, Watson's termination letter shows she was terminated not only based on the complaints filed against her (only some of which can be tied to Abernathy), but also because of her lack of accountability, her inability to make changes, and her failure to follow directives; there is no evidence these latter reasons have anything to do with Abernathy. *See* Termination letter, Defs.' Ex. 36, ECF No. 166-1 at 2–3 ("I gave you time to make changes and bring the organization together, but unfortunately the police department only became more fractioned . . . . You refused to acknowledge your weaknesses and were unwilling to make changes to improve yourself as a leader. I specifically asked you what you could do to improve the relationship between PD management and the unions, and you said, 'nothing.' This was extremely concerning and unacceptable to me . . . . *I saw no effort on your part to improve your*

*leadership style or follow my guidance over the last eight months*, I have made the decision to terminate your employment as the Chief of Police." (emphasis added)).

The existence of the independent investigator's report and recommendation that Watson be terminated, and the explanation provided in the termination letter itself, eliminates "but for" causation as it relates to Abernathy's alleged actions. *See Lakeside-Scott*, 556 F.3d at 806 (finding no subordinate liability when the evidence demonstrates that the decision to terminate an employee was *independent* of the subordinate's conduct).

Consequently, Watson has not demonstrated that she had any contractual relationship upon which she has rights under § 1981. She therefore has not adequately demonstrated the first element of a § 1983 claim: a violation of her constitutional rights, or any rights created by a federal statute. As a result, her § 1983 claim against Abernathy fails so he is entitled to summary judgment on Watson's § 1983 claim against him.

### 2. *Abernathy is entitled to summary judgment on Watson's state law claims.*

As I did with the City, I exercise supplemental jurisdiction over Watson's state law claims against Abernathy. I address each claim in turn.

### a. *Watson's IIED claim against Abernathy fails.*

Watson also brings an IIED claim against Abernathy. ECF No. 223 at ¶¶ 318–23. Abernathy argues that Watson's claim fails because Watson has not identified any of his conduct that was "extreme and outrageous." Watson argues that Abernathy's conduct was extreme and outrageous because he "sought out members of HPD to file complaints in what was recognized by Ellington as targeting when [Ellison] admitted the union was in a "full out war" with her, was "skew[ing] things," and was on a "mission" to file complaints and "take things out of context." ECF No. 233 at 24. Watson provides no authority to support that seeking out others to file complaints against a person is "extreme and outrageous behavior." *See Robello v. Mandalay Corp.*, 2017 U.S. Dist. LEXIS 36221, at *12–13 (D. Nev. Mar. 14, 2017) (applying Nevada law and

stating that a jury could find that a coworker's groping of plaintiff's breast was extreme and outrageous); *Dubric v. A Cab, LLC*, 2016 U.S. Dist. LEXIS 170776, at *25–26 (D. Nev. Dec. 8, 2016) (applying Nevada law and explaining that a jury could find two instances of unwanted and forceful kissing "extreme and outrageous"); *J.W. v. Clark Cnty. Sch. Dist.*, 2022 U.S. Dist. LEXIS 168564, at *34–35 (D. Nev. Sept. 19, 2022) (applying Nevada law and holding that a triable issue of material fact existed as to whether beating a child with a stick, forcing the child inside a cabinet enclosure, and forcing a child to sleep under a desk is "extreme and outrageous"). Evaluating the evidence in the light most favorable to Watson, I do not find this alleged behavior meets the high bar to be deemed "extreme and outrageous" nor is it "outside the bounds of decency." *Abrams v. Sanson*, 458 P.3d 1062, 169 (Nev. 2020); *see also Go v. Clark Cty.*, 2021 U.S. Dist. LEXIS 188811, at *8–9 (D. Nev. Sept. 30, 2021) (applying Nevada law and finding that "denying [plaintiff's] disability, forcing her to work without accommodations, berating her, and issuing writeups against her" was not IIED as a matter of law); *Candelore v. Clark Cnty. Sanitation Dist.*, 975 F.2d 588, 591 (9th Cir. 1992) ("Liability for emotional distress will not extend to 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.'" (citing Restatement (Second) of Torts § 46 cmt. d (1965))). Further, although Watson insists that "[e]vidence indicates [Abernathy[10]] was a key player in a purposeful scheme to undermine her authority and prevent her from adequately performing her job duties," she does not cite to or describe any evidence to support her allegations. ECF No. 233 at 24. Because Watson fails to provide any evidence to support her allegations, Abernathy is entitled to summary judgment on Watson's IIED claim. *See Shoen v. Amerco, Inc.*, 896 P.2d 469, 477 (Nev. 1995) (denying summary judgment on IIED claim when the **evidence** indicated the defendant assaulted and threatened the plaintiff, admitted to litigating the lawsuit to harass the plaintiff, and knew that termination would cause the plaintiff extreme distress) (emphasis added); *Dillard Dep't Stores, Inc. v. Beckwith*, 989 P.2d 882,

---

[10] The statement in Watson's reply says "[e]vidence indicates **Plaintiff** was a key player in a purposeful scheme to undermine her authority and prevent her from adequately performing her job duties. I assume the referral to Plaintiff instead of Abernathy is an error and I construe "plaintiff" as "Abernathy."

1  886 (Nev. 1999) (denying summary judgment on IIED claim when the **evidence** demonstrated

2  that defendant admitted to plaintiff that she was demoted because of her worker's

3  compensation claim, employees openly speculated about the demotion, and complaints about

4  her harmful work environment were ignored).[11]

          **b.**   *Watson's aiding and abetting defamation claim against*
                *Abernathy fails.*

7         Watson argues that Abernathy is liable for aiding and abetting defamation. ECF No. 223

8  at ¶¶ 351–55. Because Watson does not allege that Abernathy made defamatory statements,[12]

9  whether Abernathy can be found to have aided and abetted defamation turns on whether the

10 City engaged in defamation. Because Watson does not meet her burden to demonstrate that the

11 City engaged in defamation, Watson fails to demonstrate that Abernathy aided and abetted said

12 defamation. *See Emmanuel v. King Cty.*, 2020 U.S. Dist. LEXIS 152320, at *34–35 (W.D. Wash. Aug.

13 21, 2020) (holding that a defendant is entitled to summary judgment on aiding and abetting

14 defamation if a plaintiff cannot demonstrate that the underlying statements are defamatory).

15 Abernathy is entitled to summary judgment on the aiding and abetting defamation claim.

16        Watson has not met her burden in demonstrating that there is a genuine issue of

17 material fact as to any of her claims against Abernathy. As such, Abernathy's motion for

18 summary judgment is granted.[13]

---

[11] I note here that, unlike in *Dillard Dep't Stores*, where the record indicated that plaintiff's complaints about workplaces harassment were **not** investigated, the record here indicates that Watson's complaints were investigated. *See* ECF No. 165-4 at ¶ 11(o)–(q).

[12] Watson's complaint alleges defamation and libel claims against Abernathy. ECF No. 223 at 53. However, Watson's response to Abernathy's motion states that she has withdrawn these claims. ECF No. 232 at 25. Therefore, I do not address them.

[13] Because I grant summary judgment in favor of Abernathy, I consequently deny Watson's countermotion for "summary findings as a matter of law." *See* ECF No. 244.

**IV.    Conclusion**

IT IS THEREFORE ORDERED that Abernathy's motion to dismiss [ECF No. 229] is GRANTED.[14]

IT IS FURTHER ORDERED that the City of Henderson's motion for summary judgment [ECF No. 230] is GRANTED.

IT IS FURTHER ORDERED that Watson's countermotions for summary judgment [ECF Nos. 232, 233] are DENIED.

IT IS FURTHER ORDERED that defendants' motion to strike and joinder [ECF Nos. 246, 247] are DENIED.

The Clerk of Court is kindly directed to enter judgment accordingly, in favor of the City of Henderson and Kevin Abernathy, and to close this case.

Dated: March 27, 2025

_____
Cristina D. Silva
United States District Judge

---

[14] Granted as converted to a motion for summary judgment at n.1.